# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

MATTHEW POLLACK and )
JANE QUIRION, individually )
and as next friends of B.P., )
                       )
           Plaintiffs, )   Civil No. 2:13-cv-00109-NT
                       )
v. )
                       )
REGIONAL SCHOOL UNIT 75, )
BRADLEY V. SMITH, and )
KELLY ALLEN, )
                       )
           Defendants. )

## ORDER ON DEFENDANTS' MOTION TO DISMISS

Before the Court is the Defendants' motion to dismiss Counts II through X of the Plaintiffs' amended complaint. Defs.' Mot. to Dismiss Counts II-X of Pls.' Am. Compl. (ECF No. 17) ("**Mot. to Dismiss**"); Pls.' Am. Compl. (ECF No. 14) ("**Am. Compl.**"). For the reasons stated below, the Court **GRANTS** the motion in part and **DENIES** the motion in part with respect to Defendant RSU 75, **DENIES** the motion with respect to Defendant Bradley Smith, and **GRANTS** the motion in part and **DENIES** the motion in part with respect to Defendant Kelly Allen.

## FACTUAL ALLEGATIONS

The Plaintiffs, Matthew Pollack and Jane Quirion, individually and as next friends of their son, B.P., make the following allegations in their Amended

Complaint.[1]  B.P. is a fourteen year-old boy who has been diagnosed with autism, mental retardation, and Landau-Kleffner Syndrome. Am. Compl. ¶ 2.  He is non-verbal. Am. Compl. ¶ 17.  Although he recognizes several words by sight, he cannot read or follow written directions. Am. Compl. ¶ 19. Because of his neurological disorders, B.P. cannot convey accurate information about events in his life to other people. Am. Compl. ¶ 18.

B.P. attends public school in Regional School Unit Number 75 ("**RSU 75**" or the "**District**"). Am. Compl. ¶¶ 1, 4, 9, 22. Although he is a happy, well-behaved child, he requires constant adult supervision and cannot participate in the District's regular curriculum. Am. Compl. ¶¶ 4, 21, 24. For the past several years, B.P. has been educated according to an "individualized education plan" ("**IEP**") developed under the Individuals with Disabilities Education Act (the "**IDEA**"), a federal law which mandates minimum standards in the provision of special education within states that accept certain federal funds. Am. Compl. ¶ 21; *see also Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d 79, 84 (1st Cir. 2012) (describing the purpose and structure of the IDEA). The staff at RSU 75 prepares a daily written report to help keep Quirion and Pollack abreast of what B.P. is doing in school. *See* Am. Compl. ¶ 48.

In April of 2011, Quirion and Pollack requested that the District produce all records relating to them or B.P. Am. Compl. ¶ 26. School officials turned over most

---

[1]     For purposes of resolving the Defendants' motion to dismiss, the Court must accept the plausible allegations in the Amended Complaint and draw all reasonable inferences in the Plaintiffs' favor. *See Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

of the relevant records without protest, including e-mails between school staff about B.P. and his parents and lesson plans and tally sheets[2] from B.P.'s classroom activities. Am. Compl. ¶ 27. Six months later, in October of 2011, B.P.'s parents filed a request for an administrative due process hearing under the IDEA, challenging the manner in which the District had educated B.P. and alleging that the District failed to follow procedures imposed by state and federal law. Am. Compl. ¶¶ 28-29. In November of 2011, B.P.'s parents filed another request for B.P.'s education records. Am. Compl. ¶ 30. In contrast to its response to the parents' request in April, the District refused to turn over many of the documents. Am. Compl. ¶¶ 23, 30-32. In January of 2012, Quirion and Pollack negotiated a settlement of their due process claims with the District. Am. Compl. ¶ 34.

On February 9, 2012, conflict again developed. *See* Am. Compl ¶¶ 39-40. B.P.'s classroom teacher reported to school administrators that Quirion had been "spying" on a class field trip at the Topsham Public Library. *See* Am. Compl ¶¶ 39-40. Quirion learned of the report and e-mailed Patrick Moore, the District's Director of Special Services, and Kelly Allen, the District's autism consultant, refuting the teacher's version of events. *See* Am. Compl. ¶¶ 39-40, 42-43.

The afternoon of February 10, 2012, B.P. was alone with his classroom teacher for at least thirty minutes. Am. Compl. ¶ 44. When Quirion arrived at school to pick up B.P. at around 2:20 p.m., B.P. acted unusually and cried continuously for the next hour and a half. Am. Compl. ¶ 46. The District staff's daily

---

[2]     "Tally sheets" are records kept by ed techs that document a special education student's performance on specific tasks and programs in his or her educational program. *See* Am. Compl. ¶¶ 82, 230.

report did not mention B.P.'s distress, and no one at the school was able to explain adequately what had happened. Am. Compl. ¶¶ 48-53.

In the wake this incident, Quirion and Pollack submitted a formal request that the school replace B.P.'s classroom teacher, complaining that she was incompetent, unable to effectively communicate, and dishonest. Am. Compl. ¶ 54. Quirion also wrote a letter to Moore and the school principal on March 5, 2012, informing them that she would be placing a voice-recording device on B.P. whenever he was in school so that she could have some "semblance of peace that he is safe . . . ." Am. Compl. ¶¶ 54-64.

A day later, the District's attorney responded in writing. Am. Compl. ¶ 65. He informed Quirion: (1) that placing a recording device on B.P. would violate state anti-voyeurism statutes, school rules regarding student use of personal electronics, and the District's collective bargaining agreement; (2) that B.P. could attend school "only on the condition that he does not use an audio recording device during the school day"; and (3) that Quirion and Pollack's statements about B.P.'s classroom teacher constituted defamation per se, and that if they "continue[d] to engage in these false claims, [they] could face substantial exposure."[3] Am. Compl. ¶¶ 65-67. District attorneys later repeated their warnings that B.P. would not be allowed to attend school with a recording device and that B.P.'s parents might face defamation liability. Am. Compl. ¶ 71-73.

---

[3]     In August of 2012, B.P.'s former classroom teacher served Quirion and Pollack with a notice of claim alleging that they had defamed her. Am. Compl. ¶ 77.

On April 13, 2012, Quirion and Pollack lodged another formal records request. Am. Compl. ¶ 79. The District initially refused to turn over many of the types of documents it had provided in April of 2011. Am. Compl. ¶ 79-80. It later agreed to produce them only if Quirion and Pollack paid the District over $2,600. Am. Compl. ¶ 79-84.

In May of 2012, Pollack attended a school board meeting where a proposal to grant tenure to B.P.'s classroom teacher was on the agenda. Am. Compl. ¶ 86. Pollack planned to speak in opposition to the proposal during the meeting's public comment period. Am. Compl. ¶ 86. After arriving, he reviewed the printed guide distributed to attendees and noticed that it contained a policy stating that "[n]o complaints or allegations will be allowed at Board meetings concerning any person employed by the school system." Am. Compl. ¶ 87. Because of the policy, he decided not to speak, and the teacher was ultimately granted tenure. Am. Compl. ¶¶ 88, 91.

In June of 2012, the District agreed to assign B.P. a new classroom teacher. Am. Compl. ¶ 63. That same month, Quirion sent the District a formal request for accommodation under the Americans with Disabilities Act (the "**ADA**") asking that B.P. be allowed to carry a voice recording device so he could "tell" his parents about his day at school despite his communication disability. Am. Compl. ¶ 101. Although the District's attorney acknowledged receipt of the request, no response was given until August 30, 2012, when Quirion notified the District's attorney that she was treating the District's failure to respond as an implicit approval of her request. Am. Compl. ¶¶ 102, 104. The attorney begged Quirion's indulgence, but Quirion insisted

that she would be sending B.P. to school with a recording device. Am. Compl. ¶ 105. Moore responded that B.P. would not be permitted to come to school with the recording device. Am. Compl. ¶ 106.

On September 4, 2012, the first day of the 2012-2013 academic year, Moore met Quirion at the front door when she was dropping B.P. off for school in the morning. Am. Compl. ¶ 122. Moore asked Quirion if B.P. was wearing a recording device. Am. Compl. ¶ 123. Quirion responded that "the District would not find a recording device on B.P." Am. Compl. ¶ 123. At some point later that school day, Allen opened a pocket attached to B.P.'s shoe, found a novelty eraser and a folded note inside, and opened and read the note. Am. Compl. ¶¶ 125-28. Allen later claimed she had been looking for a key to the padlock on B.P.'s locker. Am. Compl. ¶ 128. Quirion and Pollack learned about the incident only when the District tried to use the content of the note as evidence against them at a due process hearing near the end of October of 2012.[4] Am. Compl. ¶¶ 130-143.

Eventually, school officials told Quirion that they would accommodate B.P.'s ADA request for a recording device by designing an improved daily report form, but the new form provided the same level of information as the previous form. Am Compl. ¶ 108. As a result of the District's refusal to let B.P. wear an audio recording device, B.P.'s parents have failed to learn about important incidents at school. Am.

---

[4]     Citing *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.,* 267 F.3d 30 (1st Cir. 2001), the Defendants ask the Court to consider a transcript of Allen's testimony during the IDEA due process hearing in which Allen explained why she looked into B.P.'s shoe pocket and described the contents of the note she found. Ex. A to Defs.' Reply Mem. (ECF No. 21-1). Under the general rule, "[c]onsideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment . . . ." *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993). The narrow exception set forth in *Alternative Energy* does not apply to a transcript of disputed testimony.

Compl. ¶¶ 109-110. For instance, in April of 2013, Quirion noticed unexplained bruises on B.P.'s forearms, which a doctor determined were consistent with grab marks. Am. Compl. ¶¶ 146, 154.

Although the District justified its recording prohibition by referencing a Maine anti-voyeurism law, the District allows other disabled students to use audio-recording devices during the school day without taking measures to protect the privacy of their peers. Am. Compl. ¶¶ 65, 120. District representatives have told Quirion and Pollack that the reason B.P. is treated differently is that B.P. and his parents want to monitor the behavior of school officials and employees, while the other students use recording devices for school-sanctioned purposes. Am. Compl. ¶ 121.

Since the fall of 2010, Quirion and Pollack have shared their concerns about the District with reporters and columnists for media outlets. Am. Compl. ¶ 162. They claim that they "have acted not only . . . to advocate for B.P. and his education, but also to inform the public of the District's actions and inaction and to advocate for the right of all students and parents to obtain information about the District's operations . . . ." Am. Compl. ¶ 165.

## PROCEDURAL HISTORY

In September of 2012, Quirion and Pollack filed a due process hearing request pursuant to the IDEA and Maine special education regulations seeking orders requiring the District to allow B.P. to carry a recording device during the school day and requiring the District to turn over certain records. Am. Compl.

¶¶ 135-36. A hearing officer held a full evidentiary hearing on Quirion and Pollack's due process hearing request. Am. Compl. ¶¶ 143-44. In an order issued in December of 2012, the hearing officer denied Quirion and Pollack's requests for relief. Am. Compl. ¶ 145.

The Plaintiffs filed this suit in March of 2013, Compl. (ECF No. 1), and then amended their complaint in May. Count I, which the Plaintiffs bring against the District, seeks judicial review of the due process hearing officer's decision under the IDEA. Am. Compl. ¶¶ 166-70; *see also* Attach. 1 to Am. Compl. 1 (ECF No. 1-1). Counts II through X assert various other claims against the District under the First, Fourth, and Fourteenth Amendments of the United States Constitution, Title II of the ADA, Section 504 of the Rehabilitation Act of 1973, and the IDEA. ¶¶ 171-241. Count II asserts a claim against Smith, and Counts II and V assert claims against Allen. *See* Am. Compl. ¶¶ 171, 191.

The Defendants' motion seeks the dismissal of Counts II through X under Federal Rule of Civil Procedure 12(b)(6). The Court held oral argument on the Defendants' motion on the morning of March 10, 2014. That afternoon, the Defendants filed notice alerting the Court to a recent First Circuit decision regarding standing, *Blum v. Holder*, No. 13-1490, 2014 WL 888918 (1st Cir. Mar. 7, 2014). Notice of Supplemental Authority 1 (ECF No. 26). The filing contends that the Plaintiffs lack standing to bring Count VII. Notice of Supplemental Authority 2. The Court sought and received additional briefing on the standing issue from both

parties. Notice (ECF No. 28); Pls.' Supplemental Mem. (ECF No. 30); Defs.' Supplemental Mem. (ECF No. 31).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires a civil complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "A 'short and plain' statement need[ ] only" provide "enough detail to" allow "a defendant 'fair notice of what . . . the claim is and the grounds upon which it rests.'" *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). However, a complaint cannot rest on legal conclusions or generic "the-defendant-unlawfully-harmed-me accusation[s]" alone. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). It "must contain enough factual material 'to raise a right to relief above the speculative level . . . .'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Twombly*, 550 U.S. at 555). *Cf.*, *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 365 (1st Cir. 2001).

Federal Rule of Civil Procedure 12(b)(6) permits a party to move to dismiss a complaint on the grounds that the plaintiff failed "to state a claim upon which relief can be granted." Dismissal under Rule 12(b)(6) is warranted only if a complaint fails to meet the limited notice pleading requirement imposed by Rule 8(a)(2). *Ocasio-Hernández*, 640 F.3d at 11-12.

Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint on the grounds that the court "lack[s] . . . subject-matter jurisdiction" to hear the case because the plaintiff lacks standing. *See Blum,* 2014 WL 888918 at *4.

In assessing standing, the court must "accept as true all material allegations of the complaint" and "construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "[I]n practice," the standard applied to determine standing "differs little from that used to review motions to dismiss" under Rule 12(b)(6). *Benjamin v. Aroostook Med. Ctr., Inc.*, 57 F.3d 101, 104 (1st Cir. 1995); *cf.*, *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 365 (1st Cir. 2001).

## DISCUSSION

### I.     IDEA Preemption

Before discussing the merits of the individual counts in the Amended Complaint, the Court addresses the Defendants' contention that Counts II, III, IV, VIII, IX, and X are preempted by the IDEA, codified at 20 U.S.C. §§ 1400-1482.

#### A.     The Governing Law

##### 1.     General Statutory & Regulatory Framework

The IDEA "is a comprehensive statutory scheme" passed by Congress to ensure that "all children with disabilities have available to them a free appropriate public education" ("**FAPE**"), and "that the rights of children with disabilities" and their "parents . . . are protected." 20 U.S.C. § 1400(d)(1)(A)-(B); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 58 (1st Cir. 2002).

A state that chooses to receive federal funds under the IDEA "must offer every disabled child within its jurisdiction a FAPE." *Sebastian M.,* 685 F.3d at 84; *see also* 20 U.S.C. § 1412(a)(1), (5). In order to provide a FAPE, a school must create an IEP for each disabled student and then follow it. *D.B. ex. rel. Elizabeth B. v.*

*Esposito*, 675 F.3d 26, 34 (1st Cir. 2012). The IEP is developed by a team composed of the student's parents and educators. 20 U.S.C. § 1414(d). If school officials and parents are not able to reach consensus about what the IEP should contain, the school officials make the ultimate determination. 05-071-101 Me. Code. R. § VI.2(I) (LexisNexis 2014); *see also* 20 U.S.C. §§ 1415(b)(3), 1415(c).

The IDEA "contains a panoply of procedural safeguards designed to assure that parents will have meaningful input into decisions that affect the education of children with special needs." *Frazier*, 276 F.3d at 58. For instance, school districts must allow parents "to examine all records" relating to the "provision" of their child's FAPE and their child's identification, evaluation, and educational placement. 20 U.S.C. § 1415(b)(1). The IDEA also requires states to allow students and parents to lodge formal complaints "with respect to any matter relating" to these topics. 20 U.S.C. § 1415(b)(6)(A).

If the parties cannot resolve the dispute, the student and parents have the right to demand a hearing by an impartial hearing officer. 20 U.S.C. §§ 1415(f)(1)(A), (B)(ii). The hearing officer may grant relief on substantive grounds if the school's services do not meet the IDEA's definition of a FAPE. 20 U.S.C. § 1415(f)(3)(E). The hearing officer may also grant relief if "procedural inadequacies" caused: (1) "the child's right to a [FAPE]" to be "impeded"; (2) "the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]" to be "significantly impeded"; or (3) "a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

A party dissatisfied with a hearing officer's decision may appeal it to a state court or a federal district court. 20 U.S.C. § 1415(i)(2)(A). The reviewing court "shall grant such relief as [it] determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).

### 2.    IDEA Preemption

The IDEA contains both a savings clause and an exhaustion clause. 20 U.S.C. 1415(*l*). The savings clause provides that "[n]othing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], title V of the Rehabilitation Act . . . , or other Federal laws protecting the rights of children with disabilities." *Id.* This is qualified by the exhaustion clause, which provides that, "before . . . filing . . . a civil action under such laws seeking relief that is also available under [IDEA]," a party must exhaust IDEA's due process hearing procedure "to the same extent as would be required had the action been brought under [IDEA]." *Id.* As a whole, § 1415(*l*) has two purposes: (1) "to ensure that the IDEA does not restrict rights and remedies" that are "independently available through other sources of law"; and (2) to ensure that parties channel IDEA disputes through the administrative procedure Congress crafted to handle them. *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006).

The First Circuit has explained that where a plaintiff's "underlying claim is one of violation of the IDEA," the plaintiff cannot use another federal statute "to evade" the IDEA's "limited remedial structure." *Diaz-Fonseca*, 451 F.3d at 29. More recently, the First Circuit clarified that where a "claim is 'independently available through other sources of law,'" the IDEA does not preempt that claim, *M.M.R.-Z. ex*

*rel. Ramirez-Senda v. Puerto Rico*, 528 F.3d 9, 14-15 (1st Cir. 2008) (quoting *Diaz-Fonseca*, 451 F.3d at 29). Plaintiffs are not "barred from bringing a non-IDEA claim alongside an IDEA claim" just because "there is *some* overlap between" them. *D.B.*, 675 F.3d at 39-40.

## B.  Application of the Law to the Claims in this Case

The Plaintiffs core IDEA claim, brought under 20 U.S.C. § 1415(i)(2)(A), is found in Count I. There, the Plaintiffs seek review of the state due process hearing officer's decision that the District did not violate the IDEA either by failing to turn over certain records or by denying the Plaintiffs' request that B.P. be allowed to record his school day.

The Defendants argue that the IDEA preempts Counts II, III, IV, VI, XIII, IX, and X, or that these claims are subsumed by Count I. In Count II, the Plaintiffs assert that the District, Moore, and Allen illegally retaliated against them for exercising their First Amendment rights when it denied them access to records, threatened them with legal liability, prohibited B.P. from using a recording device, and searched B.P. in September of 2012. In Count III, the Plaintiffs assert that the District illegally retaliated against them in the same ways for engaging in conduct protected by the Rehabilitation Act, a law that applies to recipients of federal funding and prohibits discrimination against disabled individuals. *See D.B.*, 675 F.3d at 39. In Count IV, the Plaintiffs assert that the District discriminated against them in violation of the Rehabilitation Act and the ADA, a disability discrimination law that applies to local governments, when it refused to let B.P. wear a recording device in school. They claim that the District failed to live up to an affirmative

obligation imposed by these laws to adopt reasonable modifications to existing policies, practices, and rules under certain circumstances. In Count IV, the Plaintiffs assert that the District burdened expression in violation of the First Amendment when it imposed the recording prohibition. Without the recordings, they argue, B.P. is unable to engage in a form of expression that would allow him to inform his parents about his school day. In Counts XIII through X, the Plaintiffs assert various additional claims for injunctive and declaratory relief.

In this section, the Court analyzes how the law of IDEA preemption applies to these claims, providing only cursory discussion of the substantive law that undergirds them. More rigorous discussion of the claims and their legal basis is provided in subsequent sections, where the Court analyzes the merits of Counts II, III, IV and VI.

### 1. Counts II & III: The Retaliation Claims

In both *D.B.* and *M.M.R.-Z.*, the First Circuit explained that, because retaliation claims rest on different proof than IDEA claims, they are not preempted by the IDEA. *D.B.*, 675 F.3d at 39-41 (Rehabilitation Act and First Amendment retaliation claims not preempted); *M.M.R.-Z.*, 528 F.3d at 14-15 (Rehabilitation Act retaliation claim not preempted). Accordingly, Counts II and III, which state claims of First Amendment retaliation and Rehabilitation Act retaliation, respectively, are not preempted by the IDEA.

### 2. Count IV: The Failure-to-Modify Claims

In a failure-to-modify claim brought under Title II of the ADA or the Rehabilitation Act, the plaintiff must show that the defendant's denial of a

14

requested modification prevented the plaintiff from "participat[ing]" in or enjoying the "benefits" of the defendants' "services, programs, or activities," or otherwise "subjected" the plaintiff to "discrimination." 42 U.S.C. § 12132; *Theriault v. Flynn*, 162 F.3d 46, 48 n.3 (1998). The plaintiff must also show that the requested modification was "reasonable." *See* 42 U.S.C. §§ 12131(2), 12132. By contrast, an IDEA claim requires a plaintiff to demonstrate that a school district failed to provide a disabled student a FAPE or committed an actionable procedural violation. 20 U.S.C. § 1415(f)(3)(E). An ADA or Rehabilitation Act failure-to-modify case is about whether discrimination occurred, while an IDEA case is about whether a school's special education services met a basic, minimum threshold set by statute. Because the Plaintiffs' failure-to-modify claims are based on different proof than their IDEA claim, they are not preempted.

### 3. Counts VIII, IX, and X: Additional Claims for Injunctive and Declaratory Relief

In Count VIII, the Plaintiffs seek an injunction under the IDEA requiring the District to turn over certain records. Am. Compl. ¶¶ 227-34. In Count IX, the Plaintiffs seek a declaration that the District's interpretation of the IDEA and its regulations regarding which records the District is required to turn over to Quirion and Pollack is incorrect. Am. Compl. ¶¶ 235-38. In Count X, the Plaintiffs seek a declaration that they have a right to record B.P.'s school day, whether under the IDEA, the ADA, the Rehabilitation Act, or the First Amendment. Am. Compl. ¶¶ 239-41.

The Defendants argue that these claims are preempted by the IDEA and must be dismissed. The Plaintiffs respond that they are simply seeking alternative relief and not circumventing the IDEA's remedial scheme. Given the Plaintiffs' clarification, the Court construes Counts VIII, IX, and the IDEA portion of Count X to be specific requests for relief pursuant to 20 U.S.C. § 1415(i)(2), the IDEA's civil action provision.

The Defendants' IDEA preemption argument fails as to the remainder of Count X, which is brought under Title II of the ADA, Section 504 of the Rehabilitation Act, and the First Amendment, via the Declaratory Judgment Act. As discussed above, the IDEA's savings clause specifically provides that "[n]othing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], or Title V of the Rehabilitation Act or any other laws protecting the rights of children with disabilities . . . ." 20 U.S.C. 1415(*l*).

In sum, the First Amendment retaliation claim stated in Count II, the Rehabilitation Act retaliation claim stated in Count III, the ADA and Rehabilitation Act failure-to-modify claim stated in Count IV, the First Amendment right-to-record claim stated in Count VI, and the claim for declaratory relief stated in Count X are not preempted by the IDEA. With the exception of Count X, the Defendants articulate other merits-based arguments as to why these counts should be dismissed. The Court analyzes these merits-based arguments below, along with the Fourth Amendment unreasonable search claim stated in Count V and the First

Amendment challenge of the District school board's commenting policy stated in Count VII. No further analysis is required as to Counts VIII and IX.

## II.    First Amendment Retaliation Claims

In Count II, the Plaintiffs claim that the District, Smith, and Allen illegally retaliated against them for asserting their rights under the First Amendment. They bring their claims under 42 U.S.C. § 1983. The Defendants assert that the Plaintiffs have failed to state a claim for relief against any of the Defendants.[5]

### A.    The Governing Law

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of people to peaceably assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. The Due Process Clause of the Fourteenth Amendment incorporates this prohibition to the states. *Gitlow v. New York*, 268 U.S. 652, 630 (1927). Section 1983 provides a cause of action to individuals who are "depriv[ed]" of "any rights, privileges, or immunities secured by the Constitution or U.S. law" by a "person"[6] acting "under color of" state law. 42 U.S.C. § 1983.

---

[5]    Without citation or argument, the Defendants also state that "[t]he individual defendants are . . . entitled to qualified immunity from liability for any alleged retaliatory actions." Mot. to Dismiss 6. Because the Defendants have not explained how the qualified immunity doctrine applies, the Court does not address the issue.

[6]    Local governmental bodies like school districts are considered "persons" for § 1983 purposes and therefore may be named as defendants in a § 1983 case. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690-91 (1978); *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989). A plaintiff bringing a § 1983 suit against a governmental body must establish not only that a constitutional violation occurred, but also that the violation resulted from either: (1) a policy or custom of the local governmental body, *see Monell*, 436 U.S. at 690-91; or (2) a discrete action taken by a local governmental body "policymaker," an official with the authority to make final decisions on

State actors, including both school districts and individual school officials, "offend the First Amendment when they retaliate against an individual for constitutionally protected speech." *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81 (1977). To establish a prima facie case of First Amendment retaliation, a plaintiff must show: (1) that "he or she engaged in constitutionally protected conduct"; (2) that "he or she was subjected to an adverse action by the defendant"; and (3) that "the protected conduct was a substantial or motivating factor in the adverse action." *D.B.*, 675 F.3d at 26. Regarding the second element, an adverse action in a First Amendment case is one that "viewed objectively . . . would have a chilling effect on [the plaintiff's] exercise of First Amendment rights," *Barton v. Clancy*, 632 F.3d 9, 29 & n.19 (1st Cir. 2011), or that "would deter a reasonably hardy person from exercising his or her constitutional rights." *D.B.*, 675 F.3d at 43 n.11. Regarding the third element of a First Amendment retaliation claim, "'temporal proximity . . . may serve as circumstantial evidence of retaliation.'" *Hannon v. Beard*, 645 F.3d 45, 49 (1st Cir. 2011) (quoting *Gayle v. Gonyea*, 313 F.3d 677, 683 (2nd Cir. 2002)).

### B.    Application of the Law to the Facts of the Case

Quirion and Pollack allege that they engaged in conduct protected by the Free Speech Clause or the Petition for Redress Clause of the First Amendment on at least four occasions: (1) when they filed a due process hearing request in October

---

the body's behalf. *Jett*, 491 U.S. at 737. The Defendants have not raised the municipal liability issue, so the Court does not address it.

of 2011; (2) when they filed a due process hearing request in September of 2012; (3) when they formally requested a new classroom teacher in February of 2012; and (4) when they formally requested a modification of school policies under the ADA in June of 2012. For purposes of their motion to dismiss, the Defendants assume that these actions constitute protected conduct. Mot. to Dismiss 7.

### a. Claim Against the District

The Plaintiffs assert that the District took several adverse actions against them because they engaged in protected activity. These actions fall into four general categories: (1) denying Quirion and Pollack access to certain educational records; (2) telling Quirion and Pollack that B.P.'s classroom teacher would sue them for defamation if they did not withdraw a petition seeking her replacement and suggesting to the teacher that she serve a notice of claim on them; (3) refusing to allow B.P. to attend school while carry a recording device; and (4) searching B.P. on the first day of the 2012-2013 school year. Am. Compl. ¶ 182. The Defendants argue that the Plaintiffs fail to sufficiently allege adverse action and causation. Mot. to Dismiss 7-11.

Although the Defendants state that refusing Quirion and Pollack access to educational records is not a cognizable adverse action, the only argument they make in support of this contention is a rehash of their preemption argument. *See* Mot. to Dismiss 8. Accordingly, the Court assumes for purposes of deciding the motion that this action was sufficiently adverse.

The only remaining question with respect to this allegation is whether the Plaintiffs' protected conduct was a substantial or motivating factor in the school

district's refusal to provide records. Here, the Plaintiffs have plausibly alleged that it was. When Quirion and Pollack requested B.P.'s educational records in April of 2011, the school district provided more or less everything they asked for, free of charge. But when they made similar requests in November of 2011 and April of 2012, school district officials either refused to provide many of the same types of records or agreed to provide them only if Quirion and Pollack paid a substantial sum of money. It is at least plausible that the due process hearing request the Plaintiffs lodged in October of 2011 played a motivating or substantial role in the District's change in behavior. Because the Plaintiffs' First Amendment retaliation claim survives under at least one of the adverse actions pled in the Amended Complaint, the Court need not determine whether the other adverse actions alleged would also support their claim.

### b.  Claim Against Allen

The Defendants correctly point out that the only allegation in the Plaintiffs' complaint that specifically mentions Allen is their charge that she searched B.P.'s person on the first day of the 2012-2013 school year. The Plaintiffs claim that Allen's alleged search of B.P. was an adverse action and that it was brought on by their protected conduct. The Defendants dispute both contentions.

Regarding the adverse action element, the question is whether Allen's conduct "would deter a reasonably hardy person" in the Plaintiffs' position "from exercising [their] constitutional rights." *D.B.*, 675 F.3d at 43 n.11. The Plaintiffs allege only that Allen opened a pocket on B.P.'s shoe and removed and read a note inside. While this intrusion appears relatively limited, objective reasonableness

inquiries are "generally not susceptible to resolution on a Rule 12(b)(6) motion." *Bonney v. Washington Mut. Bank*, 596 F. Supp. 2d 173, 179 (D. Mass. 2009). Furthermore, it is at least plausible that the prospect of facing an investigative search—or subjecting one's disabled child to an investigative search—might well chill a reasonably hardy person from engaging in protected expression. By a close margin, the Plaintiffs have plausibly alleged that Allen took adverse action against them.

The causation element is more straightforward. The Plaintiffs allege as protected conduct their request for a modification of school rules to allow B.P. to carry a recording device to school. Quirion reiterated this request on August 30, 2012, just five days before Allen allegedly searched B.P. This close "temporal proximity" supports an inference that Allen retaliated against the Plaintiffs because of their request. For these reasons, the claim against Allen survives the Defendants' motion to dismiss.

### c. Claim Against Smith

The only allegations in the Amended Complaint which implicate Smith by name relate to the District's refusal to turn over certain records to Pollack in June of 2012 and the search of B.P.'s pocket on September of 2012. With respect to the records request, the Plaintiffs allege that Smith played a personal role in partially denying it. This allegation survives for the same reasons described in the discussion of the Plaintiffs' First Amendment retaliation claim against the District. Since the Plaintiffs have a viable claim against Smith based on the District's June 2012

refusal to turn over records, the Court need not reach the issue of whether the allegations related to the September 2012 search also support a viable claim.

## III. Rehabilitation Act Retaliation Claim

In Count III, the Plaintiffs claim the Defendants illegally retaliated against them for asserting their rights under the Rehabilitation Act. The Defendants contend that the Plaintiffs have failed to state a claim for relief.

### A. The Governing Law

To make out a prima facie case of retaliation under the Rehabilitation Act, a plaintiff must establish: (1) that he or she engaged in conduct protected by the Rehabilitation Act; (2) that he or she "was subjected to an adverse action by the defendant," *D.B.*, 675 F.3d at 41; and (3) that the protected conduct was "the but-for cause" of the adverse action. *See Palmquist v. Shinseki*, 689 F.3d 66, 74 (1st Cir. 2012). Under the Rehabilitation Act, an adverse action is "one that might well dissuade a reasonable person from making or supporting a charge of discrimination." *D.B.*, 675 F.3d at 41.

### B. Application of the Law to the Facts of the Case

As the above recitation of the black letter law shows, there are some differences between retaliation claims brought under the First Amendment and retaliation claims brought under the Rehabilitation Act. However, the Defendants have not pointed to any meaningful distinctions in how these different bodies of law operate on the facts. Therefore, the Plaintiffs' Rehabilitation Act retaliation claim against the District survives for the same reasons their First Amendment retaliation claim against the District survives.

## IV.  ADA and Rehabilitation Act Failure-to-Modify Claims

In Count IV, the Plaintiffs claim that the District discriminated against B.P. when it refused to allow B.P. to bring a recording device to school to record his day. Plaintiffs bring overlapping claims under Title II of the ADA and Section 504 of the Rehabilitation Act. The Defendants argue that the Plaintiffs have failed to allege that they were discriminated against or denied a benefit of a public entity's services or programs and that their claim should therefore be dismissed.

### A.  Claim under Title II of the ADA

#### 1.  The Governing Law

Congress passed Title II of the ADA to ensure disabled individuals opportunities equal to those who are not disabled. *See* 42 U.S.C. § 12101(7)-(8). Section 202 of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. This prohibition places an affirmative obligation on public entities to make modifications to existing rules, policies or practices in certain circumstances. 42 U.S.C. § 12131(2) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets" a program's "essential eligibility requirements"); *Tennessee v. Lane*, 541 U.S. 509, 531-32 (2004) (citing to 42 U.S.C. § 12131(2) as the source of Title II's requirement that public entities make reasonable modifications for the disabled); *Toledo v.*

*Sanchez*, 454 F.3d 24, 39 (1st Cir. 2006) (same); 28 C.F.R. § 35.130(b)(7) (interpreting Title II to impose obligation to make reasonable modifications).

In a "reasonable modification" case, the plaintiff bears a burden of establishing: (1) that the defendant is a "public entity"; (2) that the plaintiff has a "disability"; (3) that the plaintiff is "qualified" to participate in or receive the benefits of the defendant's services, programs, or activities; (3) that the plaintiff informed the defendant of his or her disability and requested a modification of the defendant's rules, policies or practices (or that the plaintiff's disability and need for a modification was obvious); (4) that the requested modification was "reasonable"; (5) that the defendant nonetheless refused; and (6) that, as a result, the plaintiff was not able to "to participat[e] in" or enjoy "the benefits of the [defendant's] services, programs, or activities," or was otherwise "subjected to discrimination." 42 U.S.C. §§ 12102, 12131, 12132; *Kiman v. N.H. Dep't of Corr.*, 451 F.3d 274, 283 (1st Cir. 2006); *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 258 (1st Cir. 2001) (Title I "reasonable accommodation" case); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 265 (1st Cir. 1999) (Title I "reasonable accommodation" case); *Bercovitch v. Baldwin Sch. Inc.*, 133 F.3d 141, 152 (1st Cir. 1998) (Title III "reasonable modification" case).[7]

---

[7]     The First Circuit has held that "reasonable accommodation" cases brought under Title I of the ADA, which protects against discrimination by private and state and local government employers, are persuasive authority in Title II "reasonable modification" cases. *Kiman,* 451 F.3d at 283 n.9. The logic of that holding applies with equal force to "reasonable modification" cases brought under Title III of the ADA, which protects against discrimination in places of public accommodation. *Compare* 42 U.S.C. §§ 12111, 12112 (applicable provisions of Title I) *with* 42 U.S.C. §§ 12181, 12182 (applicable provisions of Title III).

The sixth element is derived from three distinct clauses in Title II's core anti-discrimination provision: (1) a "participation" clause, which protects the disabled from being "excluded from participation in . . . the services, programs, or activities of a public entity"; (2) a "benefits" clause, which protects the disabled from being "denied the benefits of the services, programs, or activities of a public entity"; and (3) a "catch-all" clause, which protects the disabled, without qualification, from being "subjected to discrimination" by a public entity. *See* 42 U.S.C. §12132. The "catch-all" clause can fairly be read to cover discrimination against a recipient of "services, programs, or activities" offered by a public entity. A plaintiff's allegation of discrimination by a public entity can therefore survive a motion to dismiss even if the alleged conduct does not fit within the participation clause or the benefits clause. *See Currie v. Grp. Ins. Comm'n*, 290 F.3d 1, 6-7 (1st Cir. 2002); *Parker v. Universidad de P.R.*, 225 F.3d 1, 5 (1st Cir. 2000); *Kelley v. Mayhew*, No. 1:12-cv-00390-NT, 2013 WL 5347718, at *5 (D. Me. Sept. 23, 2013).

### 2.     Application of the Law to the Facts of the Case

There is no dispute that the District is a public entity, that B.P. has a disability, that B.P. is qualified to attend public school, that B.P.'s parents requested a modification of school rules on his behalf, or that the District denied the request. The Defendants make no argument at this stage of the suit that the Plaintiffs' request was unreasonable as a matter of law. Instead, they contest only the sixth element: that refusing B.P.'s request for a modification denied him the ability to participate in or enjoy the benefits of public education, or otherwise subjected him to discrimination by the District.

The Defendants do not support this argument with citations to authority. Instead, they label the Plaintiffs' claim "attenuated," assert that Plaintiffs have failed to identify a "benefit" of public education, argue that the allegations are not plausible in light of the hearing officer's findings under the IDEA,[8] and ask for dismissal. *See* Mot. to Dismiss 13; Defs.' Reply Mem. 3 (ECF No. 21). By focusing on the Plaintiffs' purported failure to identify a "benefit" of public education denied to their son, they fail to explain why the more general catch-all clause does not apply. Their contention that the Plaintiffs' allegations "simply do not amount to plausible allegations that B.P. . . . has been subjected to discrimination" ignores the fact that a failure to accommodate a reasonable request to modify is *itself* a form of discrimination. Mot. to Dismiss 13; 42 U.S.C. § 12101(a)(5); *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 588 (1999). The Plaintiffs have alleged sufficient facts to state a plausible claim that the District denied a reasonable request to modify a school policy which, because of B.P.'s disability, prevents him from enjoying the same quality of public school services as his non-disabled peers.

## B.    Claim under Section 504 of the Rehabilitation Act

Whereas Title II prohibits disability discrimination by public entities, Section 504 of the Rehabilitation Act prohibits disability discrimination "under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Except for this difference, the two statutes are "to be interpreted consistently," as Title II

---

[8]    The Defendants' use of the hearing officer's findings to rebut the plausibility of the allegations is misguided. At this stage, the Court limits itself to the four corners of the Amended Complaint and makes its determinations under the Rule 12(b)(6) standard. *Watterson*, 987 F.2d at 3. The contested findings of the hearing officer are not properly considered on a Rule 12(b)(6) motion to dismiss, especially in a case where the Court will be called on to review those very findings. See 20 U.S.C. § 2015(i)(2)(C)(iii).

was expressly modeled on Section 504. *Theriault*, 162 F.3d at 48 n.3. The Defendants do not dispute that the District receives federal aid. Accordingly, the analysis of the Plaintiffs' Title II failure-to-modify claim applies with equal force to their Section 504 claim. The facts plead as to Count IV are sufficient to survive a motion to dismiss.

## V.     Fourth Amendment Unreasonable Search Claim

In Count V, the Plaintiffs claim that Allen and the District violated the Fourth Amendment when Allen opened a pocket attached to B.P.'s shoe and opened and read a folded note she found inside. They bring their claim under 42 U.S.C. § 1983. The Defendants respond that Allen is entitled to qualified immunity and that the Amended Complaint fails to allege that the search[9] was unreasonable.

### A.     The Governing Law

#### 1.     Unreasonable Searches & Seizures

The Fourth Amendment provides that the federal government shall not violate "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Fourteenth Amendment extends this protection "to searches and seizures by state officers, . . . including public school officials." *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995).

A search takes place when a government official violates an individual's "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 361 (1967)

---

[9]     The Defendants also argue that Allen never conducted a search at all, but was just helping B.P. find a locker key. Mot. to Dismiss 16-17. At this stage of the suit, the Court accepts the Plaintiffs' plausible theory that Allen conducted a search for a recording device.

(Harlan, J., concurring), or "physical[ly] intru[des upon] a constitutionally protected area in order to obtain information." *United States v. Jones*, 132 S. Ct. 945, 951 (2012) (quoting *United States v. Knotts*, 460 U.S. 276, 286 (1983)) (internal quotation marks omitted). In assessing a Fourth Amendment challenge at the motion to dismiss phase, a court must accept the facts as alleged, drawing all inferences in the plaintiff's favor, and then, accepting those facts as true, determine if they constitute an unreasonable search or seizure. *See Sanchez v. Pereira-Castillo,* 590 F.3d 31, 44 n. 6 (1st Cir. 2009).

Two seminal Supreme Court cases govern Fourth Amendment challenges to searches in school settings: (1) *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), where the Court ruled on the constitutionality of an impromptu search by a public school official based on particularized suspicion that a law or school rule had been violated, *T.L.O.*, 469 U.S. at 341 (holding that search of student's purse for evidence related to alleged violation of smoking ban was reasonable); and (2) *Vernonia*, where the Court ruled on the constitutionality of a broad, suspicionless administrative search program in a public school, *see Vernonia* 515 U.S. at 652 (holding that program requiring student athletes to undergo drug urinalysis was reasonable).

Under *T.L.O.*, an impromptu search conducted by a public school official based on particularized suspicion that a law or school rule has been violated is reasonable if, "under all the circumstances": (1) the search is "justified at its inception"; and (2) the search as actually conducted is "reasonably related in scope to the circumstances which justified the interference in the first place." *T.L.O.*, 469

U.S. at 341 (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)) (internal quotation marks omitted); *see also Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375-76 (2009). The first prong is satisfied where there is a "moderate chance," *Safford*, 557 U.S. at 371, or there are "reasonable grounds for suspecting," that "the search will turn up evidence" of wrongdoing. *T.L.O.*, 469 U.S. at 341-42. The second prong is satisfied "when the measures adopted" to carry out the search "are reasonably related to [its] objectives . . . and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id.* at 342. In completing this analysis, courts must grant the "professional judgment" of school officials a "high degree of deference." *Safford*, 557 U.S. at 377.

Under *Vernonia*, the reasonableness of a suspicionless administrative search program conducted in a public school is determined "by balancing" the program's "intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Vernonia*, 515 U.S. at 652-52 (quoting *Skinner v. Ry. Execs.' Ass'n*, 489 U.S. 602, 619 (1989)); *accord Bd. of Ed. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 823 (2002). Courts undertaking this inquiry must consider three factors: (1) "the nature of the privacy interest upon which the search . . . at issue intrudes"; (2) "the character of the intrusion"; and (3) "the nature and immediacy of the governmental concern at issue, and the efficacy of [the] means for meeting it." *Vernonia*, 515 U.S. at 654, 658, 660. As applied in schools, this balancing test "permit[s] a degree of supervision and control that could not be exercised over free adults." *Id.* at 655-56.

### 2. Qualified Immunity

Where a plaintiff brings a § 1983 claim against an individual public official, qualified immunity may shield the official from both liability and litigation. *Bergeron v. Cabral*, 560 F.3d 1, 5 (1st Cir. 2009). Qualified immunity protects officials who "make reasonable but mistaken judgments about open legal questions," *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011), but not those who "should have known their conduct was unlawful." *Haley v. City of Boston*, 657 F.3d 39, 47 (1st Cir. 2011). "[C]ourts should evaluate claims of qualified immunity at the earliest practicable stage" of a lawsuit. *MacDonald v. Town of Eastham*, No. 13-1779, 2014 WL 944707, at *3-4 (1st Cir. Mar. 12, 2014).

An official is entitled to qualified immunity if the court determines that either: (1) "the facts alleged or shown by the plaintiff" do not "make out a violation of a constitutional right"; or (2) "the right" the plaintiff's suit is based on was not "'clearly established' at the time of the defendant's violation." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

Determining whether a right was "clearly established" entails two further inquiries. First, the court asks "whether 'the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Mosher v. Nelson*, 589 F.3d 488, 493 (2009) (quoting *Maldonado*, 568 F.3d at 269). This inquiry "focuses on the clarity of the law at the time of the alleged civil rights violation." *Maldonado*, 568 F.3d at 269. Second, the court asks "whether in the specific context of the case, 'a reasonable defendant would have understood that

his conduct violated the plaintiffs' constitutional rights.'" *Mosher*, 589 F.3d at 493 (quoting *Maldonado*, 568 F.3d at 269). This inquiry "focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." *Maldonado*, 568 F.3d at 269.

### B. Application of the Law to the Facts of this Case

#### 1. The Claim Against Allen

The Plaintiffs raise three theories as to how Allen's conduct violated B.P.'s Fourth Amendment rights: (1) that she initiated the search to enforce a rule that was itself unlawful, so the search could not have been "justified at its inception"; (2) that she did not have "reasonable grounds" to believe she would find a recording device inside the pocket on B.P.'s shoe, so it was unreasonable for her to open it and look inside; and (3) that she could not have found evidence related to a recording device inside a folded piece of paper, so removing and reading the note was not "reasonably related in scope to the circumstances" justifying the search. *T.L.O*, 469 at 341; *see also* Am. Compl. ¶ 125; Pls.' Opp'n 22-23 (ECF No. 18). The Defendants argue that it was not "clearly established" that Allen's actions violated the constitution under any of these theories, so the qualified immunity standard entitles Allen to dismissal. The Plaintiffs argue in response that *T.L.O.* and *Vernonia* provide clear rules of law and that a reasonable person in Allen's shoes could not have failed to appreciate she was violating the Fourth Amendment. Pls.' Opp'n 23-24.

With respect to the Plaintiffs' first theory—that Allen violated the Fourth Amendment by initiating a search based on a rule that was itself unlawful—the school's no-recording rule touches on murky, undeveloped areas of the law. *See supra* Part IV (discussion of Plaintiffs' failure-to-modify claims); *infra* Part VI (discussion of Plaintiffs' First Amendment right-to-record claim). It was by no means clearly established that the no-recording rule was unlawful, and a reasonable person in Allen's position could have assumed it was a valid rule.

With respect to the Plaintiffs' second theory—that Allen violated the Fourth Amendment by opening B.P.'s pocket—the Court agrees that *T.L.O.* likely governs. However, a reasonable person in Allen's position could have thought she had "reasonable grounds" to conduct a limited search of an exterior shoe pocket that could hold a recording device. Quirion told school officials five days before the search that B.P. would be attending school with a recording device. *See* Am. Compl. ¶¶ 104-105. The morning of the search, Moore asked Quirion if B.P. was carrying a recording device, and Quirion responded by saying that "the District would not find a recording device on B.P." Am. Compl. ¶ 123. Finally, a search of a pocket attached to a shoe is not particularly intrusive. The precise contours of the school search "reasonable grounds" and "reasonably related in scope" standards are not sufficiently clear that a reasonable person in Allen's position would necessarily have known whether opening the pocket on the shoe was unconstitutional. *See Safford*, 557 U.S. at 378.

With respect to the Plaintiffs' third theory—that Allen violated the Fourth Amendment by removing and reading the note in B.P.'s pocket—the unique features of this case make it difficult to even determine which Fourth Amendment standard applies. The Plaintiffs argue that *T.L.O.* provides the rule of law and that the search clearly violated its second prong, because Allen could not have found a recording device inside the note and the search therefore was not "reasonably related in scope to the circumstances which justified" it. *T.L.O.*, 469 U.S. at 341. The Court agrees with the Plaintiffs' factual premise, but not their legal conclusion. The fact that the note could not have contained a recorder or any evidence related to one is so obvious that it strains credulity to even characterize the second search as an extension of the first.

At the time Allen encountered the note, she had worked with B.P. for eight years. Am. Compl. ¶ 129. She was aware that he was nonverbal and therefore knew that he could not have written the note or been its intended recipient. Am. Compl. ¶¶ 17, 129. On these facts, it was not clearly established that removing and opening a note inside a pocket on B.P.'s shoe would even directly implicate *T.L.O.*, which involved a very different set of circumstances. It is not clear how *Vernonia* applies either. There, the Supreme Court outlined the balancing test to be applied to a drug-testing program, but also stated in more general terms that "when the government acts as guardian and tutor," the "relevant question is whether the search is one that a reasonable guardian and tutor might undertake." *Vernonia*, 515 U.S. at 665. This statement suggests that a more general, unbounded standard may

apply when a government official takes impromptu action to fulfill a "custodial and tutelary responsibility," *Vernonia*, 515 U.S. at 655; *see also Cady v. Dombrowski*, 413 U.S. 433, 441 (1973).[10] Given the uncertainty about what legal standards apply in such situations and how much latitude they allow educators, it would not be fair to say that a reasonable official in Allen's shoes would have known whether reading the note was a violation of B.P.'s Fourth Amendment rights. Allen is therefore entitled to qualified immunity and the charges against her in Count V are dismissed.

### 2. The Claim Against the District

The Plaintiffs argue that "to the extent that Allen was directed or requested to conduct the search by a member of the District's administration, the District is liable . . . for the damages" that ensued. Am. Compl. ¶ 204. They also ask the Court to infer that a member of the District's administration directed Allen to search B.P. Am. Compl. ¶ 133. The requested factual inference is plausible,[11] though the legal contention that precedes it—that the District is liable for any action encouraged by a member of its administration—is at best an imprecise statement of the law of § 1983 municipal liability. The Defendants failed to contest

---

[10]     In *Dombrowski*, the Court recognized the reasonableness of a search conducted by a police officer in order to carry out a "community caretaking" function "totally divorced from the detection" or "investigation" of wrongdoing, but did not explain the exact test or methodology it used to reach its conclusion. *Dombrowski*, 413 U.S. at 441. The Supreme Court has not again applied the community caretaking function doctrine and its reach and content remain "poorly defined." *MacDonald*, 2014 WL 944707, at *3-4.

[11]     Quirion told school officials five days before the search that B.P. would be attending school with a recording device. *See* Am. Compl. ¶¶ 104-105. The morning of the search, Moore asked Quirion if B.P. was carrying a recording device, and Quirion responded by saying only that "the District would not *find* a recording device on B.P." Am. Compl. ¶ 123 (emphasis added). It is plausible that school administrators informed Allen about these incidents and that she opened the pocket on B.P.'s shoe at their behest.

the issue, so the Court assumes for purposes of resolving this motion that the Plaintiffs' statement of the law is correct.

Regarding Allen's conduct in opening the pocket on B.P.'s shoe, the discussion of Counts IV and VI shows that the Plaintiffs have alleged sufficient facts to state a plausible claim that the recording prohibition violated the ADA and the First Amendment. If the prohibition was unlawful, then the initial search of the pocket on B.P.'s shoe might not have been "justified at its inception." *T.L.O.*, 469 U.S. at 341. Because the District is a municipality, not an individual, it cannot avail itself of the qualified immunity defense that shielded Allen. *See Walden v. City of Providence, R.I.*, 696 F.3d 38, 55 n.23 (1st Cir. 2010). The Plaintiffs' claim against the District survives on at least one basis, so the Court need not address the Plaintiffs' additional theories.

## VI.    First Amendment Right-to-Record Claim

In Count VI, the Plaintiffs claim that the District's recording device prohibition violates the First Amendment. They argue that the prohibition impinges both B.P.'s right to "tell" his parents about the events of his school day, including details that might paint school officials in a negative light, and his parents' rights to gather and receive information about government officials.

The Defendants articulate three different arguments for dismissal: (1) that the recordings the Plaintiffs seek to make have no communicative element, and are therefore not entitled to any First Amendment protection; (2) that the Plaintiffs' request to record implicates only private concerns, so First Amendment protections are not available in this context; and (3) that schools are nonpublic forums and the

District's refusal to allow unlimited, full-time recording of B.P.'s school day survives the standard applicable in such settings, as it is both reasonable and viewpoint-neutral. Mot. to Dismiss 20-24.

The cases interpreting the First Amendment create a kaleidoscope of tests which are narrowly applicable in different factual contexts. As one prominent constitutional scholar has observed, "it is not possible to comprehensively flowchart the First Amendment as a defined series of questions in a required sequential order." Erwin Chemerinsky, *Constitutional Law* § 11.1.3 (3d ed. 2006). The Defendants' motion does little to clarify which standards apply or why. For now, the Court lays out a general framework for assessing First Amendment challenges, discusses the law necessary to understand the Defendants' arguments, and then applies that law, tackling each of the Defendants' arguments in turn.

### A.  The General First Amendment Framework

Generally speaking, a First Amendment challenge proceeds in three steps. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). In the first step, the plaintiff bears the burden of "demonstrat[ing] that the First Amendment even applies" to the activity he or she claims is protected as expression. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). If the conduct or speech is protected, the court proceeds to the second step to analyze the context in which the expression took place and determine which First Amendment standard or standards apply. *See Cornelius*, 473 U.S. at 797. In the third step, the court assesses whether the government's justifications for restricting the conduct or speech satisfy the applicable standard or standards. *Id.*

**B.    Application of the General Framework to the Facts of the Case**

    **1.    Step One: Determining Whether the First Amendment "Even Applies"**

The Defendants' first argument—that the recordings the Plaintiffs seek to make do not implicate the First Amendment at all—requires analysis under the first step of the framework. The First Amendment "looks beyond written or spoken words as mediums of expression" and provides protection for a wide range of expressive activities. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569-70 (1995).  However, the Supreme Court has explicitly rejected the idea "that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *United States v. O'Brien*, 391 U.S. 367, 376 (1968).

Activities that are not intuitively expressive may implicate the First Amendment because they facilitate speech. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983) (state tax on ink and paper violated First Amendment); *Citizens United v. FEC*, 558 U.S. 310 (2010) (federal law prohibiting corporations from spending general treasury funds on campaign ads violated First Amendment). "Laws enacted to control or suppress speech may operate at different points in the speech process." *Citizens United,* 558 U.S. at 336-37.

The First Circuit found in *Glik v. Cunniffe* that the First Amendment encompasses a right to make audiovisual recordings of government officials working in public places, subject to restrictions normally allowed in public forums. *Glik v.*

*Cunniffe*, 655 F.3d 78, 82-84 (1st Cir. 2011). The court held that Glik, a member of the public but not the press, had a right to film an arrest in the Boston Common which he thought was excessively forceful. *Id.* "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'"[12] *Id.* (quoting *Mills v. Alabama,* 384 U.S. 214, 218 (1966)).

*Glik* seems to answer the Defendants' argument that the Plaintiffs' claim does not implicate the First Amendment *at all*. Like Glik, the Plaintiffs claim a right to make a recording needed to later express their message. While *Glik* may be distinguishable because it took place in a traditionally public forum and only involved the videotaping of a single act of official abuse, these differences go to which First Amendment standard applies, not whether the First Amendment applies at all. At a minimum, *Glik* stands for the principle that producing a recording with a plan to share it with others can be a communicative act and carries at least some First Amendment protection.[13]

---

[12]     *Accord Am. Civil Liberties Union of Il. v. Alvarez*, 679 F.3d 583, 586 (7th Cir. 2012) (state law prohibiting audio-recording conversation unless all parties consent is content-neutral but likely fails First Amendment intermediate scrutiny); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing "First Amendment right to film matters of public interest"); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) (recognizing First Amendment protects a "right to record matters of public interest"); *Demarest v. Athol/Orange Cmty. Television, Inc.*, 188 F. Supp. 2d 82, 94-95 (D. Mass. 2002) (recognizing a "constitutionally protected right to record matters of public interest"); *Cirelli v. Johnston Sch. Dist.*, 897 F. Supp. 666, 665-69 (D.R.I. 1995) (teacher has right to film potential health hazard in school, subject to restrictions normally allowable in public employee speech cases); *Connell v. Town of Hudson*, 733 F. Supp. 465, 471-72 (D.N.H. 1990) (photojournalist has right to photograph car accident victim).

[13]     The Defendants do not clearly press any argument that this count should be dismissed to the extent Pollack and Quirion bring it as individual parents, as opposed to as next friends of B.P., so the Court does not address that issue.

### 2. Step Two: Determining Which First Amendment Standards to Apply

Because the Plaintiffs have alleged enough to make out a plausible claim that the recordings they seek to make would be communicative, the Court analyzes which First Amendment standards apply. The Defendants argue that the Court should allow the Plaintiffs to proceed only if they satisfy the "public concern" test. Even if the Plaintiffs can establish that their expression implicates a matter of public concern, the Defendants argue that the District's prohibition should only have to meet the relaxed "reasonableness" standard applicable in non-public forums.

Typically, the public concern test is applied in public employee speech cases and cases involving common law torts, such as defamation or libel.[14] There may be arguments in favor of applying the public concern test in cases involving the right to record[15] or in cases involving student expression at school.[16] There may also be arguments that the Court should apply the nonpublic forum standard to schools

---

[14] *See, e.g., Pickering v. Bd. of Educ. of Township High Sch. Dist. 205, Will Cty., Il.*, 391 U.S. 563 (1968) (public employee speech case); *Connick v. Myers*, 461 U.S. 138, 146 (1983) (same); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) (state tort case); *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) (same); *Snyder v. Phelps*, 131 S. Ct. 1207 (2011) (same).

[15] Federal appeals courts which have recognized a right to record have noted that the facts before them implicated matters of "public interest," though these courts did not apply or invoke the public concern test. *Glik*, 655 F.3d at 85; *Fordyce*, 55 F.3d at 439; *Smith v. City of Cumming*, 212 F.3d at 1333.

[16] *Tinker v. Des Moines Indep. Com. Sch. Dist.*, 393 U.S. 505 (1969) (striking down a rule banning students from wearing black armbands to protest the Vietnam War clearly involved a matter of public concern, but the Court did not apply the public concern test).

while they are in session, at least as to parents.[17] But as the Plaintiffs point out, there are also arguments that "the special characteristics of the school environment" require applying school-specific standards.[18] The parties have not adequately developed these theories and the Court is reluctant to adopt a standard without more detailed briefing. For purposes of resolving this motion, however, the Court may bypass the question, because the Plaintiffs' complaint makes out a plausible claim for relief even if the standards proposed by the Defendants apply.

### 3. Step Three: Applying, for Purposes of Motion to Dismiss, the Defendants' Proposed First Amendment Standards

#### a. "Public Concern" Analysis

Speech involves a matter of public concern if the speaker's "expression can fairly be considered to relate to 'any matter of political, social, or other concern to the community.'" *Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008) (quoting *Myers*, 461 U.S. at 146). To determine whether speech is of "public concern" or "private concern," the court must engage in a "case-specific, fact-dependent inquiry," examining the "'content, form, and context'" of the speech "as revealed by the whole record." *Id.* (quoting *Myers*, 461 U.S. at 147-48). No one factor is dispositive, but it is important to "evaluate all the circumstances of the speech," including "what was

---

[17]    *See, e.g.*, *S.H.A.R.K. v. Metro Parks Serving Summit Cty.*, 499 F.3d 553 (6th Cir. 2007) (detailed discussion of right of access issues); *Mejia v. Holt Pub. Sch.*, No. 5:01-cv-116, 2002 WL 1492205 (W.D. Mich. Mar. 12, 2002) (detailed discussion of the limitations of parents' rights of access to schools); Erwin Chemerinsky, *Constitutional Law* § 11.6.3 (3d ed. 2006) ("[C]reating a [First Amendment] right of access to government places and papers might be seen as better accomplished through statutes, such as freedom of information acts and open meeting laws, that can be drawn with specificity and balance competing interests.").

[18]    *See, e.g.*, *Tinker*, 393 U.S. at 513-14; *Bethel Sch. Dist. v. Fraser*, 478 U.S. 675, 682-86 (1986); *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988); *Morse v. Frederick*, 551 U.S. 393, 404 (2007).

said, where it was said, and how it was said." *Snyder*, 131 S. Ct. at 1216. Despite the fact-intensive nature of the public concern inquiry, it is made by the court as a matter of law. *See Davignon*, 524 F.3d at 100-101 & n.4.

The Plaintiffs cite *Cirelli v. Johnston Sch. Dist.*, 897 F. Supp. 663 (D.R.I. 1995) for the proposition that "the health and safety of [school] staff and students is a matter of public concern." *Cirelli*, 897 F. Supp. at 666. These kinds of categorical statements are not enough to win the day. *See Snyder*, 131 S. Ct. at 1216; *Davignon*, 524 F.3d at 100. That the expression at issue colorably touches on an important sphere of community life weighs in favor of a "public concern" determination, but it is not ultimately determinative.

Most of what B.P. seeks to record would probably not touch on weighty public issues. Much of it, one would assume, would be both personal and mundane. On the other hand, the District's prohibition is total: B.P. can *never* attend school with a recording device. Am. Compl. ¶¶ 66, 78, 106. The Plaintiffs have alleged that B.P. was unexplainably harmed at school on two occasions and that the District's daily reports do not always match the events that actually transpire during the day.[19] The school's prohibition deprives B.P. of a communicative tool which might allow him to shed light on these issues and confirm or dispel his parents' suspicions of abuse. While these issues are especially important to B.P. and his family, they are serious enough to implicate community concerns as well.

---

[19]    *See, e.g.*, Am. Compl. ¶¶ 43-53 (B.P.'s unexplained extreme distress on February 10, 2012); Am. Compl. ¶¶ 146-58 (unexplained bruises on B.P.'s arms on April 29, 2013); Am Compl. ¶¶ 122-134 (unreported search of B.P. by Allen on September 4, 2012); Am. Compl. ¶ 111 (unreported incident of B.P. wandering into lunch room by himself during 2010-2011 school year).

Additionally, though any recordings B.P. might make of his school day would likely only be played for his parents at home, B.P. depends on his parents to speak for him in the broader community. Further, the Plaintiffs have alleged that any abuses uncovered by recording B.P.'s school day would be used in a greater struggle to improve the quality of special education in the school district as a whole. *See* Am. Compl. ¶ 165. Allegations that they have been interviewed by members of the media about B.P.'s situation at school support this claim. Am. Compl. ¶ 163.

To the extent that the public concern test applies, the Plaintiffs have alleged enough to make out a claim that the District's total ban on B.P.'s audio-recording relates to a matter of political, social, or other concern to the community.

### b.    "Non-public Forum" Analysis

Regulations of speech in non-public forums "must be . . . both viewpoint neutral and reasonable to be constitutional." *Del Gallo v. Parent*, 557 F.3d 58, 72 (1st Cir. 2009). "The reasonableness of a regulation" in a non-public forum "is weighed 'in light of the purposes served by the forum.'" *Id.* (quoting *Ridely v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 82 (1st Cir. 2004)). Viewpoint neutrality "demands that the state not suppress speech where the real rationale for the restriction is disagreement with the underlying ideology or perspective that the speech expresses." *Ridley*, 390 F.3d at 82. A regulation is not viewpoint neutral if it "denies access to a speaker solely to suppress the point of view he espouses." *Cornelius*, 473 U.S. at 806.

Here, the Plaintiffs allege that the District has justified its restriction on B.P. by invoking the privacy interests of other students, but that it allows some of B.P.'s

peers to make recordings in school without taking any privacy precautions. Am. Compl. ¶¶ 65, 120. According to the Plaintiffs, District representatives have explained this disparate treatment by noting that B.P. and his parents "are seeking to monitor the behavior of school officials and employees, while the other students are recording for a school-sanctioned purpose." Am. Compl. ¶ 121. Accordingly, the Plaintiffs have plausibly alleged that the "real rationale" for the District's restriction is its "disagreement with the underlying . . . perspective" that B.P. and his parents plan to express. *Ridley*, 390 F.3d at 82. That smacks of viewpoint discrimination. *See id.* Assuming without deciding that the First Amendment standards which the Defendant identifies apply, Plaintiffs' Count VI survives.

## VII. First Amendment Challenge of School Board Meeting Commenting Policy

In Count VII, the Plaintiffs claim that a District policy prohibiting members of the public from making "complaints or allegations . . . concerning any person employed by the school system" during the public comment period of school board meetings violates the First Amendment and should be struck down. Am. Compl. ¶¶ 86-87. Though the Plaintiffs allege that the existence of the policy caused Pollack to self-censor his speech at one meeting in the past, the policy has never been enforced against the Plaintiffs and they seek only injunctive relief. Am. Compl. ¶¶ 88, 219, 226. The Defendants contend that the Plaintiffs have not plausibly alleged that the policy is unconstitutional and that the Plaintiffs lack standing to bring their challenge. Mot. to Dismiss 20-24; Defs.' Supplemental Mem. 1-6.

Because the Court finds that the Plaintiffs lack standing, the Court need not address whether Count VII otherwise states a claim for relief.

Article III of the United States Constitution restricts the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. Under this restriction, a party asserting federal jurisdiction carries the burden of establishing constitutional standing. *Blum,* 2014 WL 888918, at *4.

In a case like this one, involving a pre-enforcement First Amendment challenge of a statute or rule, a plaintiff seeking to establish standing must show that: "(i) she has suffered an actual or threatened injury in fact, which is (ii) fairly traceable to the statute [or rule], and (iii) can be redressed by a favorable decision." *Ramírez v. Sánchez Ramos*, 438 F.3d 92, 97 (1st Cir. 2006). An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). A plaintiff may satisfy the injury in fact requirement in the pre-enforcement context if she either: (1) "'allege[s] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute [or rule], and there exists a credible threat of prosecution,'" *Mangual v. Rotger-Sabat*, 317 F.3d 45 (1st Cir. 2003) (quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973)); or (2) "'is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences.'" *Id.* at 58 (quoting *N.H. Right to Life Political Action Comm. v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996))).

Mere "[a]llegations of a subjective 'chill'" cannot satisfy the injury in fact requirement. *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972). However, the precise standard that does apply is somewhat unclear in the wake of the Supreme Court's recent decision in *Clapper v. Amnesty International USA*, 133 S. Ct. 1138 (2013). Before *Clapper*, the First Circuit allowed pre-enforcement First Amendment challenges to go forward if the plaintiff could show she had an "objectively reasonable" fear of prosecution. *See, e.g.*, *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 48 (1st Cir. 2011); *Ramírez*, 438 F.3d at 99. But *Clapper* "may have adopted a more stringent injury standard," given its holding that a First Amendment suit premised on a fear of future injury survives only if the injury is "certainly impending." *Blum*, 2014 WL 888918, at *4; *see Clapper*, 133 S. Ct. at 1147. Under either standard, "a plaintiff must establish with specificity that she is 'within the class of persons potentially chilled.'" *Nat'l Org. for Marriage*, 649 F.3d at 47 (quoting *Osediacz v. City of Cranston*, 414 F.3d 136, 142 (1st Cir. 2005)).

The Plaintiffs allege that in May of 2012, Pollack attended a school board meeting where a proposal to grant tenure to B.P.'s classroom teacher was on the agenda. Pollack intended to voice his reservations about the teacher during the meeting's public comments period but decided not to after he received a pamphlet containing the board's policy. The Plaintiffs claim Pollack changed his mind for two reasons: (1) he was worried that the chairperson might deem his comments "'complaints or allegations,'" in violation of the policy, and declare him to be "disrupt[ing] . . . the meeting"; and (2) based on earlier threats leveled by RSU 75

attorneys, he was concerned that the District and the classroom teacher might sue him for defamation. Am. Compl. ¶ 88.

In their supplemental memorandum, the Plaintiffs make much of these earlier threats. Pls.' Supplemental Mem. 4. They may be relevant to the Plaintiffs' First Amendment retaliation claim, but they carry no water here. An injury is "fairly traceable" to a challenged statute or rule if it is "not the result of the independent action of some third party not before the court." *Lujan,* 504 U.S. at 660 (internal citations, quotation marks, brackets and ellipses omitted). Any injury caused by independent threats made by RSU 75 attorneys is not "fairly traceable" to the school board's public commenting policy.

Although the Amended Complaint alleges that the school board's policy "will continue" to "harm and injure" the Plaintiffs "into the future," Am. Compl. ¶¶ 225-26, the Plaintiffs fail to alleged any specific facts to support this claim. They make no claim that they plan to attend to future school board meetings to make critical comments about staff members. *Cf. Nat'l Org. for Marriage*, 649 F.3d at 47. Though they seek only an injunction to forestall future harm, their claim is essentially backward-looking, focusing on a single incident in the past. Their abstract claims that they will suffer harm and injury in the future, without specifying how, are the very types of conclusory allegations *Iqbal* and *Twombly* instruct district courts to set aside. The Plaintiffs' failure to demonstrate any ongoing harm or objectively reasonable fear of prosecution is fatal to their assertion that they have standing to bring this challenge.

## CONCLUSION

Regarding the Plaintiffs' claims against the District, the Defendants' motion to dismiss is **DENIED** with respect to Counts II, III, IV, V, VI, and X, but **GRANTED** with respect to Count VII. Counts VIII and IX are construed as alternate prayers for relief under Count I. Regarding the Plaintiffs' claim against Smith in Count II, the Defendants' motion to dismiss is **DENIED**. Regarding the claims against Allen, the Defendants' motion is **DENIED** with respect to Count II but **GRANTED** with respect to Count V.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 31st day of March, 2014.