## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| MATTHEW POLLACK and JANE QUIRION, individually and as next friends of B.P., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Docket No. 2:13-cv-109-NT |
| REGIONAL SCHOOL UNIT 75, et al., | ) ) ) | |
| Defendants. | ) ) ) | |

## ORDER ON PLAINTIFFS' IDEA APPEALS

Plaintiffs Matthew Pollack and Jane Quirion (the "**Parents**") are the parents of B.P., a sixteen-year-old boy who suffers from disabilities that greatly limit his ability to communicate. The Defendant named in the counts at issue, Regional School Unit 75 ("**RSU 75**" or the "**District**"), is the local educational agency responsible for making a free appropriate public education available to B.P. under the Individual with Disabilities Education Act (the "**IDEA**"), 20 U.S.C. §§ 1401-1491o.

The Parents challenge two decisions reached by Maine due process hearing officers ("**DPHOs**") under the IDEA. In the first, Case No. 13.107H, the DPHO declined to grant the Parents additional relief from the District's refusal to turn over certain documents, including internal e-mails about B.P., and declined to grant the Parents any relief from the District's refusal to allow B.P. to attend school with an audio recording device. In the second, Case No. 14.035H, the DPHO found that the District committed procedural but not substantive violations when it offered to bring

B.P. on weekly lunch outings individually rather than with his special education peers. The DPHO declined to grant an award of compensatory education.

For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** the Parents' request for relief with respect to Case No. 13.107H and **DENIES** the Parents' request for relief with respect to Case No. 14.035H.

## STATUTORY & REGULATORY BACKGROUND

Congress enacted the IDEA to ensure that all children with disabilities are provided a "free appropriate public education" ("**FAPE**"),[1] and to protect the rights of disabled children and their parents. 20 U.S.C. §§ 1400(d)(1)(A)-(B), 1401(9); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 58 (1st Cir. 2002). The "primary vehicle for deliver[ing]" a free appropriate public education is a child's "individualized education program" ("**IEP**"). *Lessard v. Wilton-Lyndeborough Coop. Sch. Dist.*, 518 F.3d 18, 23 (1st Cir. 2008). An IEP is a written statement that includes, among other things, measurable annual goals the child should be able to achieve and services the school

---

[1]    The IDEA defines the term "free appropriate public education" to mean "special education and related services" that

   (A) have been provided at public expense, under public supervision and direction, and without charge;

   (B) meet the standards of the State educational agency;

   (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and

   (D) are provided in conformity with the [disabled child's IEP].

20 U.S.C. § 1401(9).

will offer. 20 U.S.C. § 1414(d)(1)(A)-(B). The IEP must be developed by a team that includes the child's parents. *Id.*

In order to receive federal funding under the IDEA, a state must establish a due process hearing procedure to allow parents to challenge a child's special education programming. *See* 20 U.S.C. § 1415(b)(6), (f)(1)(A). A party "aggrieved" by the final state decision may bring a civil action challenging it in state court or federal district court. 20 U.S.C. § 1415(i)(1), (2).[2]

## Legal Standard

Section 1415(f)(3)(E) of the IDEA sets forth the following limitations on an IDEA DPHO's decision:

(i)     In general

Subject to clause (ii), a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education.

(ii)     Procedural issues

In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—

(I) impeded the child's right to a free appropriate public education;

---

[2]     Federal regulations require states to establish a separate "minimum state complaint procedure" to adjudicate IDEA violations as well. 34 C.F.R. §§ 300.151-153; *see also* 05-071-101 Me. Code. R. § XVI(1)(B), (4) (Maine's implementing regulations); 20 U.S.C. § 1221e-3 (statute governing Secretary of Education's general rulemaking authority). Under this procedure, a state's educational agency must allow parents to file a complaint regarding a suspected IDEA violation, conduct an independent investigation, allow the parties to submit additional information, and issue a written decision. 34 C.F.R. §§ 300.151-153; *see also* 05-071-101 Me. Code. R. § XVI(1)(B), (4). Federal regulations have allowed for this procedure, in various forms, since 1972. *See Beth V. ex rel. Yvonne V v. Carroll*, 87 F.3d 80, 82 (3d Cir. 1995).

(II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

(III) caused a deprivation of educational benefits.

(iii) Rule of construction

Nothing in this subparagraph shall be construed to preclude a hearing officer from ordering a local educational agency to comply with procedural requirements under this section.[3]

20 U.S.C. § 1415(f)(3)(E).

Clause (i) generally requires DPHOs to decide cases based on whether a school substantively denied a free appropriate public education. *See* 20 U.S.C. § 1401(9).[4] Under clause (ii), however, a DPHO may find that a procedural violation rises to the level of a denial of a free appropriate public education if it caused one of the types of harm laid out in roman numerals (I) through (III) of clause (ii).[5] The rule of construction found at clause (iii) appears to permit DPHOs to order local educational agencies to comply with IDEA's procedures even absent a finding that any violation rose to the level of a deprivation of a free appropriate public education.

---

[3]     Read in context, the quoted text uses the term "section" to refer to all of 20 U.S.C. § 1415 and the term "this subparagraph" to refer to 20 U.S.C. § 1415(f)(3)(E).

[4]     For instance, a DPHO may find that a child's IEP was not "appropriate," i.e. that it was not reasonably calculated to confer a meaningful educational benefit, *see* 20 U.S.C. § 1401(9)(C), *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 34 (1st Cir. 2012)), or that the local educational agency failed, in some material way, to implement the terms of the child's IEP. *See* 20 U.S.C. § 1401(9)(D); *S.D. v. Portland Pub. Schs.*, No. 2:13-cv-00152-JDL, 2014 WL 4681036, at *6 (D. Me. Sept. 19, 2014).

[5]     A DPHO who decides for a parent on procedural grounds under clause (ii) "nominally grants relief by concluding that the child did not receive a FAPE, but it is clear from the structure of the statute that this is not a decision on the substantive adequacy of the FAPE, but rather the label attached to a finding of procedural defect." *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 540 n.5 (Scalia, J., concurring) (citations omitted); *see also* H.R. Rep. No. 108-779, at 219 (2003) (explaining that the language found at clause (ii) "allows procedural violations to rise to the level of a substantive violation in certain circumstances").

4

Where a plaintiff *has* established a deprivation of a free appropriate public education, a DPHO may award compensatory education—monetary or injunctive relief to allow a disabled child to obtain services to make up for educational opportunities the local educational agency failed to provide. *See Mr. I. ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55*, 480 F.3d 1, 25 (1st Cir. 2007); *Diaz–Fonseca v. Puerto Rico*, 451 F.3d 13, 31 (1st Cir. 2006). Because compensatory education awards are equitable in nature, *Murphy v. Timberlane Reg'l Sch. Dist.*, 973 F.2d 13, 16 (1st Cir. 1992), hearing officers and courts have substantial discretion to decide when they are necessary. *Mr. I. ex rel. L.I.*, 480 F.3d at 25 (denial of compensatory award not abuse of discretion despite finding of substantive IDEA violation where DPHO concluded student's "pupil evaluation team" "could better assess what special education [the disabled child] needs at this point").

## Standard of Review

When a court hears a challenge of a DPHO's decision under the IDEA, it must receive the entire administrative record, hear additional evidence at the request of a party, reach a decision based on the preponderance of the evidence, and grant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The First Circuit has characterized this standard of review as falling "somewhere between the highly deferential clear-error standard and the non-deferential de novo standard." *Lessard*, 518 F.3d at 24. The court "essentially conducts a bench trial based on a stipulated record, but must nevertheless give due deference to the findings of the administrative hearing officer." *Sebastian M. v. King Philip Reg'l Sch. Dist.*, 685 F.3d

79, 85 (1st Cir. 2012) (internal citations, quotation marks, and brackets omitted).
Deference is more likely warranted where a finding is based on educational policy
judgments, *see Lessard*, 518 F.3d at 28-29, or credibility judgments. *See Sebastian
M.*, 685 F.3d at 86; *Doe ex rel. Doe v. Attleboro Pub. Schs.*, 960 F. Supp. 2d 286, 294-
95 (D. Mass. 2013). Deference is less likely warranted where the disposition hinges
on abstract questions of law. *See Lessard*, 518 F.3d at 24; *Abrahamson v. Hershman*,
701 F.2d 223, 231 (1st Cir. 1983).

## CASE NO. 13.107H

## Factual Background

I.      **B.P.'s Disability & Early Education**

B.P. is diagnosed with autism and a variant of Landau-Kleffner Syndrome, a
language disorder. R. 1040. He is nonverbal and has very limited expressive
communication skills. R. 1040, 1077. He cannot communicate his experiences to
others in detail or accurately answer questions about what has happened to him. R.
1040, 1077.

B.P. has been educated in the District since kindergarten. R. 1040. By the time
B.P. began attending Mt. Ararat Middle School, the relationship between B.P.'s
parents and District officials had grown tense. *See, e.g.,* R. 619-26, 1170; Nov. 17,
2014 Aff. of Patrick Moore ¶¶ 18-20 ("**Moore Decl.**") (ECF No. 84). In particular,
Quirion and Pollack grew dissatisfied with Teacher 1,[6] B.P.'s classroom teacher from

---

[6]      I refer to this individual as Teacher 1 rather than by name throughout this opinion because
she is the focus of personal, potentially embarrassing critiques by the Parents, the accuracy or fairness
of which are not directly at issue.

the fall of 2010 through the spring of 2012. R. 619-26. At times, Quirion showed up unannounced at field trips led by Teacher 1, causing consternation among District staffers. R. 1042. The parties resolved one series of disputes in a settlement reached in January of 2012, under which Quirion and Pollack agreed to release RSU 75 from liability for incidents arising prior to the agreement's effective date. R. 600-03, 627.

## II.     The Underlying Incident

On the morning of February 10, 2012, Pollack was meeting with Patrick Moore, RSU 75's director of special education, and Kelly Allen, B.P.'s case manager. R. 1041-42. During the meeting, Moore or Allen told him that Quirion had been "spying" on a community field trip to a public library led by Teacher 1. R. 1041-42. Pollack called Quirion immediately. R. 1041-42. She insisted she had simply gotten caught behind the school bus on her way to the grocery store. R. 1042. Later that morning, Quirion e-mailed Moore and Allen a scanned copy of her time-stamped grocery receipt to refute the accusation. R. 127-28, 1042.

When Quirion arrived at the end of the school day to pick up B.P., he burst into tears as soon as he got in the car and continued to cry for about an hour. R. 1043, 1143-44. Pollack and Quirion sought an explanation for B.P.'s aberrant behavior, but the school was unable to provide one. R. 131-33, 609-11, 1043-44, 1132, 1214-15, 1220-26, 1238-39. None of the staff members who worked with B.P. that day reported noticing anything unusual. R. 609-11, 1132, 1214-15, 1220-26. Quirion came to suspect there might be a connection between the accusation that she had been "spying" on the field trip and B.P.'s crying spell. R. 1144.

Following this incident, Pollack and Quirion submitted a formal request that Teacher 1 be replaced as B.P.'s classroom teacher. R. 619-26, 1044. The request included an eight-page narrative describing past instances that the Parents claimed demonstrated Teacher 1's dishonesty, incompetence, and inability to communicate. R. 619-26, 1044. The District responded with a letter from their attorney denying the classroom reassignment request and accusing Quirion and Pollack of violating the terms of the January settlement agreement. R. 627-28. On March 5, 2012, Quirion wrote school officials a letter withdrawing the reassignment request but also accusing the school of being "more concerned with protecting a teacher with a history of lying and retaliation" than "protecting a completely vulnerable child from that teacher." R. 629.

At this point, Pollack and Quirion stepped up their efforts to glean more information about B.P.'s day-to-day experiences at school. Their efforts proceeded on two main tracks: (1) requests for the District to allow them to inspect certain records, including all internal e-mails between District employees about B.P.; and (2) requests that the District allow B.P. to attend school with an audio recording device. The Court discusses these efforts separately below, though their timelines overlap.

## III.   Requests for Records

On April 13, 2012, Pollack and Quirion sent the District a letter requesting that they be allowed to inspect all of B.P.'s "education records," pursuant to the Family Educational Rights and Privacy Act ("**FERPA**"), 20 U.S.C. § 1232g, a law that protects the privacy and integrity of certain student records and grants parents the right to access and challenge their content. R. 588-89. The Parents asked that the

8

District "be sure to include," among other things, "[a]ll electronic or written communications between or among district employees or between a district employee or employees and another person or people, related in any way to [B.P.]." R. 588. An RSU 75 attorney responded that the internal e-mails and many of the other records the Parents sought were not "centrally maintained" and thus did not constitute "education records" under the FERPA. R. 668-69. The attorney wrote that the District would consider the Parents' letter as a request for "public records" under Maine's Freedom of Access Act, 1 M.R.S. §§ 400-414, and would not turn them over unless Quirion and Pollack paid the District $2,600, the amount the attorney estimated it would cost to gather them. R. 668-69.

On June 13, 2012, Pollack sent the District another request for records, this time also invoking the IDEA and the Maine Unified Special Education Regulation ("**MUSER**"), 05-071-101 Me. Code. R. §§ I-XIX & app. 1, a set of rules promulgated by the Maine Department of Education to implement the IDEA. R. 590-92. Among the classes of documents Pollack sought were "[a]ll electronic or written communication between or among district employees or between a district employee or employees and another person or people, related in any way to [B.P.]." R. 591.

On June 22, 2012, RSU 75 Superintendent Bradley Smith sent Pollack a preliminary response. R. 694-96. With respect to the requested electronic communications, Smith wrote that Pollack was not entitled to internal e-mails unless they were maintained as part of B.P.'s central file. R. 695. He further informed Pollack that the District would not turn over any additional e-mails unless Pollack

9

paid the District $2,600, as RSU 75's attorney had earlier specified. R. 695. Smith also stressed that certain e-mails were "privileged and confidential communications between the District and [its] attorneys." R. 695.

In July of 2012, the District turned over some of the records Pollack had identified in his June 22, 2012 records request. R. 580, 697. A cover sheet attached to the documents listed each of Pollack's requests and explained how the District was complying or why the District was not complying. R. 697. With respect to Pollack's request for electronic communications, the cover sheet provided as follows:

> OBJECTION: Electronic communications are not maintained in a centralized file/location or kept as part of a student's education records. Further, any attorney/client correspondence is privileged when made in anticipation of litigation as work product. Without waiving these objections, see attached correspondence between the district and its attorneys.

R. 697. The "attached correspondence" consisted of a handful of innocuous e-mails between the District and its attorneys about scheduling an IEP meeting. R. 418-21; *see also* Pls.' Mem. of Law on Merits of Count I of First Action 10 & n.7 ("**Parents' Case 13.107H Br.**") (ECF No. 89).

## IV.    Request to Make Audio Recordings

In the March 5, 2012 letter in which Quirion withdrew her classroom reassignment request, she also informed school officials that she planned to send B.P. to school with an audio recording device so she could "have a semblance of peace that he is safe . . . ." R. 629. An RSU 75 attorney sent Quirion a letter the following day informing her that the District would not allow B.P. to attend school with a recording device. R. 634-36. The letter claimed that permitting B.P. to record at school would

violate the District's personal electronics policies, a state wiretap statute, other students' personal privacy rights, and the school's collective bargaining agreement with its teachers. R. 634-36.[7]

On June 12, 2012, Quirion wrote a letter to Bill Zima, Mt. Ararat Middle School's principal, again requesting that B.P. be allowed to wear a recording device to school:

> Given [B.P.'s] communication disability, I formally request pursuant to the Americans with Disabilities Act of 1990 that the school provide a reasonable accommodation for [B.P.'s] communication disability by allowing him to carry and use a voice recording device so that I can review it daily for announcements and other information that the students are expected to convey to their parents, as well as for [B.P.] to be able to "tell" me about his day at school.

R. 689.

Moore acknowledged this letter in a July 14, 2012 e-mail to Quirion, assuring her that he would review her ADA request and schedule a time to meet. R. 698. Quirion wrote back the next day to say she would be willing to attend such a meeting but wanted to know the agenda ahead of time. R. 699. "If the point of a meeting is to ask me to withdraw my request, I will not withdraw it," she wrote. R. 699. It appears that no meeting took place. *See* R. 705-06.

On August 30, 2012, with a new school year about to start, Quirion e-mailed Moore and Zima to tell them that she would interpret their failure to respond as an implicit approval of her request. R. 705-06. Moore wrote back immediately to request

---

[7]      The letter suggested that the District would schedule an IEP meeting to discuss Quirion's concerns about B.P.'s safety. R. 635. By e-mail, Pollack responded that an IEP meeting would not be "the appropriate mechanism to address the issues here," which he asserted did not concern B.P.'s "behavior or education." R. 642.

that Quirion not send B.P. to school with a recording device. R. 705.[8] On September 1, 2012, Moore sent Quirion a letter reiterating the District's earlier objections. R. 710.

In the same letter, Moore offered to have B.P.'s educators include more information on a daily report the school provided the Parents each afternoon. R. 710.[9] Additionally, in December of 2012, the District agreed to add a term to B.P.'s IEP requiring RSU 75 employees who become aware of a problem with B.P. or a failure to comply with his IEP to inform Pollack and Quirion directly. *See* June 26, 2014 Decl. of Matthew Pollack ¶¶ 4-9 ("**Pollack Decl.**") (ECF No. 57-1).

## V.   Subsequent Events

The record, as supplemented by the parties after the due process hearing, also includes evidence concerning a number of subsequent events that Pollack and Quirion claim demonstrate the District's unwillingness or inability to provide them with complete and accurate information about B.P.'s experiences at school. For instance, on April 29, 2013, Quirion noticed bruises on B.P.'s arms after school. June 26, 2014 Decl. of Jane Quirion ¶ 4 ("**Quirion Decl.**") (ECF No. 57-2). B.P.'s daily report included no indication that he had been injured. Quirion Decl. ¶ 7. At the Parents' request, the District hired an attorney to investigate the incident, but the

---

[8]     Moore also informed Quirion that he wanted B.P.'s IEP team to meet to consider the issue. R. 706. Quirion wrote back that her request was "for a communication accommodation under the ADA," not "an education accommodation under the IDEA." R. 707.

[9]     The Parents contend that they actually received less information in B.P.'s daily reports in the wake of Moore's letter. Parents' Case 13.107H Br. 7-8 & n.6. *Compare* R. 156-170 (representative sample daily reports from before Moore's September 1, 2012 letter) *with* R. 171-80 (representative sample daily reports from after Moore's September 1, 2012 letter).

attorney was not able to determine the cause of the bruising. Quirion Decl. ¶¶ 12-15; Moore Decl. ¶¶ 11-13. In another instance, on September 12, 2013, B.P.'s sister told the Parents that she had seen B.P. sitting on a hallway floor with three or four other students at a time when his daily report indicated that he was in his classroom receiving instruction. Pollack Decl. ¶¶ 21-25; Moore Decl. ¶ 16. After Pollack e-mailed a number of District employees about the incident, Katie Anderson, B.P.'s special education teacher, wrote to explain that B.P. had been taking a short five-minute "motor break," as called for by his IEP. Moore Decl. ¶ 16.

### Procedural History

On September 11, 2012, Pollack and Quirion filed a due process complaint claiming that the District's refusal to turn over records and the District's denial of their request that B.P. be allowed to wear an audio recording device at school constituted procedural violations of the IDEA amounting to denials of a free appropriate public education. R. 1-7. The complaint outlined many of the events recounted above and sought an order "requiring the district to provide all records and information [the Parents] have requested" and an order "requiring the district to not interfere with [B.P.'s] right to wear a recording device during the school day." R. 3-7.

In the run-up to the due process hearing, Quirion and Pollack requested the DPHO issue a subpoena to Moore requiring him to produce, among other things, "all records (whether in electronic, documentary, or other format) relating in any way to [B.P.] (even if referencing another student) or his parents" and "all electronic or written communication between or among district employees or between a district

employee or employees and another person or people, related in any way to [B.P.] (even if referencing another student) or his parents." R. 56.[10] The District moved to vacate the subpoena. R. 70-80, 1001. The DPHO granted the Parents' first request "to the extent the requested document is not otherwise made confidential" and vacated the second request as duplicative. R. 915. The DPHO further indicated that the District could "redact" or "de-identify" documents "if appropriate." R. 915. According to the DPHO's subsequent decision, "[t]he school made no claim of confidentiality" and "produced approximately one thousand pages of documents" prior to the due process hearing. R. 1001.

The DPHO conducted a three-day hearing on October 29, October 30, and December 5, 2012 and issued a decision on December 29, 2012. R. 994-1006. With respect to the Parents' request for records, the DPHO denied relief on the basis that "[c]omplaints that a school has violated the provisions of FERPA are more properly resolved under the complaint and hearing process set forth in FERPA, rather than in the context of a special education due process hearing." R. 1001-02. As alternative grounds for his decision, the DPHO also concluded: (1) that his earlier order regarding the Parents' subpoena for records fully remedied any procedural violation, so no further order was warranted; and (2) that the Parents failed to establish that the District had significantly impeded their right to participate in the decision-making process concerning B.P.'s special education. R. 1002-04. With respect to the Parents'

---

[10]    The subpoena request was limited to documents created after January 26, 2012, the effective date of the prior settlement agreement between the Parents and the District. R. 56, 627.

14

request that B.P. be allowed to attend school with an audio recording device, the DPHO again denied relief on the grounds that the Parents failed to establish a significant impediment to their participatory rights. R. 1004-06.

The Parents subsequently appealed the DPHO's decision to this Court and moved to supplement the record with evidence concerning events that took place after the due process hearing. I granted the motion in part, allowing Pollack and Quirion to submit additional declarations and also permitting RSU 75 to submit responsive declarations.

## Discussion

## I.   Request for Records

### A.   Propriety of Reaching Merits in Light of FERPA Complaint Procedure

The DPHO's conclusion that the FERPA complaint procedure[11] provided the proper mechanism for resolving the Parents' request for records rests on an assumption that the phrase "all records," as it appears in the IDEA, *see* 20 U.S.C. § 1415(b)(1), has the same meaning as the phrase "education records," as it appears in FERPA. *See* 20 U.S.C. § 1232g(a)(4).

---

[11]    Under this procedure, a parent may file a written complaint regarding a suspected FERPA violation with the Family Policy Compliance Office (the "**FPCO**"), a subdivision of the U.S. Department of Education. 34 C.F.R. § 99.63. The FPCO is then empowered to investigate the complaint and determine whether a violation has occurred. 34 C.F.R. § 99.64(b); *see also* 20 U.S.C. 1232g(g) (providing statutory authority for complaint procedure). If the FPCO finds there has been a violation and the school fails to correct its conduct voluntarily, the Secretary of Education may withhold federal funds or initiate a hearing on whether further enforcement action should be taken. 34 C.F.R. §§ 99.66(c), 99.67(a); *see also* 20 U.S.C. § 1234e (providing statutory authority for cease and desist orders).

Under § 1415(b)(1) of the IDEA, local educational agencies must allow the parents of a disabled child "[a]n opportunity . . . to examine *all records* relating to such child . . . ." 20 U.S.C. § 1415(b)(1) (emphasis added). The IDEA does not define the phrase "all records," but the relevant legislative history suggests Congress intended it to be interpreted expansively. *See* H.R. Rep. 104-614, at 17 (1996) (explaining that the phrase "all records" was added to the IDEA, replacing the phrase "all relevant records," to "[e]nd[ ] the monopoly of schools on determining the relevance of information about a child" and to "require schools to make all records about a child available to the parents"). Though federal and Maine regulations promulgated under the authority of the IDEA use the FERPA phrase "education records," neither assert that "all records" and "education records" mean the same thing or even acknowledge the distinction. *See* 34 C.F.R. §§ 300.501, 300.611-613; 05-071-101 Me. Code. R. § XIV(3).

In contrast to the IDEA, FERPA offers protections to the parents of both disabled and regular education students. *See* 20 U.S.C. 1232g. Generally, FERPA requires schools and educational agencies that receive federal funding to allow parents to access their children's "education records," *see* 20 U.S.C. § 1232g(a), and to otherwise protect the confidentiality of such records. *See* 20 U.S.C. § 1232g(b). FERPA defines "education records" to mean "records, files, documents, and other materials which—(i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or

16

institution." 20 U.S.C. § 1232g(a)(4)(A).[12]  In *Owasso Independent School District v.*
*Falvo*, 534 U.S. 426 (2002)*,* the Supreme Court closely parsed this definition,
ultimately determining that peer-graded assignments in the hands of student graders
are not "education records" because they are not "maintained" by the school. *Id.* at
433. As Justice Kennedy wrote for the majority,

> The word "maintain" suggests FERPA records will be kept in a filing
> cabinet in a records room at the school or on a permanent secure
> database, perhaps even after the student is no longer enrolled. The
> student graders only handle assignments for a few moments as the
> teacher calls out the answers. It is fanciful to say they maintain the
> papers in the same way the registrar maintains a student's folder in a
> permanent file.

*Id.* The Court buttressed this narrow interpretation by looking to FERPA's structure.
Provisions allowing parents to challenge the content of their children's "education
records" and requiring schools to maintain a log of who had accessed "education
records" further suggested to the Court that the term was intended to refer to
institutional records kept in a single place. *Owasso*, 534 U.S. at 434-35; *see also* 20
U.S.C. § 1232g(a)(2), (a)(4)(A).

Against this statutory background, any assumption that FERPA's definition of
"education records" governs the scope of the IDEA's "all records" provision rests on
shaky ground. Section 1415(b) of the IDEA contains none of the text the *Owasso*
majority relied on to limit the reach of the phrase "education records," and the two
statutes serve substantially different purposes. While FERPA's definition of

---

[12]    This general description is narrowed by a number of specific exceptions. 20 U.S.C.
§ 1232g(a)(4)(B).

"education records," as interpreted by *Owasso*, is aimed at protecting the integrity and privacy of the central record that follows all students from grade to grade and school to school, the IDEA's "all records" provision is geared at providing the parents of disabled children with sufficient information to be active, informed participants in the development of their children's IEPs.

## B.  Relief Provided by Earlier Order

Because I disagree with the conclusion that FERPA's complaint procedure offered the proper venue to resolve the merits of the Parents' claim, I go on to examine the DPHO's subsequent determination that his pre-hearing subpoena order fully resolved the Parents' complaint.

As detailed above, the DPHO responded to the Parents' subpoena request by ordering the District to produce "all records . . . relating in any way to [B.P.]" "to the extent the requested document is not otherwise made confidential." R. 915, 1001. The DPHO later found that the District fully complied with his order when it turned over approximately 1,000 pages of documents. R. 1001.

The Parents assert that the evidence cannot support a finding that the District provided them with all the records to which they were entitled under the IDEA because the DPHO "did not require the District to identify any documents that it withheld under claim of confidentiality." Pls.' Reply Mem. on Merits of Count I of First Action 6 (ECF No. 106). I agree.

Although the DPHO wrote in his decision that the District made no claim of confidentiality, it is unclear on the record before me whether the District understood that it needed to make explicit any claims of confidentiality or privilege in order to

18

withhold documents. Accordingly, I order the District to take the following actions, as further detailed at the conclusion of this decision: (1) inform the Parents whether it withheld any records "related in any way to [B.P.]" when it responded to the Parents' subpoena on October 29, 2013; and (2) if so, produce a log that identifies and describes the withheld documents in keeping with the requirements laid out in Federal Rule of Civil Procedure 45(e)(2).

### C.   Significant Impediment to Parents' Participatory Rights

Until the District discloses whether it withheld any records under an unstated claim of confidentiality or privilege, it is premature to reach the issue of whether the District significantly impeded the Parents' right to participate in the special education decision-making process.

## II.   Request to Audio Record

Quirion and Pollack argue that the District's decision to bar them from sending B.P. to school with a recording device was a procedural IDEA violation.[13] The DPHO rejected that claim on the basis that the Parents failed to establish that the District significantly impeded their opportunity to participate in the decisionmaking process concerning B.P.'s education. *See* R. 1004-06. I affirm the DPHO's disposition of the case for a simpler reason: the Parents failed to identify a procedural violation at all.

In general, a plaintiff pressing a procedural IDEA claim must identify a specific procedure provided for under the IDEA and then demonstrate how the local

---

[13]   As the Parents' conceded at oral argument, they make no argument that the District *substantively* denied a free appropriate public education by forbidding B.P. to record his school day.

educational agency failed to abide by it. In an attempt to make the first of these showings, the Parents assert that two provisions confer on them a procedural right to gather and preserve an undefined quantum of information about their child's school day. First, they point to 20 U.S.C. § 1415(h)(2), which guarantees parents "the right to present evidence" at an IDEA due process hearing. But this provision simply entitles parents to present their case to a DPHO, which Quirion and Pollack were allowed to do here.[14] Second, the Parents point to 20 U.S.C. § 1415(f)(3)(E)(ii)(II), the provision that allows a procedural violation to rise to the level of a substantive deprivation of a free appropriate public education if it significantly impeded a parent's participatory rights. This provision does not help Quirion and Pollack either. Rather than conferring any additional rights, it actually imposes an additional *burden* on parents bringing procedural IDEA claims.[15]

For the reasons stated above, I deny the Parents' appeal with respect to their claim that RSU 75 committed a procedural IDEA violation by failing to allow B.P. to attend school with an audio recording device.

---

[14]     The scope of a parent's right to obtain evidence is governed by the provisions that explicitly address that question. *See, e.g.,* 20 U.S.C. § 1415(b)(1) (entitling parents "to examine all records relating to" their child); 20 U.S.C. § 1415(c)(2)(B) (entitling parents to a detailed written response to issues raised in a due process hearing complaint); 20 U.S.C. § 1415(f)(2) (requiring parties to disclose any evaluations they intend to use at the due process hearing); 05-071-101 Me. Code. R. § XVI(7)(A) (2015) (allowing DPHOs broad authority to issue subpoenas to require the attendance of witnesses and the production of evidence).

[15]     Again, the scope of a parent's right to participate in the IEP decision-making process is governed by the provisions that explicitly address that question. *See*, *e.g.*, 20 U.S.C. § 1414(d)(1)(B)(i) (entitling parents to membership in their child's IEP team); 20 U.S.C. § 1414(d)(3)(A)(ii) (requiring IEP teams to consider parents' educational concerns); 05-071-101 Me. Code. R. § VI(2)(I) (detailing the role of parents in the IEP decision-making process).

**CASE NO. 14.035H**

The second IDEA appeal before the Court, Case No. 14.035H, requires me to analyze whether the District deprived B.P. of a free appropriate public education by offering to bring B.P. to public outings individually rather than with his special education peers.

**Factual Background**

In the face of the Parents' ongoing dissatisfaction with Teacher 1, the District agreed to remove her as B.P.'s teacher at the end of his sixth grade year. R. 709-10, 715, 726. Under this agreement, Teacher 1 was precluded from having "any input" into B.P.'s day-to-day education, but she retained authority over B.P. to "address emergency situations" when necessary. R. 710, 719. Due to various programmatic constraints, B.P. continued to be located in the same classroom as Teacher 1. R. 709-710, 715, 726.

The Parents' relationship with Teacher 1 remained strained. *See, e.g.,* R. 424-25, 719. For instance, near the end of B.P.'s seventh grade year, after Teacher 1 initiated a conversation with Quirion about B.P.'s eyesight, Quirion e-mailed Moore to complain:

> I would really appreciate it if you could keep her away from me unless there is an emergency I need to know about right then and there. . . . I am not comfortable with [Teacher 1] as I told you, I do not trust her or like her, so please try to impress upon her that she should stay away from me and not seek me out when there are other avenues that she can use to communicate with me.

R. 424. A week later, in another e-mail to Moore, Quirion wrote that she could "see no way" to "come to a working relationship with [Teacher 1]" and that she "want[ed] to vomit just thinking about having to interact with her." R. 425.

At the time of the events in question, B.P. was in the eighth grade and was one of four students in Mt. Ararat Middle School's "Community Experiential Program" ("**CEP**"). R. 475, 719. These students received the bulk of their instruction in Teacher 1's classroom but worked one-on-one with educational technicians or other specialists throughout the day. R. 719. Teacher 1 was the primary teacher for the other students in the classroom, while Katie Anderson, a teacher based out of a nearby classroom, was B.P.'s primary teacher. R. 709-10, 726.

The three other CEP students often went on community outings to businesses outside the school to work on functional life skills. R. 710. For years, the Parents objected to B.P. participating in these trips, claiming that they did not address B.P.'s IEP goals. R. 710, 716. Accordingly, B.P. did not attend them. *See* R. 710, 716.

Among these trips was a weekly Monday lunch trip led by Teacher 1. R. 710.[16] This trip took place each week after a swimming program conducted at Bowdoin College. R. 710. Though B.P. took part in the swimming program, he did not travel to Bowdoin with the other students or Teacher 1. R. 710, 729. Quirion drove him there and back on her own, and B.P. skipped the lunch outings. R. 710, 729.

---

[16]     On the four other days of the school week, B.P. ate in the cafeteria with his CEP peers. R. 717, 734. They typically ate in a group, along with non-disabled peers. R. 717, 734.

In July of 2013, an educational consultant named Candice Bray performed a literacy consultation on B.P. and recommended that his educational team begin working with him on "reading menus from places he eats with his family." R. 460. Bray suggested B.P.'s teachers use this activity to help strengthen B.P.'s reading skills. R. 460-61.

In the fall of 2013, the District scheduled IEP meetings for October 28 and November 12, 2013. R. 465, 472. At the time, B.P.'s full IEP team consisted of Quirion, Pollack, Moore, Anderson, Allen, Tanji Johnston (Mt. Ararat Middle School's special education coordinator), Kirk Niese (B.P.'s regular education homeroom teacher), Barbara Linnehan-Smith (an adaptive phys ed teacher), Sarah McLaughlin (a speech therapist), Barbara Piccirillo (an occupational therapist), and Elaine DeFreitas (a physical therapist). R. 466.

At the first meeting, the team focused primarily on B.P.'s annual goals and short term objectives, taking Bray's suggestions into consideration. *See* RSU Ex. 52,[17] BP IEP part 1.m4a ("**Oct. Meeting Recording**"). The IEP team did not specifically discuss the possibility of B.P. joining his CEP peers on Monday lunch outings. *See* Oct. Meeting Recording.

However, between the two IEP meeting dates, on October 29, 2013, the Parents e-mailed Anderson to let her know that their position on the lunch outings had changed:

---

[17]     RSU Exhibit 52 is a DVD-R labeled "District Audio Exhibit" and containing two audio files, one of the October 28, 2013 IEP meeting (with the file name "BP IEP part 1.m4a") and one of the November 12, 2013 IEP meeting (with the file name "IEP Mtg #2.m4a").

> We . . . want to have [B.P.] start participating in the field trips out for lunch on Mondays. [Quirion] will need to know where the class is going so that she can bring [B.P.] to the restaurant. We presume staff will bring the Vantage[18] to the restaurant and be available to provide the instruction to [B.P.] that staff provide on these field trip[s]. [Quirion] will make certain that [B.P.] is back at school by 1:00 p.m. for speech.

R. 155.

Anderson forwarded the e-mail to District administrators, and Moore wrote the Parents a brief response on November 1, 2013:

> Happy to hear that you want [B.P.] to participate in the lunch field trips. The [middle school] staff hasn't sorted out all the logistics for this coming Monday, November 4 for the community lunch outing. We are not prepared to initiate this program change yet. As you know, [Teacher 1] is the teacher and you have made your wishes known about [Teacher 1] not instructing or supervising [B.P.] except in an emergency. We can address this program change at the [upcoming] IEP meeting . . . .

R. 156.

The IEP team met again on November 12, 2013, finally reaching this issue near the end of the meeting. RSU 75 Ex. 52, IEP Mtg #2.m4a, 1:00:02 ("**Nov. Meeting Recording**"). As the conversation began, Moore raised concerns about placing B.P. in a lunch outing supervised by Teacher 1:[19]

| | |
|---|---|
| Moore: | Let's talk about Monday logistics for the lunch thing. |
| Allen: | Okay. |
| Moore: | Are we talking about lunch along with the rest of the group, or are we talking about these restaurants, |

---

[18]   The Vantage is a touch-screen device with an automated voice that allows B.P. to communicate, in a limited fashion, with those around him. *See* R. 710.

[19]   The below excerpts are based on the audio recording of the full IEP meeting found on the DVD-R entered into evidence as RSU Exhibit 52. The Court consulted but did not ultimately rely on the partial transcript of the meeting the Parents appended to their post-hearing memorandum to the DPHO. *See* R. 333-42.

|  | Applebee's, 99, et cetera, the ones that he's familiar with the menus on— |
|---|---|
| Quirion: | I figured he'd be going where the rest of the kids are. |
| Moore: | The problem we have there is that [Teacher 1's] the teacher there, and I know that you didn't want that interaction at all. |
| Pollack: | Well, why is that any different than the classroom? |
| Quirion: | Yeah. |
| Moore: | Because she doesn't interact with him. |
| Quirion: | Why does she have to interact with him at the restaurant? |
| Moore: | Because she's the person who does those community supports as it is right now. |

Nov. Meeting Recording 1:00:02-1:01:30; *see also* R. 333.

The team continued to discuss the issue for nearly five minutes, and Moore raised the possibility that Teacher 1 might be uncomfortable presiding over an outing that B.P. and Quirion would attend. Nov. Meeting Recording 1:06:15-1:06:22. He told the Parents he would talk with them if it was a problem. Nov. Meeting Recording 1:06:15-1:06:22. As Moore attempted to wrap up the meeting about a minute later, the following exchange took place:

| Moore: | Any other discussion about that? |
|---|---|
| Niese: | No, it sounds like a neat opportunity. It sounds really— |
| Johnston: | I'm just—I—the thing I'm worried about has nothing to do with [B.P.]. It has to do with your and [Teacher 1's] relationship historically, and the way that that's played out. So I'm just worried about it. So I need to just say that here. Which is—that does not have to do with [B.P.], it has to do with— |

Pollack:        Probably just ignore each other, right?

Quirion:        Well, I have no intention of interacting with her.

Johnston:       But what I mean is, in terms of an actual thing that sometimes goes on in human dynamics, I'm worried about that. So I'm just saying it here. Because I think, um—

Quirion:        I know how to behave, and I—you know, I don't—I don't see the issue, but, you know—

Johnston:       I know. And that's why I'm saying I do see it as a potential issue. So I'm just saying it here so that I'm not saying anything that I didn't say directly.

Allen:          So, if there is an issue, would you guys still be interested in going to a restaurant, not necessarily the one that the other boys are going to, to practice these skills as well? With a staff person.

Quirion:         I suppose.

Pollack:        Maybe, yeah.

Allen:          Okay.

Quirion:        I mean, again, the rest of them don't make or break [B.P.'s] education, right?

Allen:          Right. It's still the experience. Okay.

Johnston:       No, I love the experience.

Allen:          I do too.

Anderson:       Yeah, I think it's going to be amazing.

Allen:          Okay.

Moore:          And we want this to work.

Quirion:        Yeah.

Moore:          Well, for everybody.

Nov. Meeting Recording 1:07:19-1:08:45; *see also* R. 340-42. The team then discussed

when lunch outings could start, and Moore, Allen and the Parents appeared to settle

on December 2, 2013. Nov. Meeting Recording 1:08:45-1:09:22.

On November 25, 2013, Johnston wrote an e-mail to Quirion and Pollack

informing them that the District would provide lunch outings to B.P. individually,

rather than with his CEP peers "[d]ue to the issues we briefly discussed at the IEP

[meeting]." *See* R. 218. Johnston wrote that she and McLaughlin would take B.P. on

lunch outings on December 2, 9, and 16 and that Anderson would take over after that.

R. 218.

Pollack wrote back shortly afterwards to push back against the District's

decision:

> We remember you vaguely mentioning some issue with [Teacher 1] at
> the IEP meeting. But you did not describe exactly what harm you are
> seeking to prevent by putting [B.P.] in a more restrictive environment
> and prohibiting him from being with the rest of his class, or why the risk
> (whatever it purportedly is) to [Teacher 1] is more important than the
> factors directly concerning [B.P.'s] education.
>
> Please tell us in detail the reasons that you have unilaterally decided
> that this placement for the community outings is "the best way to
> address community goals" and the reasons you determined that placing
> him with the rest of his class in those outings is inappropriate.

R. 217-18.

Johnston replied that she had been referring to "the historical difficulty of the

relationship between [Quirion] and [Teacher 1], the teacher for the other students."

R. 217. "It is not the intention to make any decision unilaterally," Johnston continued.

R. 217. "[R]ather, the intention is to figure out how best to support the IEP goals in the community in the context of some other rather difficult dynamics." R. 217.[20]

On November 26, 2013, the following day, the District sent the Parents both B.P.'s new IEP and a post-IEP-meeting "Written Notice." R. 475-96 (IEP); R. 497-501 (written notice). The section of the IEP listing the "related services" or "supplementary services" the District would provide contained only general descriptions and did not specifically mention lunch outings. R. 490-91. The written notice mentioned only that Quirion and Pollack were "interested in [B.P.] accessing restaurants in the community on Mondays," not that they preferred he do so with his CEP peers. R. 499.

On Monday, December 2, 2013, Quirion brought B.P. to an individual lunch outing at McDonald's. R. 218. B.P. sat at a table with McLaughlin and Johnston and worked on functional goals from his IEP, while Quirion sat at a separate table. R. 714, 737. After this outing, the Parents withdrew their consent for B.P. to go on individual lunch outings. R. 714, 741. The District offered to resume the individual outings or allow B.P. join the group outings, so long as Quirion did not attend. R. 714, 741. The Parents refused. R. 714, 741.

### Procedural History

On December 11, 2013, the Parents filed an IDEA due process hearing request stating the following grievance, among others:

---

[20]     Johnston later testified that she also had reservations about Quirion attending the group lunch outings based on complaints from other staff members and parents about Quirion's behavior. R. 737-38, 748-49.

> District made unilateral decision to remove [B.P.] from placement in his program for purposes of "community outings," specifically lunch. Decision was not made for educational reasons, and parents were not made participants on decision team that made the decision. Placement is not least restrictive placement, but is segregated from all other students.

R. 2. As a remedy, the parents sought for B.P. to be provided communal lunch outings as compensatory education. R. 662.

After conducting a two-day hearing on February 6 and 24, 2014, the DPHO determined that B.P.'s IEP team had agreed to include B.P. on Monday lunch outings with his CEP peers. R. 698-99. The DPHO found that the District had not substantively denied B.P. a free appropriate public education but had violated the IDEA's procedural safeguards in three ways: (1) by failing to list the Monday lunch outings in B.P.'s IEP as a related or supplemental service the District would provide; (2) by failing to adequately address the Monday lunch outings in the post-IEP-meeting written notice; and (3) by failing to contact the Parents after the November 12, 2013 IEP meeting to discuss the issue. R. 699-700.

As a remedy, the DPHO ordered the school to take the following actions: (1) convene an IEP meeting "to discuss implementing the Monday lunch outings as an individual activity"; (2) "[p]roperly reflect any agreement in a Written Notice"; and (3) "[a]mend the IEP to include any revised plan for conducting the Monday lunch outings as a supplemental service or activity." R. 705. The DPHO declined to order RSU 75 to provide additional lunch outings in a group setting, finding that the procedural violation did not rise to the level of a deprivation of a free appropriate public education and that the Parents were therefore not entitled to an award of

compensatory education. R. 700-02. The Parents' subsequently appealed the DPHO's decision to this Court.[21]

## Discussion

As discussed above, an individualized education program or IEP is "a written statement for each child with a disability that is developed, reviewed and revised in accordance with [20 U.S.C. § 1414],"[22] and that includes, among other things, a description of the services a local educational agency will provide to a disabled student. 20 U.S.C. § 1414(d)(1)(A)-(B). An IEP "serves as both a plan of action for school districts to follow and a legal touchstone for hearing officers and judges to assess their efforts." *York Sch. Dep't v. S.Z.*, No. 2:13-cv-00042-NT, 2015 WL 860953, at *15 (D. Me. Feb. 27, 2015). Because the IDEA defines the term "free appropriate public education" to include "special education and related services" that "are provided in conformity with [the IEP]," 20 U.S.C. § 1401(9)(D), a material failure to provide a service contained in an IEP can constitute a substantive violation of the IDEA. *S.D.*, 2014 WL 4681036, at *6.

By its own terms, the IDEA provides little detail about how the terms of an IEP should be formulated or how IEP teams should proceed when disagreements

---

[21]    The complaint containing the Parents' appeal was originally treated as a distinct case and assigned its own docket number, 2:14-cv-215-NT. The Court granted the Parents' motion to consolidate it with this case on October 21, 2014.

[22]    The IDEA includes a number of procedural safeguards regarding IEPs, among them a requirement that parents be allowed to take part in decisions about their child's programming, 20 U.S.C. § 1414(d)(1), (d)(3), (e), and a requirement that local educational agencies provide parents detailed written notice justifying any proposed change or refusal to change a child's programming. 20 U.S.C. § 1415(b)(3); *see also* 34 C.F.R. § 300.503.

arise. Maine's implementing regulations, found in MUSER, offer more specific guidance:

> The IEP meeting serves as a communication vehicle between parents and school personnel, and enables them, as equal participants, to make joint, informed decisions regarding [the child's special education]. Parents are considered equal partners with school personnel in making these decisions, and the IEP Team must consider the parents' concerns and the information that they provide regarding their child in . . . developing, reviewing, and revising IEPs; and determining placement.
>
> The IEP Team should work toward consensus, but the [local educational agency] has ultimate responsibility to ensure that . . . the IEP includes the services that the child needs in order to receive FAPE; and that the child's placement is in the least restrictive educational placement. It is not appropriate to make . . . IEP or placement decisions based upon a majority "vote." If the team cannot reach consensus, the [local educational agency] must provide parents with prior written notice of the school's proposals or refusals, or both, regarding their child's educational program, and the parents have the right to seek resolution of any disagreements by initiating an impartial due process hearing or a State complaint investigation.

05-071-101 Me. Code. R. § VI(2)(I).

Here, the DPHO reached a sound practical result by sending the parties back to the IEP meeting to rehash the lunch outings issue but also by declining to grant a compensatory education award. The DPHO found that the IEP team agreed that B.P. should receive lunch outings with his CEP peers and that the District committed a procedural violation by leaving this out of his IEP. However, she failed to discuss: (1) whether this verbal agreement became part of B.P.'s IEP though never memorialized in writing; and (2) if so, whether the District's failure to provide *communal* lunch outings thereby constituted a material failure to provide services in conformity with the IEP, i.e. a substantive IDEA violation. I reject her factual findings on the issue of

31

agreement as unsupported[23] and reach beyond her analysis because I believe its reasoning may cause difficulties in the future.

A close review of the recording of the November IEP meeting shows the DPHO's finding of an agreement was not warranted. While Moore did represent to the Parents that the District would take B.P. on weekly lunch outings, he hedged on whether B.P. could attend the outings led by Teacher 1, indicating that he would talk with the Parents if there was a problem. A minute or so later, Johnston expressed her concerns about the "human dynamics" at play, and Allen asked the Parents if they would "still be interested in going to a restaurant, not necessarily the one that the other boys are going to" if it turned out there was "an issue." Quirion responded, "I suppose," while Pollock answered, "Maybe, yeah." Quirion then suggested that "the rest of them don't make or break [B.P.'s] education, right?" These exchanges may demonstrate consensus on whether B.P. should go on lunch outings, but they reveal substantial *disagreement* on whether the outings should occur with B.P.'s CEP peers or in another setting.[24]

Although there may be a situation where a decision reached at an IEP meeting but not reduced to writing could be deemed part of an enforceable IEP, I do not believe this is such a case. An approach that places determinative legal significance on a moment of apparent agreement between two or three members of an IEP team that

---

[23]    The Parents have argued that the Court cannot upset a factual finding that the District did not appeal. I reject their constrained view of the powers the IDEA confers on me to review the record and grant appropriate relief.

[24]    The DPHO based her conclusion on a recording of a meeting that was also available to me, not on live testimony, and I accordingly do not defer to the inferences she drew.

is later undercut by further discussion is unworkable. If parties are allowed to play "gotcha" by plucking snippets from lengthy meetings, important back-and-forth discussions about a disabled child's well-being will be chilled.[25] In general, I believe, the better practice is to allow the local educational agency to formalize the decisions reached at an IEP meeting into a written IEP document and then to allow parents to challenge the IEP if they feel that something is missing.

The cases explain that the IDEA sets an accommodating, holistic standard for schools to meet. *Lessard*, 518 F.3d at 30; *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 992 (1st Cir. 1990). It does not give parents the authority to dictate the curriculum or insist on a particular methodology. *Lessard*, 518 F.3d at 30; *Roland M. v. Concord Sch. Comm.*, 910 F.2d at 992; *Greenbush Sch. Comm. v. Mr. K*, 949 F. Supp. 934, 940 (D. Me. 1996). As the First Circuit wrote in *Lessard*,

> The test is whether the IEP, taken in its entirety, is reasonably calculated to enable the particular child to garner educational benefits. Were the law otherwise, parents could endlessly parse IEPs into highly particularized components and circumvent the general rule that parents cannot unilaterally dictate the content of their child's IEP.

*Lessard*, 518 F.3d at 30. Ultimately, where consensus cannot be reached, it is for the school to decide and for the parents to contest. Allowing parents to comb through transcripts of lengthy meetings for moments of agreement that do not make their way into an IEP would open the door to the type of parsing the case law forbids.[26]

---

[25]    The case cited by the Parents in support of their theory that something said at a meeting can later become a provision of an IEP is distinguishable. *Cf. K.A. ex rel. F.A. v. Fulton Cnty. Sch. Dist.*, No. 1:11-CV-727-TWT, 2011 WL 5554008 (N.D. Ga. Nov. 15, 2011). There, the school's own notes of the meeting reflected a unanimous decision to provide the child with a personal assistant. *Id.* at *2.

[26]    The Parents' alternative argument that the District's decision to provide lunch outings individually was improper because it was based solely on administrative convenience also runs afoul

Because I overturn the DPHO's finding that the IEP team reached agreement, I also overturn her conclusion that the District committed a procedural violation by failing to reflect that agreement in the IEP. The Parents' briefing identifies two further alleged procedural violations: (1) that the District failed to give the Parents adequate written notice of their final decision concerning the lunch outings, *see* 20 U.S.C. § 1415(c)(1), 34 C.F.R. § 300.503; and (2) that the District failed to adequately include the Parents in that decision. *See* 20 U.S.C. § 1414(d)(1)(B)-(C), (d)(3)(D), (d)(3)(F), (e). The record does not support a finding that either of these alleged violations significantly impeded the Parents' right to participate in the decision-making process concerning B.P.'s special education, the only type of harm they assert on appeal. Quirion and Pollack attended an IEP meeting where community lunch outings were discussed at length. During that meeting, they made school officials aware of their preferences, learned about the District's primary concerns, and presented counter-arguments in favor of their point of view. The Parents were allowed to meaningfully participate in the IEP decision-making process. They had no right to "unilaterally dictate" the results of that process. *Lessard*, 518 F.3d at 30; *see also* 05-071-101 Me. Code. R. § VI(2)(I).[27]

---

of the rule of *Lessard*. Additionally, it is unclear whether this argument is properly before me. The Parents only presented this line of reasoning to the DPHO in the context of an argument that B.P.'s placement in individual lunch outings violated the least restrictive environment requirement. *See* R. 658-62. The Parents expressly declined to press any least restrictive environment argument on appeal. Pls.' Mem. of Law on Merits of Count I of Second Action 17 n.8 (ECF No. 90).

[27]    Even if the Parents had established a substantive or procedural denial of a free appropriate public education, they would not necessarily be entitled to further relief. As discussed above, compensatory education "is a form of equitable relief," *Murphy*, 973 F.2d at 16. It is not clear that the equities of this case support the remedy the Parents seek. *See Mr. I. ex rel. L.I.*, 480 F.3d at 26.

## CONCLUSION

For the reasons stated above, I **GRANT IN PART** and **DENY IN PART** the Parents' request for relief with respect to Case No. 13.107H and **DENY** the Parents' request for relief with respect to Case No. 14.035H. Pursuant to my partial grant of relief, I order the parties to adhere to the following schedule:

(1) by **Wednesday, May 20, 2015**, the District shall disclose to the Parents whether it withheld any records "related in any way to [B.P.]" when it responded to the Parents' subpoena on October 29, 2013, and, if so, produce a log that identifies and describes the withheld documents, in conformity with the requirements of Federal Rule of Civil Procedure 45(e)(2).

(2) by the 21st day after the District meets its obligations under paragraph (1), the parties shall jointly file a status report notifying the Court what if any issues remain for resolution with respect to the Parents' appeal of Case No. 13.107H.

SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 29th day of April, 2015.

35