UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MATTHEW POLLACK and <br> JANE QUIRION, individually <br> and as next friends of B.P., <br><br> Plaintiffs, <br><br> v. <br><br> REGIONAL SCHOOL UNIT 75, <br> et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Docket No. 2:13-cv-109-NT <br> ) <br> ) <br> ) <br> ) <br> ) |

**ORDER ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**

This matter comes before the Court on the Plaintiffs' motion for partial summary judgment (ECF No. 158), and the Defendants' motion for summary judgment. ECF No. 160. For the reasons stated below, the Plaintiffs' motion is **DENIED** and the Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

**BACKROUND**

The Plaintiffs in this case are Matthew Pollack and Jane Quirion (the "**Parents**"), individually and as next friends of their son B.P., a sixteen-year-old boy who is diagnosed with autism and a language disorder that is a variant of Landau-Kleffner Syndrome. Unified Statement of Facts Submissions for Defs.' Mot. for

Summ. J. with Citations to Joint Summ. J. R. ¶ 3 ("**SF**") (ECF No. 213).[1] B.P. is nonverbal and has very limited expressive communication skills. SF ¶ 3. He is a student at Mt. Ararat Middle School. SF ¶¶ 21, 83. The Defendants are Regional School Unit 75 ("**RSU 75**" or the "**District**"), which has been B.P.'s school district since kindergarten, and District employees Bradley Smith, Patrick Moore, Tanji Johnston, and Kelly Allen (together, the "**Defendants**"). SF ¶ 5.

The parties cross-move for summary judgment on the Plaintiffs' claims that the District violated the Americans with Disabilities Act (the "**ADA**"), Section 504 of the Rehabilitation Act ("**Section 504**"), and the First Amendment of the United States Constitution by refusing to allow B.P. to wear an audio recording device throughout his school day. The Defendants additionally move for summary judgment on the Plaintiffs' claims that the District and Allen violated the Fourth Amendment of the United States Constitution by conducting a "search" of B.P.'s person on the first day of the 2012-2013 school year and that all Defendants violated the ADA, Section 504, and the First Amendment by engaging in a variety of retaliatory acts.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, courts "view each motion separately and draw all reasonable inferences in favor of the respective non-

---

[1] The Unified Statement of Facts Submissions for Defs.' Mot. for Summ. J. with Citations to Joint Summ. J. R. ("**SF**") (ECF No. 213) contains a plethora of requests to strike. I do not address them individually in this order, but have considered and resolved them as needed in my analysis of the facts.

moving party." *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013). Faced with cross-motions, courts must "decide 'whether either of the parties deserves judgment as a matter of law on the facts that are not disputed.'" *Fid. Co-op Bank v. Nova Cas. Co.*, 726 F.3d 31, 36 (1st Cir. 2013) (quoting *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)).

## DISCUSSION

I. Recording Device Claims

    A. B.P.'s Right to Wear a Recording Device

The Plaintiffs claim that B.P. has the right to wear an audio recording device throughout his school day under the ADA, Section 504, and the First Amendment. Second Am. Compl. ¶¶ 185-98 (Count IV), 206-18 (Count VI) (ECF No. 51).

As explained in a previous order, the IDEA has both a savings clause and an exhaustion clause. *See* Order on Defs.' Mot. to Dismiss 12 (ECF No. 33). It instructs as follows:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C.A. § 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C.A. § 791 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(*l*). In other words, the IDEA does not displace other federal laws that protect disabled children, but it does require that plaintiffs seeking relief available under the IDEA first use its administrative processes to resolve their

disputes. This requirement gives education professionals with specialized knowledge and those who interact with the child on a daily basis the opportunity to find a solution, and if that fails, to create a record of their process, which will aid any later-reviewing court. *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 60-61 (1st Cir. 2002).

Here, B.P. bypassed the IDEA process for his request to wear a recording device and therefore did not administratively exhaust.[2] Specifically, in March of 2012 Quirion sent a letter to Patrick Moore (the District's Director of Special Services) and Bill Zima (the Principal of Mt. Ararat Middle School) requesting a change of B.P.'s classroom teacher and explaining that she "will have a voice recording device on [B.P.] whenever he is in school" for his safety.[3] Joint Summ. J. R. 6287 ("**SJR**") (ECF No.

---

[2] To be sure, the Plaintiffs pressed the recording device issue through the IDEA process, but only as a procedural IDEA violation with respect to the Parents' right to participate, not as a substantive IDEA violation with respect to B.P.'s education. *See* Order on Pls.' IDEA Appeals 13, 19 & n.13 (ECF No. 128).

[3] Pollack and Quirion have pointed to two events that caused them to be concerned for B.P.'s safety at school—one before the recording device request and one after it. First, Quirion reports that when she picked B.P. up from school on February 10, 2012 he was acting out of the ordinary, including by running past her, rather than waiting as he usually did. Oct. 13, 2015 Decl. of Jane Quirion ¶ 8 (ECF No. 165-7). Quirion further reports that B.P. started to cry when he got into her van and continued to cry for an hour and a half. Oct. 13, 2015 Decl. of Jane Quirion ¶ 8. Quirion testified that she believed a teacher caused B.P. to become upset, in part because it was "the only day in, at that point seven-and-a-half years of B.P.'s education experience, that he came out of school running for his life and crying uncontrollably." J. Summ. J. R. 5483 ("**SJR**") (ECF No. 199). This incident of crying took place on a day in which there had been an accusation against Quirion for "spying" on a school field trip. SJR 5480-81.

Second, after school on April 29, 2013, Quirion noticed bruising on B.P.'s arms. SJR 6440. The District hired an attorney to investigate the matter, but he did not uncover the source of B.P.'s bruising. SJR 6447-49. The investigator summarized his findings as follows:

> [W]hile the nature of the bruises indicates a possible inflicted injury, there is no other evidence that supports the Student being grabbed or assaulted by another student or adult. This conclusion is supported by the lack of any change to the Student's demeanor during or after school on April 29th. While there were no direct observations of accidental impact to the Student's arms, there were several possible incidents, unique

4

199). The District responded, in part by suggesting an IEP meeting to discuss the matter. SJR 6367-69.[4] The Parents declined the District's offer of an IEP meeting. SJR 6347.[5]

Quirion renewed the recording device request in June of 2012, this time as a reasonable accommodation for B.P. under the ADA. SJR 6406. Moore responded that he and Zima would "look into the ADA request and schedule a time to meet with you and discuss the matter." SJR 6408. Quirion responded that she would be willing to meet, but wanted to know the agenda ahead of time. SJR 6409. She also informed Moore that "[i]f the point of a meeting is to ask me to withdraw my request, I will not withdraw it." SJR 6409. The record does not indicate that any meeting took place after Quirion's June 2012 request.

On August 30, 2012, days before the start of the new school year, Quirion again wrote to Moore and Zima regarding the recording device matter. SJR 6413-14. She informed these school administrators that she interpreted their silence on her earlier request as approval, and would "be sending [B.P.] to school on Tuesday (and every

---

to April 29, which could have caused or contributed to the bruises on the Student's arms.

SJR 6449. The potential sources of accidental impact included the swinging and "clunking" of B.P.'s Vantage machine (a touch-screen communication device) as he used it that day and an unannounced fire drill that required B.P. and other students to leave the building through a single side door in an unusually-congested manner. SJR 6449.

[4] The District's responsive letter included the following: "Given that you state your belief that [B.P.] is unsafe at school, the District will schedule an IEP meeting to discuss your concerns. [B.P.'s] safety is directly relevant to the appropriateness of his placement, and the IEP team should convene to discuss these issues." SJR 6368.

[5] In declining, Pollack specified in an e-mail that neither he nor Quirion thought an IEP meeting was the "appropriate mechanism" to address the teacher change issue. SJR 6347. Pollack did not reference the recording device issue in this communication. SJR 6347-48.

day) with a recording device." SJR 6414. Moore wrote back apologizing for the delay and indicating as follows:

> I will be calling you today with a specific request not to send [B.P.] to school with a recording device on Tuesday. I would like the IEP team to review this accommodation request and have an IEP determination prior to any action on your part. If the IEP team decides that the accommodation is necessary and reasonable, request approved. If not, you have the opportunity for all your due process safeguards.

SJR 6413. Quirion declined the offer of an IEP meeting. SJR 6415. To Quirion, the request for the recording device as an ADA accommodation was different from an educational accommodation under the IDEA. SJR 6415. Moore sent Quirion a letter on September 1, 2012, reiterating the District's objections to the recording device and proposing some alternative ways to address her concerns. SJR 6418.

The request that B.P. wear a recording device at school is relief that would be available under the IDEA. *See* 20 U.S.C. §§ 1401(33), 1414(d)(1)(A)(i)(IV);[6] *see also* 20

---

[6] Specifically, the IDEA contemplates that a student's IEP may include:

[A] statement of the special education and related services and supplementary aids and services . . . to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child—

    (aa) to advance appropriately towards attaining the annual goals;

    (bb) to be involved in and make progress in the general education curriculum . . . and to participate in extracurricular and other nonacademic activities; and

    (cc) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph.

20 U.S.C. § 1414(d)(1)(A)(i)(IV). "The term 'supplementary aids and services' means aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate . . . ." 20 U.S.C. § 1401(33).

U.S.C. § 1415(*l*) (explaining the IDEA's exhaustion requirement). Had the Parents accepted the District's invitation to hold an IEP meeting on the recording device issue, a group of qualified education professionals could have sat down with Pollack and Quirion to discuss the best way to address B.P.'s needs. In March of 2012, when the Parents first raised the recording device issue to address safety, the IEP team could have met and worked collaboratively to determine whether B.P.'s IEP should include his use of supplementary aids to properly protect B.P. at school or allow B.P. to effectively communicate and advocate for himself so that he could best work towards his educational goals.[7]

As evidenced by my previous order on the Plaintiffs' IDEA appeals, record evidence from IEP meetings—where teachers, administrators, specialists, and parents work collaboratively to figure out what is best for the child—provide valuable information for me when called upon to review the matter. *See, e.g.,* Order on Pls.' IDEA Appeals 24-27, 31-34 (ECF No. 128); *see also Frazier*, 276 F.3d at 61 ("Allowing plaintiffs to bypass the IDEA's administrative process en route to state or federal court disrupts this carefully calibrated balance and shifts the burden of factfinding from the educational specialists to the judiciary."). Because the Plaintiffs did not pursue this relief first under the IDEA, there is no evidentiary record from the administrative process that would allow me to determine whether B.P. should be allowed to wear a recording device at school under the ADA, Section 504, or the First

---

[7]  In fact, B.P.'s IEP already included his use of at least one supplementary aid. Several of his IEP goals referenced his use of an electronic expressive communication device called a "Vantage." SF ¶¶ 333-35.

7

Amendment. Because the Parents would not participate in the IDEA's procedures, they have not properly exhausted. Therefore, B.P.'s claims under the ADA, Section 504, and the First Amendment to wear a recording device at school are dismissed.

### B.  The Parents' Right to Record B.P.'s School Day

The District also moves for summary judgment on the Parents' First Amendment right-to-record claim.[8] Before the parties undertook summary judgment briefing, I emphasized that it would be "particularly useful to have briefing that focuses squarely on which First Amendment standards apply and why, and whether those standards are different as to B.P.'s parents than as to B.P. himself." Local Rule 56(h) Pre-Filing Conference Report & Order 3 (ECF No. 151). The Plaintiffs responded to that request by explaining that they cannot separate Pollack and Quirion's First Amendment right to record from B.P.'s. Pls.' Resp. to Defs.' Mot. for Summ. J. 20 (ECF No. 164). Because the Parents concede that they do not have a separate and independent right to record B.P.'s school day, their First Amendment claim in Count VI of the Second Amended Complaint is dismissed.[9, 10]

---

[8]  As discussed above, *B.P.*'s First Amendment claim to record his school day is dismissed for failure to exhaust the IDEA process. The Parents are not pressing their own right to record B.P.'s school day under the ADA or Section 504. *See* Pls.' Resp. to Defs.' Mot. for Summ. J. 17 (ECF No. 164).

[9]  Count X is a request for a declaratory judgment on the recording device issue under the IDEA, ADA, Section 504, and the First Amendment. Second Am. Compl. ¶¶ 239-41 (Count X) (ECF No. 51). The IDEA portion of Count X has already been resolved against the Plaintiffs. *See* Order on Pls.' IDEA Appeals 20. The ADA, Section 504, and First Amendment portions of Count X have now also been resolved against the Plaintiffs. Count X is dismissed.

[10]  Having found that the Defendants are entitled to summary judgment on the recording device claims in light of the Plaintiffs' failure to exhaust and the Parents' concession that they hold no First Amendment right apart from B.P.'s, I do not evaluate the Plaintiffs' motion for summary judgment on the merits of these same claims.

## II. Fourth Amendment Claim

After the Defendants moved for summary judgment on the Plaintiffs' claim that the District and Allen violated the Fourth Amendment by "searching" B.P., the Plaintiffs decided not to oppose this aspect of the Defendants' motion. Pls.' Resp. to Defs.' Mot. for Summ. J. 1. Accordingly, the Fourth Amendment claims against the District and Allen are dismissed.

## III. Retaliation Claims

Together the Plaintiffs' two complaints make out First Amendment retaliation claims under 42 U.S.C. § 1983 against all Defendants, Second Am. Compl. ¶¶ 171-78 (Count II); Compl. ¶¶ 112-19 (Count II) (2:14-cv-215-NT) (ECF No. 1), and Section 504 and ADA retaliation claims against the District. Second Am. Compl. ¶¶ 179-84 (Count III-Section 504); Compl. ¶¶ 120-25 (Count III-Section 504) (2:14-cv-215-NT), 126-33 (Count IV-ADA) (2:14-cv-215-NT).[11]

State actors, including school districts and individual school officials, "offend the First Amendment when they retaliate against an individual for constitutionally protected speech." *González-Droz v. González-Colón*, 660 F.3d 1, 16 (1st Cir. 2011); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280-81 (1977). In order to establish a prima facie case of First Amendment retaliation, a plaintiff must show: (1) that "he or she engaged in constitutionally protected conduct"; (2) that "he or she was subjected to an adverse action by the defendant"; and (3) that "the

---

[11] There are two operative complaints in this matter: (1) the Second Amended Complaint filed in Case 2:13-cv-109-NT (ECF No. 51); and (2) the Complaint filed in Case 2:14-cv-215-NT (ECF No. 1). Case 2:14-cv-215-NT has been consolidated with the lead case, 2:13-cv-109-NT. *See* ECF Nos. 73, 75.

9

protected conduct was a substantial or motivating factor in the adverse action." *D.B. ex rel. Elizabeth B. v. Esposito*, 675 F.3d 26, 41 (1st Cir. 2012). On the second element, an adverse action is one that "viewed objectively . . . would have a chilling effect on [the plaintiff's] exercise of First Amendment rights," *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011), or that "would deter a reasonably hardy person from exercising his or her constitutional rights." *D.B.*, 675 F.3d at 43 n.11.

The elements of retaliation claims under Section 504 and the ADA are identical to each other. *Id.* at 41. To make out a prima facie case of retaliation under either statute, a plaintiff must establish that: "(1) he or she engaged in protected conduct, (2) he or she was subjected to an adverse action by the defendant, and (3) there was a causal connection between the protected conduct and the adverse action." *Id.* On the second element, an adverse action is "one that might well dissuade a reasonable person from making or supporting a charge of discrimination." *Id.*

### A. The Individual Defendants

The Plaintiffs press First Amendment retaliation claims against the four individual Defendants. The Defendants maintain that these individual Defendants are entitled to qualified immunity. Defs.' Mot. for Summ J. 45-49 (ECF No. 160). The First Circuit prescribes a two-step process to determine whether an official is entitled to qualified immunity. *Mosher v. Nelson*, 589 F.3d 488, 492 (1st Cir. 2009). First, the Court must determine "whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). Second, the Court must determine "whether the right was 'clearly established' at the time of the defendant's alleged violation." *Id.*

10

Completing the "clearly established" step of the qualified immunity analysis requires answering two additional questions. First, the court must "must focus 'on the clarity of the law at the time of the alleged civil rights violation.'" *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015) (quoting *Maldonado*, 568 F.3d at 269). This "assessment 'turns on whether the contours of the relevant right were clear enough to signal to a reasonable official that his conduct would infringe that right.'" *Matalon*, 806 F.3d at 633 (quoting *MacDonald v. Town of Eastham*, 745 F.3d 8, 12 (1st Cir. 2014)). Second, courts "must appraise the facts of the case to determine 'whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" *Id.* (quoting *Maldonado*, 568 F.3d at 269).

The First Circuit's decision in *Barton v. Clancy*, 632 F.3d 9 (1st Cir. 2011), sheds light on the "clearly established" inquiry in the First Amendment retaliation context.[12] There, the First Circuit upheld the grant of qualified immunity for a city mayor who, in retaliation for the plaintiff's exercise of his First Amendment rights, engaged in a campaign of harassment against him. Mayor Clancy publicly criticized Barton's ability to serve as a high school basketball coach because he retired as a city firefighter due to disability. Mayor Clancy, who had a contentious history with Barton during Barton's years as a firefighter and union official, repeatedly asked school officials to remove Barton as a basketball coach and began investigations into Barton's disability pension and payment of taxes. *Id.* at 11-12.

---

[12] The court did not resolve whether the individual defendant had, in fact, violated the plaintiff's constitutional rights. *Barton v. Clancy*, 632 F.3d 9, 30 n.20 (1st Cir. 2011). That is because courts may resolve the qualified immunity question on the "clearly established" prong alone. *Id.* at 22.

11

As to the first prong of the "clearly established" inquiry—the clarity of the law at the time of the alleged violations—the First Circuit found that it was clearly established that "even relatively minor events can give rise to liability for retaliation under § 1983 and that a campaign of harassment can support a First Amendment retaliation claim if the harassment would deter a reasonably hardy individual in the exercise of his or her First Amendment rights." *Id.* at 30 (internal citations and quotations omitted).

The court then turned to the second prong of the "clearly established" inquiry, and, focusing on Mayor Clancy's actions, evaluated whether a reasonable official in his shoes would have understood that his conduct violated Barton's constitutional rights. *Id.* Answering this question in the negative, the court explained that

> In essence, Clancy instigated a public controversy about an unusual hiring decision that had larger policy implications. Given Clancy's focus on that decision, the legitimate fiscal-responsibility thrust of his commentary, and the limited nature of his records inquiry, it is far from clear that Clancy's actions were sufficiently oppressive to chill the speech of a reasonably hardy individual.

*Id.* Clancy "lacked 'fair warning that his particular conduct was unconstitutional,' " and he was thus entitled to qualified immunity. *Id.* (quoting *Maldonado*, 568 F.3d at 269).

In the case at bar, the Defendants concede that "the right to petition the government for a redress of grievances under the First Amendment" is clearly established. Defs.' Mot. for Summ. J. 46. But, the Defendants maintain that "no reasonable defendant could have understood that the conduct which Plaintiffs

12

describe as retaliatory in their complaints violated Plaintiffs' constitutional rights." Defs.' Mot. for Summ. J. 46.

### 1. Kelly Allen

Kelly Allen has worked with B.P. since kindergarten. SF ¶ 9. At different times she has served as his classroom teacher, case manager, and autism consultant. SF ¶¶ 9-11. The Plaintiffs claim that Allen committed retaliation in violation of the First Amendment when, on the first day of the 2012-2013 school year, she opened a zipped pouch on B.P.'s shoe, removed "a tan stick with a note attached to it," read the note, and returned the items to the pouch. Second Am. Compl. ¶¶ 171-78 (Count II); SJR 4483-84. I previously held that Allen is entitled to qualified immunity on the since-abandoned claim that this conduct was a "search" that violated the Fourth Amendment. Order on Defs.' Mot. to Dismiss 31-34. That is because a reasonable person in Allen's position would not have understood her conduct as violating the Fourth Amendment. Order on Defs.' Mot. to Dismiss 31-34. Nor would a reasonable person in Allen's position have understood that this same conduct amounted to unconstitutional retaliation. *See Barton*, 632 F.3d at 30-31. To commit retaliation based on the exercise of First Amendment rights, Allen would have had to have taken actions that were "sufficiently oppressive to chill the speech of a reasonably hardy individual."[13] *Id.* at 30. A reasonable educator in Allen's position would not have

---

[13] As described above, the second element of a prima facie case of First Amendment retaliation is whether the plaintiff "was subjected to an adverse action by the defendant." *D.B.*, 675 F.3d at 43. An "adverse action" is one that "viewed objectively . . . would have a chilling effect on [the plaintiff's] exercise of First Amendment rights, *Barton*, 632 F.3d at 29, or that "would deter a reasonably hardy person from exercising his or her constitutional rights." *D.B.*, 675 F.3d at 43 n.11.

13

understood that opening B.P.'s shoe pouch was an action sufficiently adverse so as to chill a reasonably hardy person's exercise of First Amendment rights.[14] She is entitled to qualified immunity.

### 2. Tanji Johnston & Patrick Moore

Tanji Johnston is Mt. Ararat Middle School's Special Education Coordinator. SF ¶ 6. As mentioned above, Patrick Moore is the District's Director of Special Services. SF ¶ 7. The Plaintiffs claim that Johnston and Moore committed retaliation in violation of the First Amendment when they participated in the IEP team decision to provide B.P. with individualized lunch outings. Compl. ¶¶ 112-19 (Count II) (2:14-cv-215-NT). Johnston and Moore are entitled to qualified immunity if a reasonable person in each of their positions would not have understood that this conduct amounted to unconstitutional retaliation. *See Barton*, 632 F.3d at 30-31. The question is whether these administrators would have understood their participation in this portion of the IEP process as "sufficiently oppressive to chill the speech of a reasonably hardy individual." *Id.* at 30.

I previously provided a detailed account of the IEP process for the lunch outing dispute. Order on Pls.' IDEA Appeals 21-28. As described in that order, Moore and Johnston attempted to provide B.P. with the benefit of the school's "Community Experiential Program" (the lunch outings), while navigating challenging interpersonal dynamics. Order on Pls.' IDEA Appeals 21-28. For example, the

---

[14] Although I concluded at the motion to dismiss stage that the Plaintiffs plausibly alleged, by a close margin, that Allen took adverse action against them, *see* Order on Defs.' Mot. to Dismiss 21 (ECF No. 33), the analysis has changed in light of the Defendants' more developed qualified immunity defense.

14

Parents had previously insisted that the teacher for this program only interact with B.P. in emergency situations. SF ¶ 51. Further, parents of other children who participated in the outings expressed concern to Johnston about Quirion's participation. SJR 4951-52. Moore and Johnston could not have understood that helping to find a way for B.P. to participate in lunch outings, albeit separately from other students, could have constituted behavior that was sufficiently oppressive to chill a reasonably hardy person's exercise of First Amendment rights. *See Barton*, 632 F.3d at 30-31. Moore and Johnston are entitled to qualified immunity.[15]

### 3. Bradley Smith

Bradley Smith is the Superintendent of RSU 75. SF ¶ 184. The Plaintiffs claim that Smith committed retaliation in violation of the First Amendment through his involvement in responding to the Parents' record requests.[16] Second Am. Compl. ¶¶ 171-78 (Count II).

In the Spring of 2011, the Parents requested all of B.P.'s "education records" pursuant to the Family Educational Rights and Privacy Act ("**FERPA**"), 20 U.S.C.

---

[15] Even without qualified immunity, the claims against Moore and Johnston would nonetheless be dismissed. I have already held that the District committed no procedural IDEA violation in resolving the lunch outing matter. Order on Pls.' IDEA Appeals 34. As the First Circuit has explained, "in the face of a school system's compliance with the IDEA . . . a plaintiff who asserts that the . . . conduct of an IEP process was retaliatory must show evidence of something more than . . . the predictable back-and-forth associated with the IEP process in order to survive summary judgment." *D.B.*, 675 F.3d at 42. The Parents have not made that showing.

[16] The Plaintiffs also alleged that Smith directed Allen to "search" B.P. on the first day of the 2012-2013 school year. Second Am. Compl. ¶ 133. The Defendants point out that no evidence has come to light in discovery connecting Smith to the shoe pouch incident. Defs.' Mot. for Summ. J. 48 (ECF No. 160). The Plaintiffs have admitted that Smith did not direct Allen to conduct the "search," and in fact, Smith did not learn of it until after the fact. SF ¶¶ 163-64. Because there is no evidence that Smith was involved in the incident, this part of Count II against him fails.

§ 1232g. SF ¶ 320. The District responded by providing, among other records, hundreds of e-mails among District staff members about B.P. SF ¶ 320. After the Parents made their first due process hearing request, they continued to seek B.P.'s records, including under FERPA and the IDEA. SJR 6354-56. However, the District took the position that it was not required to produce e-mails between District staff members about B.P. SJR 6355. The District did offer, "in the interest of cooperation," to provide the e-mails under the Maine Freedom of Access Act if the Plaintiffs paid $2,600.[17] SJR 6355.

The Defendants also argue that the scope of parental access under statutes like FERPA and the IDEA is far from clear, and thus "no reasonable defendant would understand that providing a student's centrally-maintained education records in response to a request for documents made under FERPA and the IDEA would violate the Constitutional rights of the person making the request." Defs.' Mot. for Summ J. 47. I am sympathetic to the Defendants' point that these statutes are difficult to interpret.[18] *See* Defs.' Mot. for Summ J. 47. But the question here is not whether Smith is entitled to qualified immunity for his interpretation of FERPA or the IDEA, it is whether he is entitled to qualified immunity for alleged First Amendment retaliation against the Plaintiffs. I find, for purposes of qualified immunity, that a

---

[17]  In a letter to Pollack, Smith explained that "under FOAA, the District is entitled to recoup a portion of its costs, and we estimated that the material would cost approximately $2,600 to prepare for you." SJR 6355.

[18]  In my order on the IDEA appeals, I discussed the contours of the term "all records" under the IDEA as contrasted with the term "education records" under FERPA. *See* Order on Pls.' IDEA Appeals 15-18.

reasonable person in Smith's shoes would have understood that charging $2,600 for records it previously provided free of charge could chill the reasonably hardy person from exercising First Amendment rights.

The Defendants also argue that there is no evidence that Smith acted with a retaliatory motive. Defs.' Mot. for Summ. J. 47. The Plaintiffs assert that there are issues of fact as to whether Smith acted with a retaliatory motive and that these factual issues preclude summary judgment based on qualified immunity. Pls.' Resp. to Defs.' Mot. for Summ. J. 44.

The First Circuit has held that a factual dispute on motive may preclude summary judgment on qualified immunity for a First Amendment retaliation claim. In *Feliciano-Angulo v. Rivera-Cruz*, 858 F.2d 40, 45 (1st Cir. 1988), a government employee claimed, in part, that he had been fired because of his political affiliation, while the government maintained he had been fired for cause, including for misrepresentations in his employment application. "If," the First Circuit reasoned, "plaintiff were fired because of his political affiliation, the question of whether or not the law then existing clearly permitted this is an altogether different question from whether the law allowed him to be fired because he had misrepresented his qualifications in his initial employment application." *Id.* at 47. Accordingly, the reason why he was fired had to be "settled by further factfinding before, or in conjunction with, the qualified immunity issue." *Id.*

Smith's intent in charging for records is relevant to whether he is entitled to qualified immunity. Whether the law is clearly established here depends on whether

17

Smith was motivated by a desire to chill the Plaintiffs' protected conduct or to simply preserve the District's resources. *See* SF ¶ 189. A reasonable district superintendent would understand that charging thousands of dollars for records *because* parents asked for a due process hearing would infringe on those parents' constitutional rights. Because further fact-finding is required, Smith is not entitled to qualified immunity.[19] *See Feliciano-Angulo*, 858 F.2d at 47.

### B.   The District

The Plaintiffs press retaliation claims against the District under the First Amendment, Section 504, and the ADA. Second Am. Compl. ¶¶ 171-78 (Count II), 179-84 (Count III); Compl. ¶¶ 112-19 (Count II) (2:14-cv-215-NT), 120-125 (Count III) (2:14-cv-215-NT), 126-33 (Count IV) (2:14-cv-215-NT). Material issues of fact remain as to whether the District's changed response to the Plaintiffs' record requests constituted an adverse action under the First Amendment, Section 504, and the ADA. Material issues of fact likewise persist as to the causal connection between the Plaintiffs' protected activity and the changed response from the District. Because the Plaintiffs' retaliation claims against the District survive under at least one of the adverse actions the Plaintiffs have set forth, the Defendants' motion for summary judgment on these retaliation claims against the District is denied.

---

[19]   Setting aside qualified immunity, I also find, with respect to the First Amendment retaliation claim against Smith, that a jury should evaluate his explanation for the changed response to the Plaintiffs' record requests. This evaluation will involve fact-based credibility determinations best left to a jury.

**IV.     The District's Breach of Contract Counterclaim**

The District moves for summary judgment on its counterclaim against the Plaintiffs for an alleged breach of the parties' January 26, 2012 settlement agreement. Defs.' Mot. for Summ. J. 50; Def. SAD 75's Answer to Pls.' Am. Compl., Counterclaim, and Demand for a Jury Trial 35-36 (Count I) (ECF No. 34). The District's argument as to why it should prevail on its counterclaim is not sufficiently developed, and thus I consider it waived for purposes of summary judgment. *See Lebron v. Commonwealth of P.R.*, 770 F.3d 25, 31 (1st Cir. 2014).

## CONCLUSION

For the reasons stated above, the Defendants' motion for summary judgment (ECF No. 160) is **GRANTED** with respect to:

- Count IV in the Second Amended Complaint (2:13-cv-109-NT) (recording device claim);

- Count VI in the Second Amended Complaint (2:13-cv-109-NT) (recording device claim);

- Count X in the Second Amended Complaint (2:13-cv-109-NT) (recording device claim);

- Count V in the Second Amended Complaint (2:13-cv-109-NT) (search claim);

- Count II in the Second Amended Complaint (2:13-cv-109-NT) (First Amendment retaliation claim) against Kelly Allen;

- Count II in the Complaint (2:14-cv-215-NT) (First Amendment retaliation claims) against Patrick Moore and Tanji Johnston;

and **DENIED** with respect to:

- Count II in the Second Amended Complaint (2:13-cv-109-NT) (First Amendment retaliation claim) against Bradley Smith and RSU 75;

- Count III in the Second Amended Complaint (2:13-cv-109-NT) (Section 504 retaliation claim);

- Count II in the Complaint (2:14-cv-215-NT) (First Amendment retaliation claim) against RSU 75;

- Count III in the Complaint (2:14-cv-215-NT) (Section 504 retaliation claim);

- Count IV in the Complaint (2:14-cv-215-NT) (ADA retaliation claim); and

- Count I in RSU 75's Answer and Counterclaim (2:13-cv-109-NT) (ECF No. 34) (breach of contract claim).

The Plaintiffs' motion for partial summary judgment (ECF No. 158) is **DENIED**.


SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 27th day of January, 2016.