## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

MATTHEW POLLACK and ) 
JANE QUIRION, individually )
and as next friends of B.P., )
  )
         Plaintiffs, )
  )
v. )  No. 2:13-cv-109-NT
  )
REGIONAL SCHOOL UNIT 75, )
et al., )
  )
         Defendants. )

## ORDER ON PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

Before me are the Plaintiffs' motion for partial summary judgment, the Defendant's motion for summary judgment, and the Defendant's supplemental motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (ECF Nos. 158, 160, 258). For the reasons stated below, the Plaintiffs' motion is **DENIED** and the District's motions are **GRANTED IN PART** and **DENIED IN PART.**

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, courts "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." *Roman Catholic Bishop of Springfield v. City of Springfield*, 724 F.3d 78, 89 (1st Cir. 2013). Faced with cross-motions, courts must "decide 'whether either of the parties deserves judgment as a matter of law on the facts that are not

disputed.' " *Fid. Co-op Bank v. Nova Cas. Co.*, 726 F.3d 31, 36 (1st Cir. 2013) (quoting *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)).

## BACKGROUND

The Plaintiffs in this case are Matthew Pollack and Jane Quirion (the "**Parents**"), as the parents and next friends of their eighteen-year-old son B.P. Unified Statement of Facts Submissions for Defs.' Mot. for Summ. J. with Citations to Joint Summ. J. R. ¶ 3 ("**DSF**") (ECF No. 213). The remaining Defendant is Regional School Unit 75 ("**RSU 75**" or the "**District**"), which has been B.P.'s school district since kindergarten. DSF ¶ 5.

B.P. is diagnosed with autism and a language disorder that is a variant of Landau-Kleffner Syndrome. DSF ¶ 3. He is nonverbal and has very limited expressive communication skills. DSF ¶ 3. B.P. is happy, loves school, and has made some progress toward his educational goals. DSF ¶ 5. By the time B.P. began attending Mt. Ararat Middle School, however, the relationship between his Parents and District officials had grown tense. DSF ¶ 21.

Although the Parents and District officials have butted heads numerous times over the years, an incident that occurred in February of 2012 is of particular relevance for purposes of this motion. On the morning of February 10, 2012, Pollack met with Patrick Moore, RSU 75's director of special education, and Kelly Allen, B.P.'s case manager. DSF ¶¶ 7-11, 40. During the meeting:

> Pollack was informed that Quirion had been "spying" on a community field trip to a public library. Pollack called Quirion immediately who insisted that she had simply gotten caught behind the school bus on her way to the grocery store. Later that morning, Quirion e-mailed Moore

and Allen a scanned copy of her time-stamped grocery receipt to refute the accusation.

DSF ¶ 40. Moore later apologized for the misunderstanding. DSF ¶ 41.

When Quirion picked up B.P. at the end of school that day, he acted uncharacteristically upset and cried for approximately an hour and a half. DSF ¶ 42. Pollack and Quirion sought an explanation for B.P.'s aberrant behavior, but the school was unable to provide one. DSF ¶¶ 43-44, 47-48. None of the staff members who worked with B.P. that day reported noticing anything unusual. DSF ¶ 47. Quirion came to suspect there might be a connection between the accusation that she had been "spying" on the field trip and B.P.'s crying spell.[1] DSF ¶ 49.

In March of 2012, Quirion first wrote a letter to school officials informing them that she planned to send B.P. to school with an audio recording device so she could "have a semblance of peace that he is safe." DSF ¶ 78. An RSU 75 attorney sent Quirion a letter the following day informing her that the District would not allow B.P. to attend school with a recording device. DSF ¶ 81. The letter stated that permitting B.P. to record at school would violate the District's personal electronics policies, a

---

[1] The Parents have suspected that the District withheld important information from them about B.P.'s treatment at school on other occasions. On April 29, 2013, Quirion noticed bruises on B.P.'s arms after school. DSF ¶ 129. The District hired an attorney to investigate the matter, but he did not uncover the source of B.P.'s bruising. DSF ¶ 138. The Parents also believe they were not given sufficient information in B.P.'s daily reports about why the main school doors to the middle school were locked as part of a fire drill that occurred in April of 2013. DSF ¶ 149. Additionally, on September 4, 2013, Pollack emailed a number of District employees to ask why the shades were drawn in B.P.'s classroom that day. DSF ¶ 143. And on September 12, 2013, B.P.'s sister told the Parents that she had seen B.P. sitting on a hallway floor with three or four other students at a time when his daily report indicated he was in his classroom receiving instruction. DSF ¶ 147.

state wiretap statute, other students' personal privacy rights, and the school's collective bargaining agreement with its teachers.[2] DSF ¶ 81.

On June 12, 2012, Quirion wrote a letter to Bill Zima, Mt. Ararat Middle School's principal, again requesting that B.P. be allowed to wear a recording device to school "as an accommodation under the ADA." DSF ¶ 83. Quirion specifically asked that the District "provide a reasonable accommodation for [B.P.]'s communication disability by allowing him to carry and use a voice recording device so that [she] can review it daily for announcements and other information that the students are expected to convey to their parents, as well as for [B.P.] to be able to 'tell' [her] about his day at school." DSF ¶ 344. "On July 13, 2012, Patrick Moore acknowledged Quirion's June 12, 2012, letter, 'assuring her that he would review her ADA request and schedule a time to meet.'" DSF ¶ 84. Quirion wrote back the next day to say she would be willing to attend such a meeting but wanted to know the agenda ahead of time. DSF ¶ 84. "If the point of a meeting is to ask me to withdraw my request, I will not withdraw it," she wrote. DSF ¶ 84.

On August 30, 2012, with a new school year about to start, Quirion e-mailed Moore and Zima to tell them that she would interpret their failure to respond as an implicit approval of her request. DSF ¶ 85. Moore wrote back immediately to request that Quirion not send B.P. to school with a recording device. DSF ¶ 86. Moore also wrote:

---

[2]     The letter also "suggested that the District would schedule an IEP meeting to discuss Quirion's concerns about B.P.'s safety." DSF ¶ 81. By e-mail, Pollack declined the District's offer of an IEP meeting. Summary Judgment Record ("**SJR**") 6347-48 (ECF No. 199-6).

> I would like the IEP team to review this accommodation request and
> have an IEP determination prior to any action on your part. If the IEP
> team decides that the accommodation is necessary and reasonable,
> request approved. If not, you have the opportunity for all your due
> process safeguards.

DSF ¶ 347. Quirion declined the offer of an IEP meeting. Summary Judgment Record

("**SJR**") 6415 (ECF No. 199-7). To Quirion, the request for the recording device as an

ADA accommodation was different from an educational accommodation under the

IDEA. DSF ¶ 348. She explained that "[w]hether [B.P.] is entitled to use the device

as an accommodation for his disability that prevents him from telling us what

happened in school is a separate question from whether the device is necessary to

further his education." DSF ¶ 348.

On September 1, 2012, Moore sent Quirion a letter reiterating the District's

earlier objections, as outlined in the March 6, 2012 letter from District counsel.

DSF ¶ 87. Moore's letter concluded by stating that the District "did not give

permission for B.P. to attend school with a recording device . . . . If B.P. comes to

school with such a device we will ask you to remove the device, and if you are not

willing to remove the device, you will need to take B.P. home." SJR 6418 (ECF No.

199-7); DSF ¶ 351.

Two years later, in September of 2014, Pollack made "another ADA request to

equip B.P. with a recording device or body camera to be able to tell Plaintiffs what

happens to him in school." DSF ¶ 91. The District responded by "requesting additional

information, and reminding Plaintiffs of the concerns the District has expressed

about the impact on the educational environment, and the problems the District faces

in protecting the rights and confidentiality of other students and employees and requested proposals for addressing those concerns." DSF ¶ 92.

In November of 2014, Pollack provided Superintendent Smith with information regarding the body camera and recording device and disputed the District's "views concerning the impact on the educational environment, and confidentiality of staff and other students." DSF ¶ 93. Smith responded in January of 2015, writing that "he disagreed with Pollack's assertion that the presence of audio and video recording devices on B.P. would have no impact on the educational environment, of the concerns about the impact that such devices have had and will have on the educators in the school, and indicated his willingness to meet with Pollack in early 2015 to discuss Pollack's request." DSF ¶ 94. Smith did not receive a response from the Parents regarding his invitation to meet. DSF ¶ 95.

In denying the Parents' requests for B.P. to wear a recording device, the District has consistently relied upon its written policy covering employee and student use of cellular telephones and other privately-owned electronic devices. SJR 6151 (ECF No. 199-6); DSF ¶ 332. The policy provides:

> 4. All students are prohibited from using privately-owned electronic devices, including but not limited to cellular telephones, Blackberries, IPhones, handheld computers, MP3 players and electronic games during classes, study halls, assemblies and other school activities.
>
> > a. During classes and school activities, all such devices must be turned off.
> >
> > b. The only exception to this rule is when a teacher or staff member specifically authorizes students to use a personal electronic device for a specific school purpose (such as entering an assignment in a PDA).

> c. If this rule is violated, the teacher may refer the student to administration, or immediately confiscate the device for the remainder of the school day, or both. Discipline may be imposed as provided below.

SJR 6151 (ECF No. 199-6). The District has disciplined students for unauthorized use of electronic devices. DSF ¶ 104.[3] The District has not permitted B.P. to use a recording device because it determined the recording was not for an instructional benefit and "the purpose of the policy is to support the teaching and learning environment." DSF ¶ 101.[4] The District also had "concerns about the educational efficacy and necessity" of the recording device and its impact on staff and other students. DSF ¶ 102.[5]

Students, however, have been permitted to make recordings for educational purposes, such as recording specific lessons with the permission of their teachers so that they can refer to the audio after class. DSF ¶¶ 103, 339. At least one student's IEP permitted and encouraged the use of a recording device in classes during school as an accommodation. DSF ¶ 341. B.P., too, was permitted to use two electronic devices at school. DSF ¶ 338. For many years, B.P. used an electronic expressive communication device ("**Vantage**"). DSF ¶ 333. The Vantage is used to assist B.P. to

---

[3]     The Plaintiffs' request to strike based on "lack of personal knowledge" is denied. In response to being asked "have you ever heard of any student being disciplined for using a recording device," Superintendent Smith testified "I have." He then went on to explain that he received a telephone call from a parent of a student who had been disciplined for violating the policy by using a recording device to take a picture of an assignment. SJR 5712-14 (ECF No. 199-1).

[4]     The Plaintiffs' request to strike is denied. Testimony from District officials, including from Superintendent Smith and Special Educational Coordinator Moore, that the purpose of the District's policy is to support the teaching and learning environment is not expert testimony.

[5]     The Plaintiffs' request to strike is denied.

develop and utilize communication abilities. DSF ¶ 335. B.P. used the device often during his school day, and several of his IEP goals referenced his use of the Vantage. DSF ¶¶ 334-35. B.P. also carried a personally owned Amber Alert GPS device most days at school during the 2013-2014 school year. DSF ¶ 336.

The Parents want B.P. to wear the recording device so that they can learn about his day, thus facilitating their ability to advocate on his behalf, and to "discover and identify any mistreatment or abuse by school personnel or other students." DSF ¶¶ 355-57. Parents do not intend to listen to all of the recordings every day, but rather plan to store the recordings. They state they might listen to them to try to decipher what happened at school if and when they need to advocate for B.P. and his education or randomly to see what B.P.'s day is like. DSF ¶ 109.

## PROCEDURAL HISTORY

The Plaintiffs filed two suits in this Court, the first in March of 2013 and the second in May of 2014. The cases were consolidated on October 23, 2014. After a barrage of early motion practice, the parties filed cross-motions for summary judgment in September of 2015 on the Plaintiffs' claims that the District violated the Americans with Disabilities Act (the "**ADA**"), Section 504 of the Rehabilitation Act ("**Section 504**" or "**the Rehabilitation Act**"), and the First Amendment by refusing to allow B.P. to wear an audio recording device throughout his school day. I granted the District's motion on January 27, 2016, holding that the Plaintiffs failed to exhaust the Individuals with Disabilities Education Act ("**IDEA**") administrative process as

required by 20 U.S.C. § 1415(l). ECF No. 217. The Plaintiffs filed a notice of appeal in April of 2016.

On January 5, 2016, before I ruled on the parties' cross-motions, Pollack filed a new due process complaint with the Maine Department of Education. In the hearing request, Pollack alleged that the District failed to permit B.P. to carry a recording device at school and sought an order requiring the District to allow B.P. to carry and use a recording device for his entire school day. Def.'s Supp. Statement of Facts ¶¶ 3-4 ("**DSSF**") (ECF No. 271). Pollack claimed that the District was required under the IDEA, the Rehabilitation Act, the ADA, and the First Amendment to provide a reasonable accommodation of allowing B.P. to use a recording device. DSSF ¶¶ 5-6.

In March of 2016, a three-day special education due process hearing was held. DSSF ¶ 13. At the hearing, the Maine Department of Education Hearing Officer ("**DPHO**") stated that the issue "with respect to the recording device was 'whether [B.P.'s] IEP should include the use of supplementary aids to properly protect him at school and allow him to effectively communicate and advocate for himself.' " DSSF ¶ 14.[6] Eleven witnesses testified under oath at the hearing, including Pollack and Quirion. DSSF ¶ 18. Pollack "introduced evidence, testified, questioned witnesses, and made legal arguments with respect to the recording device claim." DSSF ¶¶ 15-

---

[6]     In her written decision, the DPHO framed the issue as follows: "Did the District's actions in not permitting [B.P.] to wear a recording device while at school deprive the Parent of his right to participate in the IDEA decision-making process to the extent that it deprived [B.P.] of a free appropriate public education (FAPE) in violation of state or federal special education law?" DPHO Dec. 38. This appears to be a misstatement of the issue. A thorough review of the administrative record reveals that the issue actually raised and decided by the DPHO was whether the recording device was necessary for B.P. to receive a FAPE. *See* SJR 7398, 7466, 7560, 7569, 7582, 7587, 7592 (ECF No. 254-1).

17. In his written closing argument, Pollack stated that the recording device was necessary because B.P. "must be able to gather and communicate to [his parents] his own information about what happens to him at school" and that, because of B.P.'s "communication disabilities and his inability to answer questions about events that have happened to him, the only mechanism that [B.P.] has to protect himself and advocate for himself is to record his day at school so that he can 'tell' us what happened." DSSF ¶¶ 20-21.

The DPHO issued her decision on May 31, 2016. DSSF ¶ 23. She held that B.P. was receiving FAPE. Underlying this conclusion were her findings that B.P. had been going to school for 12 years in the District "without a recording device, and throughout his entire educational career, he has been happy, has loved school, and has made continuous and significant progress." DPHO Dec. 41 (ECF No. 254-1). She observed that the District had provided the Parents with the highest level of detail about a student's day that she had seen in 14 years presiding over due process disputes. DPHO Dec. 41. Noting that there had only been "a handful of incidents of concern to the Parents" and that the Parents stated under oath that they felt B.P. was safe at school, she determined that the recording device was not needed for B.P.'s safety. DPHO Dec. 41.

Furthermore, the DPHO found that the recording device was not needed for B.P. to benefit educationally. To the contrary, she noted that "[t]here is a wealth of evidence from both educators and the parent of another child with autism . . . that the recording device actually would be disruptive and detrimental to the education of

[B.P.] and would interfere with the learning process." DPHO Dec. 42. Based on the evidence put forth at the hearing, she found that permitting B.P. to wear a recording device at school would "interfere with his ability to receive FAPE." DPHO Dec. 42. She noted that Pollack was "unable to state how or whether the Parents would use the recordings." DPHO Dec. 42. Thus, she found that there was "no demonstrable benefit" to the recording device, and "there is the potential for harm." DPHO Dec. 42. The Plaintiffs did not appeal the DPHO's decision. DSSF ¶ 26.

In September of 2016, the District notified the Court of Appeals for the First Circuit of the DPHO's decision. Accordingly, the First Circuit dismissed the appeal as moot, vacated the portion of my order granting the District summary judgment for failing to exhaust on the ADA, Section 504, and First Amendment claims, and remanded the case to me for determination of these claims on the merits. *Pollack v. Reg'l Sch. Unit 75*, 660 F. App'x 1, 3 (1st Cir. 2016).

## DISCUSSION

### I.    ADA and Section 504 of the Rehabilitation Act

The Plaintiffs claim that the District's refusal to allow B.P. to wear the recording device violated the ADA and Section 504 of the Rehabilitation Act. The District contends that these claims are barred by res judicata.

#### A.    Overview of the Law

Title II of the ADA, which applies to public schools, provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a

public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, § 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Although there are differences between Title II and § 504, the two statutes are interpreted consistently. *See Theriault v. Flynn*, 162 F.3d 46, 48 n.3 (1st Cir. 1998). Thus, like the parties, I analyze the statutes in tandem.

The Plaintiffs assert a failure to modify theory of liability. To establish a failure to modify claim under Title II, a plaintiff must show:

> (1) that he is a qualified individual with a disability; (2) that he was excluded from participating in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Kiman v. N.H. Dep't of Corrs.*, 451 F.3d 274, 283 (1st Cir. 2006) (quoting *Parker v. Universidad de P.R.*, 225 F.3d 1, 5 (1st Cir. 2000)). "An entity discriminates against a disabled individual when it fails to make reasonable modifications for that person." *Darian v. Univ. of Mass. Boston*, 980 F. Supp. 77, 84 (D. Mass. 1997). "To recover compensatory damages under either Title II or Section 504, a plaintiff must demonstrate that the [public entity] intentionally discriminated against her and caused her economic harm." *Kelley v. Mayhew*, 973 F. Supp. 2d 31, 36 (D. Me. 2013) (citing *Nieves–Márquez v. Puerto Rico*, 353 F.3d 108, 126 (1st Cir. 2003)).

The duties of a public entity are outlined in the regulations promulgated by the U.S. Department of Justice under 42 U.S.C. § 12134(a). The regulations provide that:

> A public entity, in providing any aid, benefit, or service, may not . . . [a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others . . . [or] [p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result.

28 C.F.R. § 35.130(b)(1)(ii)-(iii).[7] Furthermore, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

### 1. Modifications Necessary for Meaningful Access

"The protection afforded by the ADA is characterized as a guarantee of 'meaningful access' to government benefits and programs." *Theriault*, 162 F.3d at 48 (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985). "Meaningful access" means an equal opportunity to gain an equal benefit, not equal results. *Choate*, 469 U.S. at 721-22; *see also Theriault*, 162 F.3d at 48.

In a failure to accommodate case, a plaintiff must show that the requested accommodation "was needed to provide 'meaningful access to a public service.' "[8]

---

[7]     The regulations under the Rehabilitation Act contain similar requirements. *See* 45 C.F.R. § 84.4(b)(1)(ii)-(iii).

[8]     "The regulations under the relevant portion of the ADA refer to 'reasonable modification,' 28 C.F.R. § 35.130(b)(7), while the coordinating regulations under the Rehabilitation Act use the term

*Nunes*, 766 F.3d at 145 (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273-76 (2d Cir. 2003)). "It naturally follows that when an individual already has 'meaningful access' to a benefit to which he or she is entitled, no additional accommodation, 'reasonable' or not, need be provided by the grantee." *A.M. ex rel. J.M. v. NYC Dep't of Educ.*, 840 F. Supp. 2d 660, 680 (E.D.N.Y. 2012), *aff'd*, 513 F. App'x 95 (2d Cir. 2013); *see also PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682 (2001) (explaining in dicta in a Title III[9] case that sometimes "an accommodation might be reasonable but not necessary"). Thus, "any requested accommodation must first be deemed *necessary* to ensure an individual with disabilities has 'meaningful access' to the benefit in question." *A.M. ex rel. J.M.,* 840 F. Supp. 2d at 680 (citing *Se. Cmty. Coll. v. Davis*, 442 U.S. 397, 410 (1979)).

### 2. Reasonable Accommodation

In order to ensure meaningful access, a public entity may need to make reasonable accommodations. "Reasonableness 'depends on the individual circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to [enjoy meaningful access to the program.]" *Mark H. v. Hamamoto*, 620 F.3d 1090,

---

'reasonable accommodation,' 28 C.F.R. § 41.53, but there is no material difference between the terms." *Nunes v. Mass. Dep't of Correction*, 766 F.3d 136, 145 (1st Cir. 2014).

[9]      The First Circuit has held that "reasonable accommodation" cases brought under Title I of the ADA, which protects against discrimination by private and state and local government employers, are persuasive authority in Title II "reasonable modification" cases. *Kiman v. N.H. Dep't of Corrs*., 451 F.3d 274, 283 n.9 (1st Cir. 2006). The logic of that holding applies with equal force to "reasonable modification" cases brought under Title III of the ADA, which protects against discrimination in places of public accommodation. *Compare* 42 U.S.C. §§ 12111, 12112 (applicable provisions of Title I) *with* 42 U.S.C. §§ 12181, 12182 (applicable provisions of Title III).

1098 (9th Cir. 2010) (quoting *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002)) (alteration in original). An accommodation is not reasonable if it imposes an undue burden on the public entity or requires it to substantially alter its program. 28 C.F.R. § 35.130(b)(7)(i). The plaintiff bears the initial burden of demonstrating that the requested accommodation is reasonable, i.e. feasible on its face under the circumstances. *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 259 (1st Cir. 2001) (Title I employment case). The burden then shifts to the defendant to show that the accommodation would impose an undue hardship or require a fundamental alteration of its programs. *Id.*

The ADA is intentionally broad in scope, but it does not require public entities to provide every requested accommodation. A plaintiff is entitled only "to reasonable accommodations, not to optimal ones finely tuned to his preferences." *Nunes*, 766 F.3d at 146. "Otherwise, a requested service would automatically be transformed into a 'necessary' service merely by the fact that it was requested." *Martin v. Halifax Healthcare Sys., Inc.*, 621 F. App'x 594, 602 (11th Cir. 2015).

### 3. Effective Communications Regulation

The inquiry into "meaningful access" is "guided by the relevant regulations interpreting Title II." *K.M. ex rel. Bright v. Tustin Unified School Dist*rict, 725 F.3d 1088, 1102 (9th Cir. 2013). At issue in this case is the so-called effective communications regulation. 28 C.F.R. § 35.160.[10] The effective communications

---

[10] "Insofar as the Title II effective communications regulation has a Section 504 analog, it is . . . the Section 504 communications regulation at 28 C.F.R. § 39.160." *Tustin*, 725 F.3d at 1099-100. This regulation provides, *inter alia*, that covered entities must "furnish appropriate auxiliary aids where

regulation has two components. First, a public entity must "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). Second, a public entity must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1). "The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 28 C.F.R. § 35.160(b)(2). And "[i]n determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." 28 C.F.R. § 35.160(b)(2). However, a public entity need not "take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." 28 C.F.R. § 35.164.

---

necessary to afford a handicapped person an equal opportunity to participate in, and enjoy the benefits of, a program or activity." 28 C.F.R. § 39.160(a)(1).

## B.     Application of the Law to the Facts

### 1.     Applicability of the Effective Communication Regulation

The District contends that the Plaintiffs' reliance on the effective communications regulation is misplaced. It argues that, "the regulation requires that a public entity ensure that *the public entity's* communications with individuals with disabilities are effective." Defs.' Opp'n to Pls.' Mot. for Summ. J. 6 (ECF No. 166). There is no authority supporting the Plaintiffs' position, the District argues, "that the regulation requires a public entity to provide auxiliary aids and services to facilitate effective communications between a student with a disability and that student's parents, occurring in private and outside of school, after the school day is done." Defs.' Opp'n to Pls.' Mot. for Summ. J. 6.

On its face, the regulation establishes a framework to ensure that a disabled individual can effectively communicate with, receive information from, and convey information to, a public entity. The regulation requires "[a] public entity" to "ensure that communications with . . . participants . . . with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). Further, "[a] public entity" must "furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." § 35.160(b)(1).

The regulation also applies to "companions," but it is referring to companions *with disabilities*. § 35.160(a)(1). The regulations interpretive guidance explains that a public entity would have a duty to provide effective communication to companions with disabilities in the following settings:

> [S]ituations include back-to-school nights or parent-teacher conferences at a public school. If the faculty writes on the board or otherwise displays information in a visual context during a back-to-school night, this information must be communicated effectively to parents or guardians who are blind or have low vision . . . . It makes no difference that the child who attends the school does not have a disability.

28 C.F.R. § Pt. 35, App. A. As these examples demonstrate, the regulation requires a public entity to provide appropriate auxiliary aids and services to ensure that its communications with companions with disabilities are as effective as communications with others.

The Plaintiffs read the regulation as requiring the District to ensure that B.P.'s communication with his *parents* about his school day is as effective as nondisabled students. Pls.' Opp'n to Defs.' Mot. for Summ. J. 7 ("**Pls.' Opp'n**") (ECF No. 164). But this reading of the regulation extends its reach beyond the schoolhouse doors to communications between parent and child outside of the school setting. The Plaintiffs have not cited, and I have not found, any authority supporting such an expansive reading of the regulation.

The Plaintiffs marshal several arguments as to why the regulation applies to the facts of this case, but none are persuasive. The Plaintiffs' primary argument relies on regulatory guidance for the proposition that the regulation "applies not just to communications occurring within the school, but also to a student's school-related communications with his or her parents." Pls.' Mot. for Summ. J. 5 (citing U.S. Depts. of Educ. & Justice, Frequently Asked Questions on Effective Communications for Students with Hearing, Vision, or Speech Disabilities in Public elementary and

Secondary, at 4 (Nov. 2014) ("**FAQ**")). By taking the FAQ out of context, the Plaintiffs have mischaracterized the agencies' guidance. The FAQ explains that the regulation's

> requirements apply to all of a student's school-related communications, not just those with teachers or school personnel. Therefore, given the ongoing exchanges students experience with teachers, students, coaches, and school officials, any student who requires a sign language interpreter in order to receive effective communication in an academic class would likely need interpreter services throughout the day and may also need them to participate in school-sponsored extracurricular activities.

FAQ ¶ 4. In these settings, the regulation is not limited to communications with teachers or personnel. Read in context, the "school-related communications" discussed in the FAQ relate to accommodations needed for communications taking place during the school day or at school-sponsored extracurricular activities. The Plaintiffs' reading extends "school-related communications" well beyond the regulatory guidance. In my view, the Plaintiffs stretch too far in trying to bring this case within the effective communication regulation.

## 2. Res Judicata

The Plaintiffs maintain that the District violated the ADA because its refusal to allow B.P. to wear a recording device "has deprived B.P. of the opportunity to communicate with his parents about happenings at school as effectively as his peers without disabilities through its failure either to modify its policy prohibiting the use of 'privately owned' electronic devices or to provide an auxiliary aid in the form of a personal voice recorder." Pls.' Opp'n 12. They contend that:

> This deprivation prevents B.P.'s parents from being as capable as parents of non-disabled students to advocate on his behalf, thereby depriving him of an *equally effective* opportunity to participate in the District's benefits or services, to obtain the same result from those

services, to gain the same benefits from those services, or to enjoy a "privilege, advantage, or opportunity"—the ability to communicate with parents any problems or concerns experienced at school and therefore to have his parents advocate for him—"enjoyed by others receiving the . . . benefit or service."

Pls.' Opp'n 12. Accordingly, the Plaintiffs' argument is that the recording device is needed to provide B.P. with equally effective parental advocacy so that he can enjoy the same quality of public school services as his non-disabled peers.

The District argues that this claim is foreclosed by the DPHO's decision under principles of res judicata. "[T]he Supreme Court has instructed that 'federal courts must give the [state] agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.' " *Bath Iron Works Corp. v. Dir., Office of Workers' Comp. Programs*, 125 F.3d 18, 21 (1st Cir. 1997) (quoting *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 799 (1986)). The prior decision at issue was rendered by a Maine administrative agency, so Maine law governs the preclusion analysis. In Maine, "decisions of state and municipal administrative agencies are . . . accorded the same finality that attaches to judicial judgments." *Hebron Acad., Inc. v. Town of Hebron*, 60 A.3d 774, 783 (Me. 2013); *see also Town of Boothbay v. Jenness*, 822 A.2d 1169, 1175 (Me. 2003). "The doctrine of res judicata—literally, 'thing adjudged'— is a court-made collection of rules designed to ensure that the same matter will not be litigated more than once." *Beegan v. Schmidt*, 451 A.2d 642, 643-44 (Me. 1982). The doctrine is comprised of two components: issue preclusion and claim preclusion.[11] *Macomber*

---

[11] To the extent that the District contends that claim preclusion bars the Plaintiffs' disability discrimination claims, that argument fails because the hearing officer lacked jurisdiction to act on these claims. *See Mr. I v. Maine Sch. Admin. Dist.* 55, 416 F. Supp. 2d 147, 175 (D. Me. 2006); *see also* 18 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4412,

*v. MacQuinn–Tweedie*, 834 A.2d 131, 138 (Me. 2003). Issue preclusion is the component at issue in this case.

Sometimes referred to as collateral estoppel, issue preclusion is based on "the fundamental principle that courts should not revisit factual matters that a party previously litigated and another court actually decided." *Miller v. Nichols*, 586 F.3d 53, 60 (1st Cir. 2009). Issue preclusion "applies when (1) the identical factual issue was decided by a prior final judgment, and (2) the party to be estopped had an opportunity and an incentive to litigate the issue at the prior proceeding." *State v. Hughes*, 863 A.2d 266, 268 (Me. 2004). "The doctrine precludes courts from revisiting factual matters that meet this test, even when a second action seeks a different remedy than the initial litigation." *Miller*, 586 F.3d at 60. The party asserting issue preclusion "has the burden of demonstrating that the specific issue was actually decided in the earlier proceeding." *Macomber*, 834 A.2d at 140.

The DPHO held that the District's actions in not permitting B.P. to wear a recording device while at school did not deprive him of a FAPE. DPHO Dec. 42, 46. The factual findings underlying this holding were that the recording device would interfere with B.P.'s ability to receive a FAPE, was not needed for his safety, and was not necessary for him to benefit educationally. DPHO Dec. 41-42. And although the DPHO acknowledged Pollack's argument that the recording device was needed so that B.P. could gather and communicate information to his Parents about what

---

at 285 (2d ed. 2002) ("Claim preclusion is readily denied when the remedies sought in the second action could not have been sought in the first action.").

happens at school so they can "fully advocate" for him, she found that the device provided no demonstrable benefit to B.P., and concluded that the device would be disruptive and detrimental to his education. DPHO Dec. 42.

The DPHO's decision is preclusive here because the factual issues in this case are identical to the issues decided by the DPHO. The thrust of the Plaintiffs' claim at both the due process hearing and here is that the District was required to allow B.P. to use a recording device so that he could meaningfully access and benefit from the District's programs and services. Both before the DPHO and here, the Plaintiffs' theory has been that B.P. needs the device to communicate his day to his Parents so that they can effectively advocate to the District on his behalf. *Compare* Pollack's closing argument at the due process hearing, DSSF ¶ 21 ("Given his communication disabilities, and his inability to answer questions about events that have happened to him, the only mechanism that [B.P.] has to protect himself and advocate for himself is to record his day at school so that he can 'tell' us what happened."), *with* Pls.' Opp'n 10-11 ("B.P. cannot tell his parents anything about what happens during his day at school. For him to have the benefit of parental advocacy for his education equal to that of students without such a communication disability . . . [the Parents] must not be forced to rely on information provided by the District.").

The Plaintiffs must establish that the requested accommodation is reasonable and necessary to give B.P. an equal opportunity to participate in and benefit from the school's programs. Given the DPHO's findings that the recording device would negatively impact B.P.'s education, I see no way that the Plaintiffs can meet their

burden of establishing that the device is reasonable or necessary under the ADA and Section 504.[12]

In arguing to the contrary, the Plaintiffs make three points. First, they argue that issue preclusion does not apply "because the burden has shifted from the Plaintiffs in the administrative hearing to the District in this action." Pls.' Resp. to Def.'s Supp. Mot. for Summ. J. 3 ("**Pls.' Supp. Opp'n**") (ECF No. 266). The Plaintiffs correctly point out that issue preclusion may not apply where there has been a shift in the burden of proof. *See Crawford v. Allied Container Corp.*, 561 A.2d 1027, 1028 (Me. 1989). The burden of proof, however, has not shifted on this issue. Although the District would have the burden of proving that the requested accommodation would result in an undue burden or a fundamental alteration, see 28 C.F.R. § 35.164, it is the Plaintiffs' burden to show that the accommodation is necessary and reasonable. 28 C.F.R. § 35.130(b)(7)(i); *see also Nunes*, 766 F.3d at 145; *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 307 (1st Cir. 2003) (Title III).

Second, the Plaintiffs note that under Maine law, "issue preclusion applies only to 'such facts without proof of which the prior decision could not have been rendered.' " Pls.' Supp. Opp'n 7 (quoting *Sewall v. Taylor*, 672 F. Supp. 542, 544 (D. Me. 1987). Given this, the Plaintiffs contend that the facts relied upon by the District were "unnecessary to the hearing officer's ultimate conclusion regarding FAPE" and are

---

[12]    Although I do not believe that the effective communication regulation applies on these facts, even if it did apply, the Plaintiffs would not be able to establish that the device was "necessary to ensure effective communication" given the DPHO's finding that the device would negatively impact B.P.'s education. 28 C.F.R. § 35.160(b)(2).

therefore not preclusive. Pls.' Supp. Opp'n 8. For instance, the Plaintiffs contend that the finding that the device would be "disruptive or detrimental are logically beyond the hearing officer's determination of whether B.P. was receiving FAPE without the recording device." Pls.' Supp. Opp'n 8. I disagree. Given the arguments advanced by the Plaintiffs at the due process hearing as to why the recording device was necessary for FAPE, the DPHO's factual finding that the device would actually interfere with B.P.'s ability to receive FAPE was essential to her conclusion.[13]

Third, although the Plaintiffs acknowledge that "ordinary principles of issue and claim precision" can apply "in cases raising both IDEA and Title II claims where the IDEA administrative appeals process has functionally adjudicated some or all questions relevant to a Title II claim in a way that precludes litigation," they argue that the DPHO "could not and has not considered any of Plaintiffs' ADA/504 arguments." Pls.' Supp. Opp'n 5 n.5 (citing *Tustin*, 725 F.3d at 1101). This argument misconstrues the nature of issue preclusion and ignores what happened at the due process hearing. Under Maine law, issue preclusion does not depend on the legal claims asserted in the prior action—it "concerns factual issues, and applies even when the two proceedings offer different types of remedies." *Portland Water Dist. v. Town of Standish*, 940 A.2d 1097, 1100 (Me. 2008); *see also Miller*, 586 F.3d at 60. Thus, although the DPHO did not have jurisdiction to act on the Plaintiffs' disability

---

[13]      The Plaintiff also make a structural argument: any findings appearing after the DPHO's conclusion that B.P. "is receiving FAPE" are unnecessary because the DPHO "could have stopped there." Pls.' Supp. Opp'n 8. As the District points out, this argument is unreasonable—under the Plaintiffs' theory, any court decision that states its holding upfront "would render any further elaboration or discussion of underlying findings mere surplusage." Defs.' Supp. Reply 5 (ECF No. 270).

discrimination claims, the facts established in the prior proceeding can still be preclusive here. *See, e.g., Siegemund v. Shapland*, 247 F. Supp. 2d 1, 5 (D. Me. 2003) (explaining that issue preclusion may still be available as to facts established in the prior proceeding even though the prior court did not have jurisdiction to hear the claims at issue).

The second prong of issue preclusion asks whether the Plaintiffs had a fair opportunity and incentive to litigate the issue in the prior proceeding. "A party has a *fair opportunity* to litigate an issue if that party either controls the litigation, substantially participates in that litigation, or could have participated in the litigation had they chosen to do so." *Hughes*, 863 A.2d at 269. Given the extent of the Parents' involvement at the due process hearing, this prong is also satisfied. *Cf. Miller*, 586 F.3d at 63 ("It is clear that since plaintiffs actually litigated the issues in state court, they had both incentive and opportunity to present the claims.").

Because the DPHO's findings preclude the Plaintiffs from establishing essential elements of their claim, the District is entitled to summary judgment on the Plaintiffs' claims under Title II of the ADA and Section 504 of the Rehabilitation Act.[14]

---

[14]    The Plaintiffs also contend that issue preclusion is unavailable because "[e]vidence that was not before the IDEA hearing officer is now before the Court" and that this evidence creates a dispute of material fact on the issue of pretext. Pls.' Supp. Opp'n 9-10 (citing *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 796 (1st Cir. 1992)). To the extent, if any, that this new evidence is relevant to B.P.'s ADA and Section 504 claims, it does not alter my conclusion.

## II.    The First Amendment

The Plaintiffs contend that B.P. has a First Amendment right to record in school so that he can provide his parents with the information necessary to allow them to advocate on his behalf. The Defendants respond that there is no constitutionally protected right to record all day, every day at school.

### A. The General First Amendment Framework

Claims under the First Amendment are analyzed in three steps. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). The plaintiff must first demonstrate that the activity at issue is protected by the First Amendment. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). Second, if the activity at issue is protected, the context of the activity is analyzed in order to determine which First Amendment standard or standards apply. *Cornelius,* 473 U.S. at 797. And third, the Government's justification for restricting the activity is examined to ensure that it meets the applicable standard. *Id.*

### B. Application of the General Framework to the Facts of the Case

#### 1.    Step One—Is the Activity Protected?

The protections afforded by the First Amendment are not limited to written or spoken words. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995). The First Amendment also "prohibit[s] government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978). To guard the "stock of information" from which the public may draw, the First Amendment also "encompasses a range of

conduct related to the gathering and dissemination of information." *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011).

Gathering information through audio recording is generally protected by the First Amendment. *See Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *see also Martin v. Evans*, No. 16-11362-PBS, 2017 WL 1015000, at *7 (D. Mass. Mar. 13, 2017). And "[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" *Glik*, 655 F.3d at 82 (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

In *Glik*, the First Circuit found that the First Amendment encompasses a right to make audiovisual recordings of government officials working in public places, subject to reasonable time, place, and manner restrictions normally allowed in public forums. 655 F.3d at 84. The court held that the plaintiff, a member of the public but not the press, had a right to film an arrest in the Boston Common which he thought was excessively forceful. *Id.*

The Plaintiffs argue that the right of B.P. to audio record his entire school day "is protected First Amendment activity because it is information-gathering with a potential expressive use." Pls.' Reply 2 (ECF No. 268). The "potential expressive use" is the subsequent dissemination of information obtained from the recording by the Parents as B.P.'s next friend. The Plaintiffs contend that the primary purpose of the recording is to identify and expose wrongdoing in B.P.'s classroom. Pls.' Opp'n 26.

The District makes an argument that the Parents have no First Amendment protection because they have no right of access to the classroom.[15] As for B.P., the District acknowledges that he has a right to be in the classroom, but it argues without analysis that B.P.'s right of access does not include a right to record. The District also claims that because the Parents "have no plans regularly to listen to, let alone disseminate," the recordings, the recording activity is purely personal and enjoys no First Amendment protection. Defs.' Mot. for Summ. J. 24.[16]

Contrary to the District's argument, there are facts in the record which support the Plaintiffs' claim that they intend to review and disseminate the recordings if they find that B.P. is acting differently or has any bruising, as has occurred on two past occasions. If they found that the recordings supported their suspicions of misconduct, they would disseminate the recordings further to advocate against the District. *See* SJR 5302-04 (ECF No. 199-1).

At the motion to dismiss stage I said that:

---

[15]    In its supplemental briefing, the District points out that the First Amendment claim is now made "solely in B.P.'s name as the Parents' First Amendment [c]laims have been dismissed." Def.'s Suppl. Mot. for Summ. J. 15 n.12 (ECF No. 258). The Plaintiffs have not argued otherwise in their supplemental briefing. To the extent that the Parents seek to press their own First Amendment rights, that claim fails because the Parents have no right of access to the school. *Cf. Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) ("The public importance of conditions in penal facilities and the media's role of providing information afford no basis for reading into the Constitution a right of the public or the media to enter these institutions, with camera equipment, and take moving and still pictures of inmates for broadcast purposes.").

[16]    Given the DPHO's finding that Pollack "was unable to state how or whether the Parents would use the recordings," DPHO Dec. 42, the District contends that the Plaintiffs cannot establish that recording is protected activity under the First Amendment because it concerns a purely private matter. Def.'s Suppl. Mot. for Summ. J. 12 (ECF No. 258). But the DPHO's findings on this point are not entirely clear. The DPHO also noted that Pollack would probably just store the recordings "and listen to them if there was some concern." DPHO Dec. 20. Given this ambiguity, I cannot say that this issue was essential to the DPHO's decision, and, accordingly, it does not have preclusive effect.

> *Glik* seems to answer the Defendants' argument that the Plaintiffs' claim does not implicate the First Amendment *at all*. While *Glik* may be distinguishable because it took place in a traditionally public forum and only involved the videotaping of a single act of official abuse, these differences go to which First Amendment standard applies, not whether the First Amendment applies at all. At a minimum, *Glik* stands for the principle that producing a recording with a plan to share it with others can be a communicative act and carries at least some First Amendment protection.

*Pollack v. Regional School Unit 75*, 12 F. Supp. 3d 173, 199 (D. Me. 2014). The District has not pointed to any convincing authority calling this conclusion into question.[17] I believe it makes sense to treat the right to record as an activity protected by the First Amendment at the first step of the analysis. Because I conclude that the Plaintiffs have established that the requested activity can be conduct protected by the First Amendment, I proceed to the second step of the analysis.

## 2. Step Two—What is the Appropriate Standard?

At the second step, I must analyze the context in which the activity occurred in order to determine the appropriate standard to apply. The relevant context here is a public school. The Supreme Court has instructed that although students do not "shed their constitutional rights . . . at the schoolhouse gate," *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 506 (1969), the First Amendment must be "applied in light of the special characteristics of the school

---

[17] My own research has uncovered a split of opinion on the topic. Some courts have held that the right to record in a nonpublic forum gets past step one of the First Amendment analysis. *See, e.g.*, *Leibovitz v. Barry*, No. 15-CV-1722, 2016 WL 5107064, at *7 (E.D.N.Y. Sept. 20, 2016) (recording in a courthouse); *McDonough v. Fernandez-Rundle*, No. 15-20038-CV, (S.D. Fla. Sept. 17, 2015) (recording inside a police station). And some courts have held otherwise. *See, e.g.*, *Surlock v. Delaney* No. 5:11-CV-1121, 2016 WL 3200273, at *39 (N.D.N.Y. June 8, 2016) (distinguishing cases like *Glik* and noting that "[n]othing in these cases supports the proposition that the First Amendment protects a parent's right to place a hidden camera in the bedroom of their child who resides in a state run home for severely handicapped individuals").

environment," and thus students' First Amendment rights "are not automatically coextensive with the rights of adults in other settings." *Morse v. Frederick*, 551 U.S. 393, 396-97 (2007). Reconciling these principles is no easy task.

The parties argue for the application of diverse First Amendment standards. The Plaintiffs, citing *Glik*, contend that the District can restrict B.P.'s right to record in school only if the District's policy is a reasonable time, place, and manner restriction. Because they believe that the District's policy is content-based and that it is being applied against the Plaintiffs based on their viewpoint, the Plaintiffs contend that the policy must (but does not) withstand strict scrutiny. Alternatively, the Plaintiffs argue that *Tinker* sets the standard. *See* 393 U.S. 503. *Tinker* was a student speech case that stands for the proposition that schools must honor the First Amendment rights of students unless there would be substantial disruption or material interference with school activities. Plaintiffs contend that the District has not shown that the recording device would substantially disrupt or materially interfere with school activities under *Tinker*. Pls.' Mot. for Partial Summ. J. 18.

For its part, the District contends that *Glik* is not applicable because it is limited to public forums. The District also rejects *Tinker*, characterizing it as an "expression" case, and argues that this case is about "right of access" principles. The District relies heavily on "right of access" cases as setting the applicable standard. It places significant emphasis on *S.H.A.R.K. v. Metro Parks Serving Summit County*, 499 F.3d 553 (6th Cir. 2007), which applied a form of rational basis review.[18] The

---

[18]     I find *S.H.A.R.K. v. Metro Parks Serving Summit County* particularly opaque. 499 F.3d 553 (6th Cir. 2007). *S.H.A.R.K.* involved plaintiffs who planted cameras in a municipal park during

District additionally argues that its regulation is neither content nor viewpoint-based and should be upheld because it is reasonable in light of the purposes served by the forum. Finally, the District argues that even if *Tinker* does apply, it still should prevail because the recording device would substantially disrupt school activities and would impinge on other students' privacy rights. Def.'s Opp'n to Pls.' Suppl. Br. 7-9 (ECF No. 263).

### a. Forum Analysis and *Glik*

The Supreme Court's decisions "reflect, either implicitly or explicitly, a 'forum based' approach for assessing restrictions that the government seeks to place on the use of its property." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *see also Berner v. Delahanty*, 129 F.3d 20, 25 n.4 (1st Cir. 1997) ("Generally speaking, the nature of the forum in which the speech is restricted dictates the level of scrutiny required."). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799-800. Instead, "[t]he adequacy of the government's justification" for curtailing speech "is measured on a sliding scale." *Berner*, 129 F.3d at 25 n.4.

---

daytime park hours in order to record the culling of a deer herd that occurred after the park had closed. The "overarching question" as described by the Sixth Circuit was "whether the plaintiffs had a lawful right of access to the information." *Id*. at 560. Although *S.H.A.R.K.* might have been helpful to the District in analyzing the Parents' claimed right to access the school, it does not provide much insight into how to analyze B.P.'s rights, as he already has access to the information that he seeks to record.

The Supreme Court has recognized different types of forums. "At one end of the spectrum are streets and parks which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (internal quotations omitted). In public forums, content-based restrictions[19] must satisfy strict scrutiny, and viewpoint-based restrictions[20] are prohibited. *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Sagardia De Jesus*, 634 F.3d 3, 11 (1st Cir. 2011). Additionally, the state is allowed to "enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry Educ. Ass'n*, 460 U.S. at 45.

At the other end of the spectrum is "[p]ublic property which is not by tradition or designation a forum for public communication." *Id.* at 46. In these nonpublic forums, the state has far greater leeway to limit expressive activity. "In addition to

---

[19]  In *Reed v. Town of Gilbert*, the Supreme Court explained:

> Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed. This commonsense meaning of the phrase "content based" requires a court to consider whether a regulation of speech "on its face" draws distinctions based on the message a speaker conveys. Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny.

135 S. Ct. 2218, 2227 (2015) (internal citations omitted).

[20]  Viewpoint-based restrictions on speech are "an egregious form of content discrimination" because they "target not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).

time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* A restriction on speech in a non-public forum can be content-based but must still be viewpoint-neutral. *See id.* at 49; *see also Hotel Employees & Rest. Employees Union, Local 100 of N.Y., N.Y. & Vicinity, AFL CIO v. City of N.Y. Dep't of Parks & Recreation*, 311 F.3d 534, 553 (2d Cir. 2002).

The question presented in *Glik* was "fairly narrow: is there a constitutionally protected right to videotape police carrying out their duties in public?" 655 F.3d at 82. The public nature of the venue—"the oldest city park in the United States and the apotheosis of a public forum"—was reiterated throughout the opinion. *Id.* at 84. "In such traditional public spaces, the rights of the state to limit the exercise of First Amendment activity are 'sharply circumscribed.' " *Glik*, 655 F.3d at 84 (quoting *Perry Educ. Ass'n*, 460 U.S. at 45 (emphasis added)). *Glik* did not apply a special constitutional standard because the activity at issue was recording rather than speech. Instead, *Glik* used traditional principles of forum analysis, and the outcome was dependent on the nature of the forum.[21]

---

[21]     The Plaintiffs' cite *Rideout v. Gardner*, 838 F.3d 65 (1st Cir. 2016), in support of their argument "that, at least in the First Circuit, courts cannot use the recording's forum in analyzing whether the restriction imposed on recording is valid." Pls.' Suppl. Mot. for Summ. J. 7 (ECF No. 256) (citing). In *Rideout,* the First Circuit struck down a state law prohibiting "ballot selfies"—i.e., sharing a photograph of a voter's marked ballot. *See id.* at 68. *Rideout* was not a case about the right to record public officials. *Rideout* does not support the Plaintiffs' sweeping argument that the First Circuit has abandoned forum analysis in recording cases. While the Plaintiffs may be correct that the interior of a polling place is a nonpublic forum, the ballot selfie law was not limited to the interior of a polling place. Instead, it regulated "the use of imagery of marked ballots, regardless of where, when, and how that imagery [was] publicized." *Rideout*, 838 F.3d at 73. Given that the law's reach extended well

The District urges me to reject *Glik* and apply rational basis review on the ground that the school is a non-public forum. Public schools are not considered public forums, and they "may be deemed to be public forums only if school authorities have 'by policy or by practice' opened those facilities 'for indiscriminate use by the general public,' or by some segment of the public, such as student organizations." *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 267 (1988) (quoting *Perry*, 460 U.S. at 46, 47 n.7 (1983)). "If the facilities have instead been reserved for other intended purposes, 'communicative or otherwise,' then no public forum has been created, and school officials may impose reasonable restrictions on the speech of students, teachers, and other members of the school community." *Id.* (quoting *Perry*, 460 U.S. at 46 n.7). Here, there is nothing in the record indicating that B.P.'s school has been opened for use by the public, so the school constitutes a nonpublic forum. *See Ward v. Hickey*, 996 F.2d 448, 453 (1st Cir. 1993) (holding in a First Amendment employment retaliation case that "the classroom is not a public forum, and therefore is subject to reasonable speech regulation").

At bottom, the District urges me to uphold the school's electronic policy because it is rationally related to a legitimate goal of preserving the educational environment and protecting the privacy concerns of others in the school. But this argument glosses over the fact that the Supreme Court has developed a line of school-specific cases that must also be considered.

---

beyond any particular property, it is not surprising that the court did not engage in a traditional forum analysis.

### b.  *Tinker* **and Other School Specific Cases**

The Supreme Court has repeatedly recognized that students' First Amendment rights do not parallel the rights of adults in other settings because of the special characteristics of the school environment. *See Morse*, 551 U.S. at 396-97. In *Tinker*, public school officials enacted a policy prohibiting the wearing of an armband to school after learning that students planned to wear the armbands as a protest against the Vietnam War. 393 U.S. at 504. The students were sent home and suspended for violating the policy. *Id*. In holding that the policy violated the students' First Amendment rights, the Supreme Court observed:

> First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.
>        . . . .
> On the other hand, the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools. Our problem lies in the area where students in the exercise of First Amendment rights collide with the rules of the school authorities.

*Id*. at 506-07 (citation omitted). The Court characterized the school's action as a regulation of "pure speech," as distinguished from regulations that restricted student conduct. *See* 393 U.S. at 507-08 ("The problem posed by the present case does not relate to regulation of the length of skirts or the type of clothing, to hair style, or deportment."). And in analyzing the restriction, the Court found it particularly important that the school's policy "did not purport to prohibit the wearing of all

symbols of political or controversial significance," but rather singled out a particular symbol. *Id.* at 738.

The Court found that the wearing of the armbands "was entirely divorced from actually or potentially disruptive conduct," *id.* at 505, and held that the school could not ban the armbands because there was "no evidence whatever of [plaintiffs'] interference, actual or nascent, with the schools' work or of collision with the rights of other students to be secure and to be let alone." *Id.* at 508. An "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression." *Id.* Thus, in *Tinker*, the school could not deny the students' form of expression unless there were "facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities" or where "disturbances or disorders on the school premises in fact occurred." *Id.* at 514. Where such facts exist, *Tinker* notably breaks with forum analysis and allows schools to regulate speech based on viewpoint. *See, e.g., Morgan v. Swanson*, 659 F.3d 359, 379 (5th Cir. 2011) (en banc); *B.W.A. v. Farmington R-7 Sch. Dist.*, 554 F.3d 734, 740 (8th Cir. 2009); *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1184–85 (9th Cir. 2006) *cert. granted, judgment vacated as moot sub nom. Harper ex rel. Harper v. Poway Unified Sch. Dist.*, 549 U.S. 1262 (2007).

The District contends that *Tinker* does not apply because the privately-owned electronic device policy is content-neutral, and *Tinker* is limited to cases involving content and viewpoint-based restrictions on speech. Def.'s Opp'n to Pls.' Suppl. Br. 4 (ECF No. 263) (citing cases). The Plaintiffs counter by pointing out that the policy

allows "recording with an 'educational *purpose*,' but prohibits recording for any other purpose," and is thus content-based. Pls.' Reply 3 (ECF No. 268) (relying on *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015)).

Even if I bought the District's argument that the policy is content-neutral, the Plaintiffs have also alleged that the District has applied its policy to B.P. in a viewpoint-based manner. They contend that a major reason the District objects to B.P.'s recording and not to recording by other students is that the Plaintiffs' purpose is to monitor and scrutinize school officials. *See* DSF ¶ 358; *see also* DSSF ¶ 81 (permitting video-recording of a particular lesson so long as the Parents agreed not to argue that an employee should be "dismissed or disciplined or sanctioned" but permitting praise). Also, there is evidence in the record suggesting that the District has not always applied its policy evenly. For example, the District has not objected to B.P.'s use of a personally owned Amber Alert GPS device during school because the device does not record nor "cause the same concerns the District has about Plaintiffs' requested recording." DSF ¶ 337. There is thus a genuine dispute of material fact as to whether the District has applied its policy to B.P. in a viewpoint-based manner. *See Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009).

Finally, the District attempts to distinguish *Tinker* on the ground that it is an "expression" case. Defs.' Mot. for Summ. J. 20-21. But the Plaintiffs have asserted an expressive purpose to disseminate information obtained from the recordings in the event that they uncover abuse or other wrongdoing. Pls.' Reply 2 (ECF No. 268). I find it relevant that the First Circuit in *Glik* did not draw a distinction between

gathering information and "expression" even though the activity there—recording in anticipation of dissemination—was not pure "expression." I view recording activity as a point on the continuum of expression; it is the predicate act that ultimately facilities expression.

The District's refusal to allow B.P. to record his day does not neatly fit the facts of *Tinker* nor any of the other school cases cited by the parties.[22] But although *Tinker* is not the perfect fit, it is the closest fit.[23] It takes into account the unique features of the school environment and it allows schools to restrict expression—even based on viewpoint—where the schools can forecast substantial disruption of or material interference with school activities or collision with the rights of other students.

### 3. Step Three—Assessing Whether the District's Justification for Restricting the Activity Satisfies the *Tinker* Standard

Under *Tinker*, school officials can restrict speech "in two broad sets of circumstances: if the speech 'might reasonably lead school authorities to forecast

---

[22]    Since *Tinker*, the Supreme Court has decided a number of other cases involving student speech and has explained that "the mode of analysis set forth in *Tinker* is not absolute." *Morse v. Frederick*, 551 U.S. 393, 405 (2007). For example, in *Bethel School District No. 403 v. Fraser*, the Court held that schools can regulate vulgar, lewd, obscene, and plainly offensive speech. 478 U.S. 675, 683 (1986). In *Hazelwood School District v. Kuhlmeier*, the Court held that schools can limit students' school sponsored speech to legitimate educational concerns. 484 U.S. 260, 266 (1988). And in *Morse*, the Court held that schools can restrict speech at school events when the speech is reasonably viewed as promoting illegal drug use. 551 U.S. at 403. Student speech falling outside the narrow exceptions articulated in *Fraser*, *Hazelwood*, and *Morse*, however, are analyzed under the *Tinker* standard. Pls.' Suppl. Mot. 2 (citing cases); *but see Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530 (7th Cir. 1996) (applying forum analysis to a school speech challenge).

[23]    The District consistently relies on *Hazelwood* for the proposition that it can restrict B.P.'s "First Amendment related conduct 'in any reasonable manner.' " Defs.' Opp'n to Pls.' Mot. for Partial Summ. J. 27 (ECF No. 166 (quoting *Hazelwood*, 484 U.S. at 270). But *Hazelwood*'s "reasonably related to legitimate pedagogical concerns" test is limited to school sponsored speech. *See Hazelwood*, 484 U.S. at 271-71. The District has not attempted to articulate how B.P.'s recording could be considered school-sponsored speech.

substantial disruption of or material interference with school activities,' or, alternatively, if the speech 'collides with the rights of other students to be secure and to be let alone.' " *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1152 (9th Cir. 2016) (quoting *Wynar v. Douglas Cty. Sch. Dist.*, 728 F.3d 1062, 1070 (9th Cir. 2013)). "For a school's forecast to be reasonable, courts generally require that it be based on a 'concrete threat' of substantial disruption." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 37 (10th Cir. 2013). It is the District's burden to show that the restriction on B.P.'s speech activity is constitutional under *Tinker*. *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 321 (3d Cir. 2013).

Here, the District has not met its burden because it has not attempted to apply the *Tinker* standard to the facts of this case. Indeed, the District does not even raise *Tinker* in its original motion for summary judgment, choosing instead to rely on its argument that this case is governed by "right of access" principles.[24] Given the absence of any developed analysis on the issue by the District, its motion for summary judgment on the First Amendment claim is denied.

The Plaintiffs' motion for summary judgment does not fare any better. There is ample evidence in the record suggesting that the District could have reasonably forecast a substantial disruption if B.P. wore the recording device to school. There is

---

[24] In its supplemental motion for summary judgment, the District contends that the DPHO's decision precludes the Plaintiffs' claim under *Tinker* because she found that the device would be disruptive and detrimental and would interfere with the learning process. Def.'s Suppl. Mot. for Summ. J. 14-15. But as the Plaintiffs point out, issue preclusion is inapplicable here because it is the District's burden to justify its restriction under the First Amendment, whereas it was the Plaintiffs' burden to establish that the recording device was necessary to ensure a FAPE at the due process hearing. *See Crawford v. Allied Container Corp.*, 561 A.2d 1027, 1028 (Me. 1989).

also evidence suggesting that District officials could reasonably expect that allowing B.P. to wear a recording device at school would deprive others students of their right to be secure. *See, e.g., C.R.*, 835 F.3d at 1152. Thus, viewed in the light most favorable to the District, a jury could reasonably find that the District was justified in refusing to allow B.P. to wear a recording device under *Tinker*.

## CONCLUSION

For the reasons stated above, the District's motions are **GRANTED IN PART** and **DENIED IN PART,** and the Plaintiffs' motion is **DENIED**.


SO ORDERED.

/s/ Nancy Torresen
United States Chief District Judge

Dated this 28th day of April, 2017.